## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JEROME CORSI,**<br><br>         **Plaintiff**,<br><br>**v.**<br><br>**ROBERT MUELLER, individually and in his official capacity as Special Counsel, FEDERAL BUREAU OF INVESTIGATION, NATIONAL SECURITY AGENCY, CENTRAL INTELLIGENCE AGENCY, UNITED STATES DEPARTMENT OF JUSTICE, JEFF BEZOS, THE WASHINGTON POST, and MANUEL ROIG-FRANZIA,**<br><br>         **Defendants**. | Civil Action No. 1:18-cv-2885-ESH<br><br>ORAL HEARING REQUESTED |

### <u>MOTION TO DISMISS OF THE POST DEFENDANTS</u>

Defendants WP Company LLC d/b/a The Washington Post (sued incorrectly herein as "The Washington Post") ("WP"), Manuel Roig-Franzia ("Mr. Roig-Franzia"), and Jeff Bezos ("Mr. Bezos") (collectively, the "Post Defendants"), by and through their undersigned counsel and pursuant to Fed. R. Civ. P. 12(b)(6), hereby respectfully move to dismiss the First Amended Complaint (ECF No. 15) (the "Complaint") in this case with prejudice, or, in in the event that the Court grants Plaintiff's pending motion for leave to amend the Complaint (ECF No. 41), to dismiss the Second Amended Complaint ("SAC") with prejudice.

In support of their motion, the Post Defendants rely on the accompanying Memorandum of Points and Authorities (the "Memorandum"), and the Declaration of Eric J. Feder and accompanying exhibits, all of which are documents that are incorporated by reference in or relied upon by the Complaint, or of which the Court can take judicial notice. *See* Memorandum at 3

n.2.  As set forth in the Memorandum, the Complaint fails to plausibly plead the elements of a

defamation claim or a tortious interference with business relationships claim, and, as such, fails

to state a claim as a matter of law.

Because amendment of the Complaint would be futile, the Complaint should be

dismissed with prejudice.

**Application of this Motion to Second Amended Complaint**

After the Post Defendants were served with the Complaint, counsel for the parties

conferred regarding a schedule for the Post Defendants to respond to the Complaint, and

Plaintiff's counsel stated that Plaintiff intended to file a motion for leave to file a Second

Amended Complaint, the granting of which would render the Complaint moot.  *See* ECF Nos.

33, 37.  On May 15, 2019, the Court issued a minute order setting the deadline for the Post

Defendants to respond to the Complaint as June 12, 2019, and, in the event Plaintiff filed his

motion for leave by May 17, 2019, and the Court granted said motion, that the deadline for the

Post Defendants to respond to the Second Amended Complaint be set as June 12, 2019.

On May 30, 2019, Plaintiff filed a motion for leave to file a Second Amended Complaint

with the consent of the Post Defendants.  *See* ECF No. 41 (the "Motion for Leave").  The Motion

for Leave remains pending.  As of this filing, the operative complaint in this case is the

Complaint.

The allegations against the Post Defendants in the proposed SAC are identical to those in

the Complaint.  Therefore, the arguments set forth in the attached Memorandum of Points and

Authorities apply with equal force to the Complaint and the proposed SAC.  Accordingly, the

Post Defendants respectfully request that, in the event the Court grants Plaintiff's motion to

amend, the Court deem this motion as applying to the SAC.

## REQUEST FOR HEARING

The Post Defendants respectfully request a hearing on their motion to dismiss.

Dated: June 12, 2019

Respectfully submitted,

/s/ *Laura R. Handman*

Laura R. Handman (DC Bar No. 444386)
Eric J. Feder (DC Bar No. 1048522)

DAVIS WRIGHT TREMAINE LLP

1919 Pennsylvania Avenue, N.W., Suite 800
Washington, DC  20006-3401
(202) 973-4200
(202) 973-4499 (fax)
laurahandman@dwt.com
ericfeder@dwt.com

*Attorneys for Defendants WP Company LLC d/b/a
The Washington Post, Manuel Roig-Franzia, and
Jeff Bezos*

3

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 12, 2019, I will electronically file the foregoing Post

Defendants' Motion to Dismiss, Memorandum of Points and Authorities, Declaration of Eric J.

Feder (and accompanying exhibits), and Proposed Order using the CM/ECF system, which will

send a notification of electronic filing to the parties.

/s/*Laura R. Handman*

LAURA R. HANDMAN

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **JEROME CORSI,**<br><br>                    **Plaintiff**,<br><br>**v.**<br><br>**ROBERT MUELLER, individually and in his official capacity as Special Counsel, FEDERAL BUREAU OF INVESTIGATION, NATIONAL SECURITY AGENCY, CENTRAL INTELLIGENCE AGENCY, UNITED STATES DEPARTMENT OF JUSTICE, JEFF BEZOS, THE WASHINGTON POST, and MANUEL ROIG-FRANZIA,**<br><br>                    **Defendants**. | Civil Action No. 1:18-cv-2885-ESH<br><br><br>ORAL HEARING REQUESTED |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS COMPLAINT BY DEFENDANTS WP COMPANY LLC d/b/a
THE WASHINGTON POST, MANUEL ROIG-FRANZIA, AND JEFF BEZOS**

Laura R. Handman (DC Bar No. 444386)
Eric J. Feder (DC Bar No. 1048522)

DAVIS WRIGHT TREMAINE LLP

1919 Pennsylvania Avenue, N.W., Suite 800
Washington, DC  20006-3401
(202) 973-4200
(202) 973-4499 (fax)
laurahandman@dwt.com
ericfeder@dwt.com

*Attorneys for Defendants Jeff Bezos, WP Company
LLC and Manuel Roig-Franzia*

# TABLE OF CONTENTS

**Page**

**TABLE OF AUTHORITIES** .................................................................................. iii

**PRELIMINARY STATEMENT** .......................................................................... 1

**STATEMENT OF FACTS** ................................................................................... 3

    **A.**    Background ................................................................................. 3

    **B.**    The Complaint's Allegations Regarding the Post's Reporting ......................... 5

    **C.**    Subsequent Developments .......................................................... 7

**ARGUMENT** ....................................................................................................... 9

    **I.**    COURTS SHOULD APPLY THE PLAUSIBILITY STANDARD ON A MOTION TO DISMISS TO DISPOSE OF LIBEL CLAIMS AS EARLY AS POSSIBLE ...................................................................... 9

    **II.**    PLAINTIFF DOES NOT—AND CANNOT—PLEAD A PLAUSIBLE DEFAMATION CLAIM ........................................................... 11

        **A.**    Plaintiff Fails to Adequately Allege That a Defamatory Statement About Him Was "Published" ................................... 11

            **1.**    The Elements of a Defamation Claim Must Be Pleaded With Particularity ...................................................... 12

            **2.**    Plaintiff Does Not Allege the Actual Words or Circumstances of Publication of any Allegedly Defamatory Statement ............................................ 14

        **B.**    Plaintiff Does Not Plausibly Plead That Any Statements Were Made With "Actual Malice" ................................................. 18

            **1.**    Plaintiff Is Indisputably A Public Figure ................................. 18

            **2.**    Plaintiff Does Not Plausibly Allege the Post Defendants Were Aware of the Falsity of the Statements ........................ 20

        **C.**    Plaintiff Should not be Permitted to Amend his Complaint Yet Again .................................................................................. 23

    **III.**    THE TORTIOUS INTERFERENCE CLAIM FAILS AS A MATTER OF LAW ..................................................................................... 24

    **A.**    **Plaintiff Cannot Plead A Tortious Interference Claim Based on the Same Conduct Underlying His Meritless Defamation Claim**....... 24

    **B.**    **Plaintiff Does Not Plausibly Allege the Elements of a Tortious Interference Claim**................................................................................ 26

**IV.**    **THE CLAIMS AGAINST DEFENDANT BEZOS ARE PATENTLY MERITLESS**....................................................................................... 30

**CONCLUSION** ................................................................................................ 33

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Abbas v. Foreign Policy Grp., LLC*,
    783 F.3d 1328 (D.C. Cir. 2015) ............................................................................16, 17, 24

*Acosta Orellana v. CropLife Int'l*,
    711 F. Supp. 2d 81 (D.D.C. 2010) ........................................................................................32

*Adams v. Martinsville Dupont Credit Union*,
    573 F. Supp. 2d 103 (D.D.C. 2008) ......................................................................................13

*Am. Petroleum Inst. v. Technomedia Int'l, Inc.*,
    699 F. Supp. 2d 258 (D.D.C. 2010) ......................................................................................12

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ......................................................................................9, 10, 21, 32

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................................................10, 15, 16, 18

*Bennett Enters., Inc. v. Domino's Pizza, Inc.*,
    45 F.3d 493 (D.C. Cir. 1995) ......................................................................................26, 28, 29

*Biro v. Condé Nast*,
    807 F.3d 541 (2d Cir. 2015) ......................................................................................10

*Boley v. Atl. Monthly Grp.*,
    950 F. Supp. 2d 249 (D.D.C. 2013) ......................................................................................17, 18

*Brown & Williamson Tobacco Corp. v. Jacobson*,
    713 F.2d 262 (7th Cir. 1983) ......................................................................................29

*Browning v. Clinton*,
    292 F.3d 235 (D.C. Cir. 2002) ......................................................................................12, 25

*Campbell v. Citizens for an Honest Gov't, Inc.*,
    255 F.3d 560 (8th Cir. 2001) ......................................................................................21

*Carty v. CVS Pharmacy, LLC*,
    264 F. Supp. 3d 190 (D.D.C. 2017) ......................................................................................31

*Caudle v. Thomason*,
    942 F. Supp. 635 (D.D.C. 1996) ......................................................................................12

*Coates v. Law Sch. Admission Council*,
    No. 05-cv-641, 2005 WL 3213960 (D.D.C. Oct. 25, 2005) .............................................12, 14

*Command Consulting Grp., LLC v. Neuraliq, Inc.*,
    623 F. Supp. 2d 49 (D.D.C. 2009) ........................................................................................26

*Corsi v. Stone*,
    No. 19-cv-324-TJK (D.D.C. Feb. 7, 2019) ..............................................................................8

*Deripaska v. Associated Press*,
    282 F. Supp. 3d 133 (D.D.C. 2017) ............................................................................... *passim*

*In re Domestic Airline Travel Antitrust Litig.*,
    221 F. Supp. 3d 46 (D.D.C. 2016) ...........................................................................................3

*Econ. Research Servs., Inc. v. Resolution Econ., LLC*,
    208 F. Supp. 3d 219 (D.D.C. 2016) .......................................................................................27

*Fairbanks v. Roller*,
    314 F. Supp. 3d 85 (D.D.C. 2018) ...................................................................................22, 23

*Farah v. Esquire Magazine*,
    863 F. Supp. 2d 29 (D.D.C. 2012), *aff'd*, 736 F.3d 528 (D.C. Cir. 2013)....................3, 11, 25

*Franklin v. Pepco Holdings, Inc. (PHI)*,
    875 F. Supp. 2d 66 (D.D.C. 2012) .........................................................................................12

*Furash & Co. v. McClave*,
    130 F. Supp. 2d 48 (D.D.C. 2001) .........................................................................................29

*Genetic Sys. Corp. v. Abbott Labs.*,
    691 F. Supp. 407 (D.D.C. 1988) ............................................................................................26

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974).................................................................................................................19

*Ghawanmeh v. Islamic Saudi Acad.*,
    672 F. Supp. 2d 3 (D.D.C. 2009) ...........................................................................................13

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989).................................................................................................................21

*Hoffman v. Hill & Knowlton, Inc.*,
    777 F. Supp. 1003 (D.D.C. 1991) ..........................................................................................13

*Hourani v. Mirtchev*,
    796 F.3d 1 (D.C. Cir. 2015) ..............................................................................................17, 18

*Hourani v. PsyberSolutions, LLC,*
   690 F. App'x 1 (D.C. Cir. 2017), *aff'g* 164 F. Supp. 3d 128 (D.D.C. 2016)..........................18

*Interphase Garment Solutions, LLC v. Fox Television Stations, Inc.,*
   566 F. Supp. 2d 460 (D. Md. 2008) ......................................................................................29

*James Madison Ltd. v. Ludwig,*
   82 F.3d 1085 (D.C. Cir. 1996) ..............................................................................................23

*Jankovic v. Int'l Crisis Grp.,*
   822 F.3d 576 (D.C. Cir. 2016) ..........................................................................................19, 21

*Johnson v. Comm'n on Presidential Debates,*
   202 F. Supp. 3d 159 (D.D.C. 2016), *aff'd,* 869 F.3d 976 (D.C. Cir. 2017)........................3, 26

*Kahl v. Bureau of Nat'l Affairs, Inc.,*
   856 F.3d 106 (D.C. Cir. 2017), *cert. denied,* 138 S. Ct. 366 (2017) ................................11, 18

*Kelleher v. Dream Catcher, L.L.C.,*
   221 F. Supp. 3d 157 (D.D.C. 2016) ......................................................................................31

*Kenley v. D.C.,*
   83 F. Supp. 3d 20 (D.D.C. 2015) ..........................................................................................16

*Klayman v. Judicial Watch, Inc.,*
   628 F. Supp. 2d 112 (D.D.C. 2009) ..................................................................................11, 20

*LeFande v. D.C.,*
   864 F. Supp. 2d 44 (D.D.C. 2012) ........................................................................................14

*Lohrenz v. Donnelly,*
   223 F. Supp. 2d 25 (D.D.C. 2002), *aff'd,* 350 F.3d 1272 (D.C. Cir. 2003)..........................22

*Lohrenz v. Donnelly,*
   350 F.3d 1272 (D.C. Cir. 2003) ..................................................................................20, 22, 24

*Lyles v. Hughes,*
   83 F. Supp. 3d 315 (D.D.C. 2015), *aff'd in relevant part,* No. 15-5106,
   2015 WL 9007382 (D.C. Cir. Oct. 30, 2015) ......................................................................32

*Mattiaccio v. DHA Grp., Inc.,*
   908 F. Supp. 2d 136 (D.D.C. 2012) ..................................................................................12, 15

*Mayfield v. NASCAR, Inc.,*
   674 F.3d 369 (4th Cir. 2012) ................................................................................................10

*McDonald v. Wise,*
   769 F.3d 1202 (10th Cir. 2014) ............................................................................................10

*McFarlane v. Esquire Magazine*,
    74 F.3d 1296 (D.C. Cir. 1996) ........................................................................20

*McFarlane v. Sheridan Square Press, Inc.*,
    91 F.3d 1501 (D.C. Cir. 1996) ........................................................................20

*Michel v. NYP Holdings, Inc.*,
    816 F.3d 686 (11th Cir. 2016) ........................................................................10

*Moldea v. N.Y. Times Co.*,
    22 F.3d 310 (D.C. Cir. 1994), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017) ....................25

*Montgomery v. Risen*,
    197 F. Supp. 3d 219 (D.D.C. 2016) ..................................................................25

*Motir Servs., Inc. v. Ekwuno*,
    191 F. Supp. 3d 98 (D.D.C. 2016) ...................................................................31

*Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*,
    592 F. Supp. 2d 86 (D.D.C. 2009) ...................................................................29

*Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*,
    791 F. Supp. 2d 33 (D.D.C. 2011) ...................................................................26

*Nat'l Sec. Counselors v. CIA*,
    811 F.3d 22 (D.C. Cir. 2016) ..........................................................................31

*Ning Ye v. Holder*,
    644 F. Supp. 2d 112 (D.D.C. 2009) ............................................................11, 15

*Nurriddin v. Bolden*,
    818 F.3d 751 (D.C. Cir. 2016) .......................................................................9, 10

*OAO Alfa Bank v. Center for Pub. Integrity*,
    387 F. Supp. 2d 20 (D.D.C. 2005) ...................................................................24

*Oceanic Expl. Co. v. ConocoPhillips, Inc.*,
    No. 04-cv-332, 2006 WL 2711527 (D.D.C. Sept. 21, 2006) ................................27

*Palin v. N.Y. Times Co.*,
    264 F. Supp. 3d 527 (S.D.N.Y. 2017) ..............................................................22

*Parisi v. Sinclair*,
    845 F. Supp. 2d 215 (D.D.C. 2012) .................................................................23

*Parsi v. Daioleslam*,
    890 F. Supp. 2d 77 (D.D.C. 2012) ...................................................................21

*Perry ex rel. Perry v. Frederick Inv. Corp.*,
509 F. Supp. 2d 11 (D.D.C. 2007) .......................................................................31

*PetEdge, Inc. v. Garg*,
234 F. Supp. 3d 477 (S.D.N.Y. 2017)..................................................................32

*Pippen v. NBCUniversal Media, LLC*,
734 F.3d 610 (7th Cir. 2013) ..............................................................................10

*Robles v. Kerry*,
74 F. Supp. 3d 254 (D.D.C. 2014) .........................................................................3

*Schatz v. Republican State Leadership Comm.*,
669 F.3d 50 (1st Cir. 2012)...........................................................................10, 21

*Sharpe v. Am. Acad. of Actuaries*,
285 F. Supp. 3d 285 (D.D.C. 2018) .....................................................................26

*Soliman v. George Washington Univ.*,
658 F. Supp. 2d 98 (D.D.C. 2009) .......................................................................29

*Stovell v. James*,
810 F. Supp. 2d 237 (D.D.C. 2011) ...............................................................12, 13

*Tannerite Sports, LLC v. NBCUniversal News Grp*,
864 F.3d 236 (2d Cir. 2017)................................................................................13

*Tavoulareas v. Piro*,
817 F.2d 762 (D.C. Cir. 1987) ..................................................................20, 21, 24

*Tressler v. Nat'l R.R. Passenger Corp.*,
819 F. Supp. 2d 1 (D.D.C. 2011) ...................................................................12, 13

*United States ex rel. Landis v. Tailwind Sports Corp.*,
51 F. Supp. 3d 9 (D.D.C. 2014) ...........................................................................31

*Vreven v. Am. Ass'n of Retired Persons*,
604 F. Supp. 2d 9 (D.D.C. 2009) ...................................................................12, 15

*Weyrich v. New Republic, Inc.*,
235 F.3d 617 (D.C. Cir. 2001) ............................................................................17

*Wiggins v. Philip Morris, Inc.*,
853 F. Supp. 458 (D.D.C. 1994) ..........................................................................13

*Xereas v. Heiss*,
933 F. Supp. 2d 1 (D.D.C. 2013) ....................................................................26, 27

*Zandford v. Nat'l Ass'n of Sec. Dealers*,
  19 F. Supp. 2d 1 (D.D.C. 1998) ...........................................................................25

*Zimmerman v. Al Jazeera Am., LLC*,
  246 F. Supp. 3d 257 (D.D.C. 2017) ......................................................................21

**State Cases**

*Guilford Transp. Indus., Inc. v. Wilner*,
  760 A.2d 580 (D.C. 2000) ....................................................................................24

*Highland Capital Mgmt., L.P. v Dow Jones & Co.*,
  No. 151322/2018, 2018 WL 4668424 (Sup. Ct. N.Y. Cty. Sept. 28, 2018) ..........................30

*Huggins v. Povitch*,
  No. 131164/94, 1996 WL 515498 (Sup. Ct. N.Y. Cty. 1996) .................................30

*Lawlor v. D.C.*,
  758 A.2d 964 (D.C. 2000) ....................................................................................31

*Seminole Tribe of Fla. v. Times Publ'g Co.*,
  780 So. 2d 310 (Fla. Dist. Ct. App. 2001) ...........................................................29

**Federal Statutes**

39 U.S.C. § 3685 ............................................................................................................3

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ....................................................................9

**Constitutional Provisions**

U.S. Const.
  amend. I .............................................................................................9, 10, 11
  amend. IV ...........................................................................................................4

**Other Authorities**

Anna Schechter, *Roger Stone pal Jerome Corsi says Mueller is planning to indict
  him*, NBC News (Nov. 12, 2018) ........................................................................19

Chuck Ross, *Exclusive: Jerome Corsi Reveals Why He is In Mueller's Crosshairs*,
  The Daily Caller (Nov. 13, 2018) ........................................................................19

Jeff Pegues, *Jerome Corsi: "They may come in right here and indict me,"*
  CBS News (Dec. 11, 2018) ...................................................................................19

Jerome R. Corsi Ph.D., *Silent No More: How I Became a Political Prisoner of Mueller's "Witch Hunt"* (Dec. 11, 2018) ...................................................................5, 8, 28

Maggie Haberman, *Jerome Corsi, Conspiracy Theorist, Is Subpoenaed in Mueller Investigation*, N.Y. Times (Sept. 5, 2018) ...............................................................................4

Rosalind S. Helderman, *Inside the special counsel's long hunt to uncover whether the Trump campaign conspired with Russia*, Wash. Post (Apr. 21, 2019) ..............................8

Shelby Holliday, et al., *Jerome Corsi Says Roger Stone Sought "Cover Story" for 2016 Tweet*, Wall Street Journal (Nov. 28, 2018)...................................................................19

Tucker Carlson, *Jerome Corsi: Robert Mueller wanted me to lie*, Fox News (Dec. 3, 2018) .....................................................................................................................19

Defendants WP Company LLC d/b/a The Washington Post ("WP"), Manuel

Roig-Franzia ("Mr. Roig-Franzia"), and Jeff Bezos ("Mr. Bezos") (collectively, the "Post

Defendants") respectfully submit this memorandum of points and authorities in support of their

motion to dismiss the First Amended Complaint filed by Plaintiff Jerome Corsi ("Plaintiff")

(ECF No. 15) (the "Complaint") with prejudice, or, in the event that the Court grants Plaintiff's

pending motion for leave to amend the Complaint (ECF No. 41), to dismiss the Second

Amended Complaint ("SAC") with prejudice.[1]

## PRELIMINARY STATEMENT

In a typical libel case, the plaintiff files suit *after* an article is published, then lays out in

his complaint how and why the statements contained in the publication are false and defamatory.

In this case, Plaintiff Jerome Corsi ("Plaintiff" or "Corsi") went a different route.  After being

contacted by Defendant Roig-Franzia, a reporter for *The Washington Post* (the "Post"), Plaintiff

rushed into court to tack on vaguely pleaded claims against the Post Defendants to his already

pending case against Defendant Robert Mueller and various government agencies (collectively,

the "Government Defendants"), which arises out of Plaintiff's involvement as a witness in the

investigation into Russian interference with the 2016 presidential election by Defendant Mueller

and the Office of Special Counsel ("OSC").

The claims against the Post Defendants—for defamation and "tortious interference with

business relationships"—fail as a matter of law for several reasons.

---

[1] As of this filing, the operative complaint is the Complaint, filed on January 21, 2019.  The allegations against the Post Defendants in the proposed SAC are identical to those in the Complaint.  Therefore, the arguments set forth herein will apply with equal force to the SAC.  In the event the Court grants Plaintiff's motion for leave to amend, the Post Defendants request that the Court deem this motion as applying to the SAC.  For the Court's convenience, we cite paragraph numbers from both the Complaint and SAC where those numbers differ using the format "Compl. ¶ [paragraph number in the Complaint]/[paragraph number in the SAC]."

For his defamation claim, Plaintiff does not identify the actual language over which is suing, and fails to clearly allege the most basic element of a defamation claim: that any defamatory statements were published to third parties.  Even if he had done so, he does not plausibly allege that the Post Defendants made or published any statements with actual malice—that is, with knowledge of falsity or serious doubts as to the truth—which, as a public figure, he must do.  Plaintiff's allegation of an elaborate conspiracy between Defendant Mueller and Defendant Jeff Bezos to "take down" President Trump by "financially deplet[ing]" Plaintiff is a red herring—it is black letter law that ill will or political opposition does not constitute actual malice.  In any event, Plaintiff alleges absolutely nothing to support his absurd contention that Mr. Bezos ("acting in concert with Defendant Mueller," no less) "directed" the Post to carry out a scheme to "destroy" Plaintiff's business relationships, and the inclusion of Mr. Bezos as an individual defendant in the case is frivolous.

The tortious interference claim fares no better.  That claim must be dismissed in the first instance because it is based on the same conduct as Plaintiff's deficient defamation claim.  But Plaintiff also fails to plausibly plead that continuation of the "business relationship" he alleges was disrupted was commercially reasonable to expect.  And he does not allege that the Post Defendants specifically intended to interfere with Plaintiff's business relationships, as opposed to simply reporting the news, which courts have held cannot be a predicate act for this tort.

Finally, although the Post subsequently published articles regarding Plaintiff and the OSC investigation *after* the Complaint was filed, when Plaintiff filed his motion for leave to file the SAC on May 30, 2019 (after repeated delays), Plaintiff did not seek to add any new allegations to assert a claim based on any article published by the Post.  In any event, Plaintiff could not plead a viable claim as to what the Post actually published.  And Plaintiff should not be

permitted to endlessly amend his complaint to try to find a way to assert these meritless claims

against the Post Defendants.  Both the Complaint and the SAC fail to state a claim against the

Post Defendants, and should be dismissed with prejudice.

## STATEMENT OF FACTS[2]

### A.      Background

Defendant WP is the publisher of the Post, and Mr. Roig-Franzia is employed by WP as a

reporter for the Post.  Compl. ¶¶ 12-13.  Plaintiff alleges that Mr. Bezos is the "owner and Chief

Operating Officer ('CEO') [*sic*] of The Washington Post."  *Id.* ¶ 11.  In fact, Mr. Bezos is the

owner of Nash Holdings LLC, which, in turn, owns WP, and he is neither the Chief Operating

Officer nor the "CEO" of WP.[3]

---

[2] The facts set forth here are based on the allegations of the Complaint, documents that are incorporated by reference in the Complaint or on which the Complaint "necessarily relies," and matters of which the Court can take judicial notice, all of which may be considered by this Court on a motion to dismiss.  *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 54–55 (D.D.C. 2016).  As this Court has recognized, "[j]udicial notice is properly taken of publicly available historical articles" about the broader context in which an allegedly defamatory statement was made.  *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 140 (D.D.C. 2017) (Huvelle, J.) (citation omitted).  *See id.* at 146 (finding, based on "readily available, judicially noticeable information" that Oleg Deripaska "openly associates himself with the Russian government"); *Farah v. Esquire Magazine*, 863 F. Supp. 2d 29, 35 (D.D.C. 2012) (affirming appropriateness of the consideration of a broad range of materials, including "various Internet postings" to establish the political context of satirical article related to "birther" controversy), *aff'd*, 736 F.3d 528, 534 (D.C. Cir. 2013).  Judicial notice also may also be taken of "public records and government documents available from reliable sources."  *Johnson v. Comm'n on Presidential Debates*, 202 F. Supp. 3d 159, 167 (D.D.C. 2016), *aff'd*, 869 F.3d 976 (D.C. Cir. 2017); *see also Robles v. Kerry*, 74 F. Supp. 3d 254, 256 n.1 (D.D.C. 2014) ("In ruling on Defendants' motion to dismiss, the Court may consider court filings and … exhibits because they constitute 'matters of which it may take judicial notice.'") (citation omitted).

[3] This Court can take judicial notice of the Post's ownership and management, which is set forth in documents submitted to the United States Postal Service in compliance with 39 U.S.C. § 3685 (and published annually in the newspaper), and on the Post's masthead, which appears daily in the newspaper.  *See supra* note 2; Declaration of Eric J. Feder ("Feder Decl.") Exs. 1 and 2.

Plaintiff describes himself in his Complaint as "a recognized and distinguished investigative conservative journalist and author who has written … 20 books since 2004, seven (7) of which were New York Times best-selling books, and two (2) of which were number one (1) bestselling books," and notes that he is a "supporter of President Donald J. Trump."  Compl. ¶ 15.

Plaintiff became involved in the OSC investigation due to his alleged connections to Roger Stone, an adviser to then-candidate Trump, who had appeared to possess advance knowledge of the release by Wikileaks of particular emails from Hillary Clinton's presidential campaign.[4]  According to Plaintiff, the OSC "demanded that Plaintiff Corsi falsely testify under oath that he acted as a liaison between Roger Stone and Wikileaks leader Julian Assange concerning the public release of emails obtained from the DNC's servers."  *Id.* ¶ 23.  Plaintiff alleges that, in fact, he was able to predict that particular emails were going to be released by Wikileaks based on "logical investigative deduction," and not from any communications with Wikileaks or anyone else involved in the hacking of the email servers.  *Id.* ¶ 21.

On December 9, 2018, Plaintiff initiated this case by filing a complaint against the Government Defendants, asserting two claims—violations of Plaintiff's Fourth Amendment rights and violation of grand jury secrecy provisions (against only Mr. Mueller).  *See* ECF No. 1 at 6, 8.  Plaintiff alleged that the OSC had unlawfully surveilled Plaintiff's communications without probable cause, in violation of the Fourth Amendment.  *See id.* ¶¶ 26-27.  He also alleged that Defendant Mueller and the OSC had unlawfully leaked grand jury information,

---

[4] *See* Maggie Haberman, *Jerome Corsi, Conspiracy Theorist, Is Subpoenaed in Mueller Investigation*, N.Y. Times (Sept. 5, 2018), https://nyti.ms/2CycTy3.

pointing to an article published by ABC News that he alleges contains grand jury information "that could only possibly have come from Defendant Mueller."  *Id.* ¶ 23.

Two days later, Plaintiff published an e-book called *Silent No More: How I Became a Political Prisoner of Mueller's "Witch Hunt,"* in which he detailed the "Kafkaesque nightmare" of his experience being investigated by the OSC.  *See* Compl. ¶ 34 (discussing publication of book); Feder Decl. Ex. 3 ("*Silent No More*") at 9.[5]  In the book, he describes in detail the "grueling" meetings (totaling over forty hours) he and his lawyer had with investigators and attorneys from the OSC, his testimony before the Grand Jury convened by the OSC, and how he turned over his phone, computers, and backup data storage devices, and granted the OSC access to his email and social media accounts.  *See Silent No More* at 187-88.

## B.    The Complaint's Allegations Regarding the Post's Reporting

On January 21, 2019, Plaintiff filed the Complaint, which added the Post Defendants as defendants in the case, and added three additional causes of action.  Plaintiff added a claim for Abuse of Process, which appears to be directed only at the Government Defendants, as well as a claim for Tortious Interference with Business Relationships against both the Government Defendants and the Post Defendants, and a claim for defamation against only the Post Defendants.  *See* Compl. at 14-18 (Third, Fourth and Fifth Causes of Action, respectively).[6]

---

[5] The e-book version of *Silent No More* has a publication date of December 11, 2018 listed on Amazon.com.  *See* https://www.amazon.com/dp/B07LB9HT2F.  The hardcover version of *Silent No More* has a publication date of March 12, 2019.  *See* https://www.amazon.com/Silent-No-More-Political-Prisoner/dp/1642932175/.

[6] With respect to the First and Third Causes of Action, Plaintiff alleges that "Defendants, each and every one of them, acting in concert jointly and severally" committed the tortious acts, Compl. ¶¶ 44, 55/59, but alleges specific actions that could only be taken by the Government Defendants.  *See, e.g.*, *id.* ¶ 44 (alleging that defendants "unreasonably searched and seized … Plaintiff's phone"), ¶ 55/59 (alleging that defendants "abused and perverted the Court's judicial process by threatening Plaintiff Corsi with prosecution and prison if he did not provide sworn testimony that Defendants knew to be false").  Similarly, he does not differentiate between the

As to the Post Defendants, Plaintiff alleges that, on January 17, 2019, during the course of reporting a news article about Plaintiff and his role in the OSC investigation, Mr. Roig-Franzia spoke to Plaintiff by phone to "question him" about "information" that the OSC "was investigating monthly payments, which were characterized falsely and maliciously published as hush payments to Dr. Corsi so he would not provide 'incriminating evidence,' about Alex Jones, InfoWars and Roger Stone before Defendant Mueller and the grand jury."  Compl. ¶ 36. Plaintiff alleges that the "hush money payments to Plaintiff Corsi were maliciously and falsely represented to be made by Dr. David Jones, father of Alex Jones of Infowars," and were in the amount of "$15,000/month," which he was still, as of that day, "being paid."  *Id.* ¶¶ 36, 38. Plaintiff concedes that he was receiving such payments, but alleges that the money was "legitimately earned compensation."  *Id.* ¶¶ 68/72-69/73.

Despite the allegation that the "characteriz[ation]" of the payments as "hush payments" was "published," Plaintiff's Complaint does not allege that anyone other than Plaintiff and Roig-Franzia were on that telephone call.  In a similar vein, Plaintiff alleges that, "[a]s a direct result" of the Post Defendants' "actions," "the very next day Plaintiff Corsi learned from Dr. David Jones that he was being terminated and would no longer be receiving $15,000 per month."  *Id.* ¶ 39.  However, again, it is not clear from the Complaint what "actions" Plaintiff is alleging the Post Defendants took to bring about this result.  Plaintiff later alleges that the Post Defendants "made" the statements that Plaintiff "was accepting 'hush money'" to "various news and media

---

two categories of defendants when he alleges that they tortiously interfered with his business relationship with the publisher and distributor of his book, but the alleged interference took the form of "threaten[ing] Amazon" with a subpoena to obtain a copy of the book for the OSC investigation.  *Id.* ¶ 34.   He therefore does not appear to be asserting those claims against the Post Defendants.  To the extent he is doing so, he has not alleged a single fact that would plausibly establish liability on the part of the Post Defendants for those claims, and they should be dismissed along with the other claims.

outlets," which Plaintiff alleges is "evidenced by the fact that the very next day, Plaintiff Corsi

learned from Dr. David Jones that he was being terminated and would no longer be receiving

$15,000 per month."  Compl. ¶¶ 67/71, 69/73.  But Plaintiff does not identify any such "news

and media outlets," how any such communications were made, nor any basis to believe that these

specific communications took place.

Plaintiff ultimately rests his claims against the Post Defendants on the notion that

Defendant Bezos is an "ultra-leftist" who is "vehemently anti-Trump," and therefore, "acting in

concert with Defendant Mueller," Mr. Bezos "directed" the other Post Defendants to interfere

with Plaintiff's relationship with Infowars in order to "financially deplete" him so that he will be

left with "no choice but to provide the false sworn testimony they seek in order to accomplish

their designs to take down President Trump and have him removed from office, if not criminally

prosecuted."  Compl. ¶¶ 41, 63/67.  Notably, Plaintiff does not allege a single fact to plausibly

back up this convoluted conspiracy theory.

### C.      Subsequent Developments

Three days after the Complaint against the Post Defendants was filed, on January 21,

2019 (ECF No. 15), the Post published an article under the joint bylines of Rosalind S.

Helderman and Defendant Roig-Franzia under the headline "Witness in special counsel probe,

former Stone associate, collected payments from Infowars through job Stone arranged."  *See*

Feder Decl. Ex. 4 (the "Post Article").  The Post Article does not report that Plaintiff was

receiving "hush money" from Infowars.  Rather, the Post Article reports only that Mr. Mueller

and the OSC had "*asked questions* about [Plaintiff's] payments from Infowars," and that

"Mueller's team appears to be *exploring whether* the payments were made to ensure that Corsi

would offer investigators a version of events favorable to Stone."  *Id.* at 1 (emphasis added).  The

Post Article also includes denials from Plaintiff, Roger Stone, Alex Jones and an attorney for Infowars.  *Id.* at 2-3.

Plaintiff did not serve the Complaint on any of the Post Defendants until April 9, 2019. *See* ECF No. 33 ("First Consent Motion") at 1-2.  By that time, Plaintiff had filed new lawsuits against Roger Stone,[7] and against Infowars, Alex Jones, and David Jones.[8]  In these new complaints, Plaintiff asserts claims for, *inter alia*, defamation, intentional infliction of emotional distress, and assault.  The defamation claims concern statements made by Roger Stone, Alex Jones and others in videos and articles posted on the Infowars website, starting on October 26, 2018, but with many of the allegedly defamatory statements posted in early-middle January 2019.  *See* Stone Complaint ¶¶ 16-29; Infowars Complaint ¶¶ 42-69.

Plaintiff had also publicly stated on social media that he intended to add additional claims against the Post Defendants, specifically concerning another article reporting on his involvement with the OSC investigation, which was published in the Post on April 21, 2019.[9]

When counsel for the Post Defendants contacted Plaintiff's counsel to discuss a schedule for responding to the Complaint, he stated that Plaintiff was imminently going to file a motion for leave to file a second amended complaint, which would render the First Amended Complaint moot.  *See* First Consent Motion at 2.  The Post Defendants consented to this motion and, in a

---

[7] *See Corsi v. Stone*, No. 19-cv-324-TJK (D.D.C. Feb. 7, 2019), ECF No. 1, also attached as Feder Decl. Ex. 5 (the "Stone Complaint").

[8] *Corsi, et al. v. Infowars, LLC*, No. 19-cv-00656 (D.D.C. Mar. 7, 2019), ECF No. 1, also attached as Feder Decl. Ex. 6 (the "Infowars Complaint").

[9] *See* Rosalind S. Helderman, *Inside the special counsel's long hunt to uncover whether the Trump campaign conspired with Russia*, Wash. Post (Apr. 21, 2019), https://wapo.st/2UNhFjz (the "April Article").  *See also* Jerome R. Corsi, Ph.D (@jerome_corsi), Twitter (Apr. 24, 2019 6:36 a.m.), https://twitter.com/jerome_corsi/status/1121015101295931392 (linking to April Article and stating that the Post "[w]ant[s] to discredit my SILENT NO MORE by defaming me. My attorneys are preparing to add to my federal lawsuit against WaPo").

consent motion filed April 29, 2019, the parties agreed to a placeholder deadline of May 14, 2019 to respond to the Complaint in the meantime.  *See id.*  By May 13, 2019, the day before that deadline, Plaintiff had still not filed a motion for leave to amend his complaint, so the Post Defendants filed another consent motion for an extension of time that contemplated Plaintiff's filing his motion by May 17, 2019, setting June 12, 2019 as the deadline to answer the Complaint in the interim.  *See* ECF No. 37.  However, Plaintiff did not file his motion for leave to file the SAC until May 30, 2019.  *See* ECF No. 41.

After the repeated delays and threats to add new claims against the Post Defendants, the proposed SAC differs from the Complaint only in that it contains an additional cause of action against Defendant Mueller for "First Amendment Retaliation."  *See* SAC ¶¶ 49-52.  Plaintiff did not add any new allegations as to the Post Defendants, and, in particular, did not add any allegations to address the Post Article or otherwise identify a specific allegedly defamatory publication about Plaintiff by the Post Defendants.

As in the Complaint, the SAC seeks general and compensatory damages "in excess of $25,000,000.00 million USD [*sic*]" and for "punitive damages in excess of $1,350,000,000.000 billion USD [*sic*] … which includes in excess of $800,000,000.00 million USD [*sic*] in punitive damages against Defendant Bezos's [*sic*] (5% of his net worth) alone."  SAC at 18-19; *see also* Compl. at 18.

## ARGUMENT

## I.    COURTS SHOULD APPLY THE PLAUSIBILITY STANDARD ON A MOTION TO DISMISS TO DISPOSE OF LIBEL CLAIMS AS EARLY AS POSSIBLE

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009)).  A plaintiff's obligation to provide the grounds of her entitlement to relief

"requires more than labels and conclusions."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007).  In determining that issue, the court need not "accept legal conclusions couched as

factual allegations" nor should the court "accept inferences drawn by a plaintiff if such

inferences are unsupported by the facts set out in the complaint."  *Nurriddin*, 818 F.3d at 756

(citation omitted); *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements, do not suffice.").

     This Court has recognized that courts in this Circuit—in line with the decisions of every

Circuit to have considered the issue[10]—consistently hold that the *Twombly/Iqbal* pleading

standard applies in defamation actions, including to the pleading of "actual malice," the fault

standard that must be met by a public figure such as Plaintiff Jerome Corsi.  *See Deripaska*, 282

F. Supp. 3d at 143 (collecting cases).  As the Eleventh Circuit aptly explained, "application of

the plausibility pleading standard makes particular sense when examining public figure

defamation suits.  In these cases, there is a powerful interest in ensuring that free speech is not

unduly burdened by the necessity of defending against expensive yet groundless litigation."

*Michel*, 816 F.3d at 702.  The D.C. Circuit is in accord, noting that "the Supreme Court has

directed courts to expeditiously weed out unmeritorious defamation suits" in order to "preserve

First Amendment freedoms and give reporters, commentators, bloggers, and tweeters (among

others) the breathing room they need to pursue the truth," without being subjected to "[c]ostly

---

[10] *See Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016); *Biro v. Condé Nast*, 807 F.3d 541, 544–45 (2d Cir. 2015); *McDonald v. Wise*, 769 F.3d 1202, 1220 (10th Cir. 2014); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013); *Mayfield v. NASCAR, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012).

and time-consuming defamation litigation." *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017) (Kavanaugh, J.), *cert. denied*, 138 S. Ct. 366 (2017).[11]

## II.     PLAINTIFF DOES NOT—AND CANNOT—PLEAD A PLAUSIBLE DEFAMATION CLAIM

To establish a *prima facie* case of defamation, a plaintiff must allege: "(i) a false and defamatory statement was written by the defendant about the plaintiff; (ii) the defendant published it without privilege to a third party; (iii) the defendant exhibited some fault in publishing the statement; and (iv) the statement is actionable as a matter of law or the publication has caused the plaintiff special harm." *Ning Ye v. Holder*, 644 F. Supp. 2d 112, 116–17 (D.D.C. 2009) (Huvelle, J.) (citations omitted).  Where, as here, the plaintiff is a public figure, the "fault" necessary to sustain a claim is "actual malice"—that is, "that the defendant either knew the statement to be false or that the defendant 'in fact entertained serious doubts as to the truth of his publication.'" *Klayman v. Judicial Watch, Inc.*, 628 F. Supp. 2d 112, 154 (D.D.C. 2009) (citation omitted).

Plaintiff fails completely to allege these elements with either particularity or plausibility.

### A.     Plaintiff Fails to Adequately Allege That a Defamatory Statement About Him Was "Published"

Plaintiff's allegations as to the basic elements of his defamation claim are impossibly vague.  This alone is fatal to his claim.

---

[11] *See also Farah*, 736 F.3d at 534 ("[S]ummary proceedings are essential in the First Amendment area because if a suit entails 'long and expensive litigation,' then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails.") (citation omitted).

    **1.**    **The Elements of a Defamation Claim Must Be Pleaded With Particularity**

Courts in this Circuit frequently hold that "a plaintiff bringing a defamation claim must specifically 'plead the time, place, content, speaker, and listener of the alleged defamatory matter.'" *Franklin v. Pepco Holdings, Inc. (PHI)*, 875 F. Supp. 2d 66, 75 (D.D.C. 2012) (quoting *Stovell v. James*, 810 F. Supp. 2d 237, 248 (D.D.C. 2011)); *see also Mattiaccio v. DHA Grp., Inc.*, 908 F. Supp. 2d 136, 137–39 (D.D.C. 2012); *Coates v. Law Sch. Admission Council*, No. 05-cv-641, 2005 WL 3213960, at *2 (D.D.C. Oct. 25, 2005). These allegations "must be pled with sufficient particularity to provide the opposing party with opportunity to prepare responsive pleadings." *Tressler v. Nat'l R.R. Passenger Corp.*, 819 F. Supp. 2d 1, 6 (D.D.C. 2011); *see also Am. Petroleum Inst. v. Technomedia Int'l, Inc.*, 699 F. Supp. 2d 258, 268 (D.D.C. 2010) ("plaintiff must adequately identif[y] third parties, or 'listeners,' with sufficient specificity to enable the defendant to answer the complaint") (quoting *Vreven v. Am. Ass'n of Retired Persons*, 604 F. Supp. 2d 9, 15–16 (D.D.C. 2009)) (quotation marks omitted). Accordingly, courts do not hesitate to dismiss complaints like the one in this case, which contain only "vague and amorphous" allegations of when, how, and to whom allegedly defamatory statements were published. *Vreven*, 604 F. Supp. 2d at 15. *See Browning v. Clinton*, 292 F.3d 235, 247 (D.C. Cir. 2002) (holding that complaint that "vaguely alleges" on information and belief that document was "published … to other individuals" "failed to plead a critical element of defamation, i.e., that [the defendant] 'published' the defamatory statement").

It has also long been held that, "[i]n order to plead defamation, a plaintiff should allege specific defamatory comments." *Caudle v. Thomason*, 942 F. Supp. 635, 638–39 (D.D.C. 1996) Courts have explained that "[t]he use of *in hac verba* pleadings on defamation charges is favored in the federal courts because generally knowledge of the exact language used is necessary to

form responsive pleadings." *Wiggins v. Philip Morris, Inc.*, 853 F. Supp. 458, 465–66 (D.D.C. 1994) (citation omitted); *see also Hoffman v. Hill & Knowlton, Inc.*, 777 F. Supp. 1003, 1005 (D.D.C. 1991) (same). Thus, a court must dismiss libel claims where the complaint "fail[s] to identify the specific statements alleged to be defamatory." *Stovell*, 810 F. Supp. 2d at 248; *see also Tressler*, 819 F. Supp. 2d at 6–7 (holding that plaintiff's "defamation claim must be dismissed" where complaint "fail[ed] to describe the content or substance of the supposed defamatory statements" with "specificity").

Setting forth the allegedly defamatory language in a complaint is critical because "[w]ithout any information whatsoever about the actual words that were allegedly used, neither the Court nor defendants can assess whether plaintiff has stated a plausible claim for relief sufficient to support an inference of liability." *Ghawanmeh v. Islamic Saudi Acad.*, 672 F. Supp. 2d 3, 20 (D.D.C. 2009). Where a plaintiff does not include sufficient detail about the allegedly defamatory language to enable the Court to determine whether the complaint states a claim as a matter of law, the complaint must be dismissed for failure to state a claim. *See Tressler*, 819 F. Supp. 2d at 6–7; *see also Adams v. Martinsville Dupont Credit Union*, 573 F. Supp. 2d 103, 117 (D.D.C. 2008) (holding that where "plaintiff was unable to identify any allegedly defamatory statements," the claim "fundamentally lack[ed] any factual or legal basis" and was "therefore … dismissed with prejudice"); *see also Tannerite Sports, LLC v. NBCUniversal News Grp*, 864 F.3d 236, 251 (2d Cir. 2017) (explaining that defamation complaint must "identify not only the publication, but also the respect in which it was allegedly false," because "[s]ome specificity is necessary so defendants and courts may address themselves to the parts of a communication alleged to be false and defamatory instead of those not objected to").

### 2. Plaintiff Does Not Allege the Actual Words or Circumstances of Publication of any Allegedly Defamatory Statement

Here, Plaintiff fails to adequately allege either the fact of publication to a third party or the specific content of the allegedly defamatory communications.

Plaintiff alleges that Defendant Roig-Franzia telephoned Plaintiff to "question him" and "grill[] him" about the payments he had received from Infowars, "which were characterized falsely and maliciously published as hush payments to Dr. Corsi," and "maliciously and falsely represented to be made by Dr. David Jones." Compl. ¶¶ 36-37. But Plaintiff does not actually allege that this "characteriz[ation]" and "represent[ation]" were "published" to anyone other than Plaintiff during that phone call. Plainly there can be no libel claim based on a conversation between a Post reporter and the Plaintiff himself. *See LeFande v. D.C.*, 864 F. Supp. 2d 44, 51 (D.D.C. 2012) ("[I]t is … essential to liability for either libel or slander that the defamation be communicated to someone other than the person defamed.") (citations omitted); *Coates*, 2005 WL 3213960, at *3 (dismissing cases where plaintiff "failed to allege any facts to show that defendants published [the information] … to anyone other than plaintiff himself").

Beyond that, apart from generic references to "published statements," Compl. ¶ 72/76, the closest Plaintiff comes in the entire Complaint to specifying any communication to a *third* party is when he alleges that the Post Defendants "made false and defamatory statements concerning Plaintiff Corsi that he was accepting 'hush money' from Dr. David Jones, Alex Jones, and InfoWars," and that they "made these statements to various news and media outlets." *Id.* ¶¶ 67/71-69/73. But these allegations are still woefully insufficient to plead a plausible defamation claim with the requisite particularity.

First, the "vague and amorphous" reference to "various news and media outlets" falls far short of the requirement to identify the audience for an allegedly defamatory communication.

*Vreven*, 604 F. Supp. 2d at 15.  In this regard, this case is like *Ning Ye v. Holder*, which this Court decided a decade ago.  There, the plaintiff made "vague allegations that 'through [I]nternet correspondence' with a 'private party,' [the defendant] 'libelously tarnished' [the plaintiff] … by spreading '… defamatory information all over, while knowing it untrue.'"  644 F. Supp. 2d at 116–17.  This Court held that those allegations were "not definite enough, on their own, to sustain [the plaintiff's] defamation claim because they do not identify the recipients of [the defendant's] alleged publication."  *Id.*  Similarly, in *Mattiaccio*, when a plaintiff alleged that a defamatory letter was published to "numerous individuals within [his former employer,] DHA Group," but "provide[d] no details regarding when or how the letter was 'published'…or which 'DHA employees' received the letter," the court held that the "vague allegations do not provide the Defendants sufficient notice of the Plaintiff's claim as necessary for the Defendants to prepare responsive pleadings."  908 F. Supp. 2d at 138–39.  And in *Vreven*, when a plaintiff alleged that her former boss defamed her to "others at [the plaintiff's former employer]," but "fail[ed] to narrow this allegation any further by identifying anyone to whom [her boss] spoke or wrote by name, by department, or by any other identifying feature," the court dismissed the claim. 604 F. Supp. 2d at 16.  As the court explained, "[a]bsent any factual allegations that narrow this field, defendant would have to conduct thousands of interviews in order to answer the complaint," and thus the complaint "d[id] not give defendant 'fair notice' of the nature of the claims and the 'grounds' on which the claim rests, both of which are necessary in order for defendant to respond properly."  *Id.* (quoting *Twombly*, 550 U.S. at 555 n.3).

The allegations of "publication" in this Complaint are even more vague than the ones found insufficient in *Ning Ye*, *Mattiaccio*, and *Vreven*.  The phrase "various news and media outlets" could refer to almost anything or anyone.  Plaintiff provides no clarity as to who these

"various news and media outlets" are, let alone who contacted them, when they were contacted, and by what means.  Plaintiff alleges only that this communication was "evidenced" by the fact that Infowars "terminated" Plaintiff "the very next day."  Compl. ¶ 69/73.  But that "evidence[]" says nothing about who the Post Defendants communicated with and what, if anything, they said.[12]  He does not allege any basis for believing that such communications took place, such as an article reporting that Plaintiff was receiving "hush money" from Infowars based on information the publication had received from the Post.  And he certainly does not explain why the Post would have contacted other "news and media outlets" to, in effect, scoop itself by pre-sharing what it planned to publish in a forthcoming article.  Plaintiff cannot plausibly plead that a defendant published a defamatory statement based on nothing more than rank speculation.  *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").  But that is the most this Complaint can be read to provide.

The deficiency in pleading "publication" to a third party is compounded further by the complete lack of specificity as to what the allegedly defamatory statements even were.  When

---

[12] To the extent Plaintiff is arguing that The Post's newsgathering activities and requests for comment somehow constitute defamation, applicable case law makes clear that would not be actionable.  As a general matter, a reporter simply requesting comment from a company for a news article would not be defamatory.  *See Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1339 (D.C. Cir. 2015) (Kavanaugh, J.) ("Reporters routinely and necessarily ask questions in order to obtain information, and the mere asking of a question may cast a shadow on the reputation of a person about whom the question is asked.  But a genuine effort to obtain information cannot be defamatory.  A contrary rule would render legitimate reporting impossible.") (citation omitted).  And if Infowars was one of these otherwise unnamed "news and media outlets," even an affirmative statement that Infowars was paying hush money to Plaintiff would not be defamatory when made *to Infowars*, because Infowars would already know whether the statement was true or false, which negates any "any injury to [Plaintiff's] reputation."  *Kenley v. D.C.*, 83 F. Supp. 3d 20, 48–49 (D.D.C. 2015) (holding that defendant's statement to "Baldwin" that the plaintiff had "sicced his dog on him [*i.e.*, Baldwin]" was not actionable, because "[w]hile [the defendant] may have made a false statement to a third party— *i.e.,* Baldwin—the third party *knew* that it was false at the time it was made.  The statement thus could not have harmed Plaintiff in Baldwin's eyes.").

describing his phone call with Mr. Roig-Franzia, Plaintiff seems to acknowledge that he was

being asked about the payments because the OSC was "investigating" them.  *See* Compl.

¶¶ 36-37.[13]  But Plaintiff then alleges without any elaboration that the Post Defendants "made

false and defamatory statements … that [Plaintiff] was accepting 'hush money.'"  Compl. ¶

67/71.  This barebones allegation is insufficient, and not just as a technical matter.  The failure to

set forth the actual words and the context in which Plaintiff is alleging the Post Defendants

communicated prevents the parties and the Court from determining, *inter alia*, whether the

statements are, indeed, reasonably susceptible of a defamatory meaning; whether they are

reporting on official proceedings and therefore privileged; whether they convey non-actionable

opinion; or whether they merely pose non-actionable questions—all questions that are routinely

determined as a matter of law at the pleading stage.  *See, e.g.*, *Abbas*, 783 F.3d at 1338-39;

*Weyrich v. New Republic, Inc.*, 235 F.3d 617, 623–24 (D.C. Cir. 2001); *Boley v. Atl. Monthly

Grp.*, 950 F. Supp. 2d 249, 257–60 (D.D.C. 2013).

Ultimately, Plaintiff's Complaint suffers from many of the same infirmities identified by

the D.C. Circuit in affirming dismissal of a defamation claim with prejudice in *Hourani v.

Mirtchev*, 796 F.3d 1 (D.C. Cir. 2015).  As here, the plaintiff's allegations of the basic elements

of the claim "stumble[d] at the starting gate":

> The complaint claims that Mirtchev "published or caused these statements to be
> published," but it alleges no factual basis whatsoever for that charge.  There is no
> allegation that Mirtchev communicated with Forbes.com; the complaint does not
> even disclose what was published.  There likewise is no explanation of what the
> "Eurasian Transition Group" is, Mirtchev's relationship to it, or even what the
> "Aliyev Dossier" is or actually said.  Finally, the complaint is devoid of any facts
> at all about the "various other Internet publications," what they are, what they
> said, or Mirtchev's involvement with them.  Simply alleging that one year

---

[13] That is also, of course, all that the Post Article ultimately reported.  *See* Post Article at 2.

someone said something false on the Internet, without more, does not come anywhere near stating a plausible defamation claim.

*Id.* at 16 (citing *Twombly*, 550 U.S. at 570 (plaintiffs must "nudge[] their claims across the line from conceivable to plausible")).  Plaintiff's Complaint is no better, and the result here should be the same.

**B.    Plaintiff Does Not Plausibly Plead That Any Statements Were Made With "Actual Malice"**

As this Court has recognized, a public figure plaintiff's failure to plausibly plead facts giving rise to an inference of actual malice requires dismissal of the complaint.  *See Deripaska*, 282 F. Supp. 3d at 143.  Though, by his own allegations, Plaintiff is a public figure, he has alleged no facts to support his conclusory assertion of actual malice.  That also defeats his defamation claim.

**1.    Plaintiff Is Indisputably A Public Figure**

As an initial matter, there can be no doubt that Plaintiff is a public figure—certainly a limited purpose public figure, and likely a general purpose public figure as well.[14]  Plaintiff's own Complaint describes him as "a recognized and distinguished investigative conservative journalist" who has written twenty books, "seven (7) of which were New York Times best-selling books, and two (2) of which were number one (1) bestselling books."  Compl. ¶ 15.  That would likely classify him as someone who has "achieve[d] such pervasive fame or notoriety that

---

[14] Whether a defamation plaintiff is a public figure is a question of law for the Court to resolve. *See Kahl*, 856 F.3d at 114.  Courts therefore regularly resolve that question at the pleading stage based on the allegations of the complaint and information of which the Court can take judicial notice.  *See, e.g.*, *Hourani v. PsyberSolutions, LLC*, 690 F. App'x 1, 3 (D.C. Cir. 2017) (per curiam), *aff'g* 164 F. Supp. 3d 128, 131 & n.1, 136 (D.D.C. 2016); *Boley*, 950 F. Supp. 2d at 260–62.

he becomes a public figure for all purposes and in all contexts."  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974).

In any event, Plaintiff has indisputably "voluntarily inject[ed] himself … into a particular public controversy" and is therefore a limited purpose public figure.  *Deripaska*, 282 F. Supp. 3d at 141–42.[15]  The allegedly defamatory statement concerns Plaintiff's involvement in the OSC investigation of Russian interference in the 2016 presidential election.  That investigation is nothing if not a "public controversy," having generated endless news reporting, dozens of criminal investigations (and indictments) and hundreds of presidential tweets.  Plaintiff has clearly played a significant role in the controversy, and has spoken widely about it in countless media interviews (in print, online, and on television).[16]  Plaintiff even published an entire book declaring that he would be "Silent No More" about how he "Became a Political Prisoner of Mueller's 'Witch Hunt.'"  Compl. ¶ 34.  As Plaintiff himself put it in the Post Article, he is "the guy who has talked the most" about his experience with the OSC investigation.  Post Article at 2.  It is difficult to imagine a plaintiff more aggressively "thrust[ing] himself to the forefront" of a

---

[15] Courts in this Circuit employ a three-part test to determine whether a plaintiff is a limited purpose public figure: (1) Is there a public controversy?; (2) Did the plaintiff "play[] a significant role in that controversy"?; and (3) Was the allegedly defamatory statement "germane to the plaintiff's participation in the controversy"?  *Deripaska*, 282 F. Supp. 3d at 141–42 (citing *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 585 (D.C. Cir. 2016)).  The answer to all three questions here is a resounding "yes."

[16] *See, e.g.*,  Anna Schechter, *Roger Stone pal Jerome Corsi says Mueller is planning to indict him*, NBC News (Nov. 12, 2018), https://www.nbcnews.com/politics/justice-department/roger-stone-pal-jerome-corsi-says-mueller-planning-indict-him-n935436; Chuck Ross, *Exclusive: Jerome Corsi Reveals Why He is In Mueller's Crosshairs*, The Daily Caller (Nov. 13, 2018), https://www.dailycaller.com/2018/11/13/jerome-corsi-mueller-roger-stone; Shelby Holliday, et al., *Jerome Corsi Says Roger Stone Sought "Cover Story" for 2016 Tweet*, Wall Street Journal (Nov. 28, 2018), https://www.wsj.com/articles/jerome-corsi-says-roger-stone-sought-to-cover-up-podesta-tweet-1543363107; Tucker Carlson, *Jerome Corsi: Robert Mueller wanted me to lie*, Fox News (Dec. 3, 2018), https://fxn.ws/2EaJ2vi; Jeff Pegues, *Jerome Corsi: "They may come in right here and indict me,"* CBS News (Dec. 11, 2018), https://cbsn.ws/2Qolfi9.  The Court can take judicial notice of these publicly available online articles and videos.  *See supra* note 2.

public controversy.  *Deripaska*, 282 F. Supp. 3d at 142 (citation omitted).  Accordingly, Plaintiff

must plausibly plead that the allegedly defamatory statements were made with actual malice.  *Id.*

at 141.  He has not done so.

> **2.      Plaintiff Does Not Plausibly Allege the Post Defendants Were Aware of the Falsity of the Statements**

In order to adequately plead actual malice, a plaintiff must plausibly allege "not merely

that the defamatory publication was false, but that the defendant either knew the statement to be

false or that the defendant 'in fact entertained serious doubts as to the truth of his publication.'"

*Klayman*, 628 F. Supp. 2d at 154 (quoting *Tavoulareas v. Piro*, 817 F.2d 762, 775–76 (D.C. Cir.

1987) (en banc)).  The inquiry is "subjective"—the plaintiff must allege and prove that the

defendant "actually entertained a serious doubt" about the truth of the statement.  *Id.* (quoting

*McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1508 (D.C. Cir. 1996)).  As the D.C.

Circuit has recognized, this standard is a "daunting" one for a plaintiff to meet.  *McFarlane v.*

*Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996).  For example, when a defendant obtains

information from a source, the actual malice standard imposes no duty to investigate or

independently corroborate the accuracy of the information unless the defendant subjectively had

"'obvious reasons' to doubt the veracity of his source."  *Sheridan Square Press*, 91 F.3d at 1507;

*see also Lohrenz v. Donnelly*, 350 F.3d 1272, 1285 (D.C. Cir. 2003) ("Even where doubt-

inducing evidence could be discovered, a publisher may still opt not to seek out such evidence

and may rely on an informed source, so long as there is no 'obvious reason to doubt' that

source.").[17]

---

[17] Indeed, although Plaintiff does not even attempt to allege such conduct here, the Supreme Court has held that even "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers" does

To establish actual malice, Plaintiff relies only on a bald assertion that the Post Defendants "knew or had reason to know that Plaintiff Corsi was not accepting 'hush money' and/or recklessly disregarded the falsity of this statement." Compl. ¶ 70/74. But that "formulaic recitation of the elements" of actual malice is not sufficient. *Iqbal*, 556 U.S. at 678. To survive dismissal, a plaintiff must "adequately allege[] *facts* that support an inference that Defendant[s] [acted] with actual malice." *Deripaska*, 282 F. Supp. 3d at 143 (quoting *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 280 (D.D.C. 2017)) (emphasis added). As this Court summarized in *Deripaska*, the type of facts that, if plausibly alleged, could "support a finding of actual malice" include "evidence of fabrication, evidence that the story was 'so inherently improbable that only a reckless man would have put [it] in circulation,' and evidence that it was 'based wholly on an unverified anonymous telephone call or some other source that the defendant had obvious reasons to doubt.'" 282 F. Supp. 3d at 143-44 (quoting *Tavoulareas*, 817 F.2d at 790). Plaintiff does not allege any such facts, and merely pleading "actual-malice buzzwords" instead is not sufficient. *Schatz*, 669 F.3d at 56.

Plaintiff's claim ultimately rests on his allegations of an elaborate conspiracy between Defendants Bezos and Mueller to "take down" President Trump by "financially deplet[ing]" Plaintiff by publicly reporting about charges the OSC was investigating. Compl. ¶ 41. But these hyperbolic allegations do not plausibly show actual malice. On the contrary, it is well settled that "[s]ubjective ill-will does not establish actual malice, nor does a malevolent motive for publication." *Parsi v. Daioleslam*, 890 F. Supp. 2d 77, 81 (D.D.C. 2012).[18] Neither does alleged

---

not establish actual malice. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989).

[18] *See also Jankovic*, 822 F.3d at 590–91 ("Even 'ill will toward the plaintiff or bad motives are not elements of actual malice'") (citation omitted); *Campbell v. Citizens for an Honest Gov't, Inc.*, 255 F.3d 560, 569 (8th Cir. 2001) ("Evidence of a defendant's ill will, desire to injure, or

political opposition:  In a recent case in this District, a pro-Trump "grassroots" journalist accused a left-leaning reporter of defamation as part of a "personal, political war" by "gatekeeper journalists" on "their ideological adversaries and grassroots competitors" through a "campaign of smears."  *Fairbanks v. Roller*, 314 F. Supp. 3d 85, 88, 92 (D.D.C. 2018).  But the court dismissed the case for failure to plausibly plead actual malice because "even 'an extreme departure from professional standards' coupled with an illicit motive does not satisfy the actual malice standard."  *Id.* at 93 (citation omitted).  *See also Palin v. N.Y. Times Co.*, 264 F. Supp. 3d 527, 537 (S.D.N.Y. 2017) (noting that "neither the fact of [political] opposition, nor the supposition that a sharp attack on a disfavored political figure will increase a publication's readership, has ever been enough to prove actual malice").  Similarly, in *Lohrenz*, evidence that the defendants were "on a mission" to achieve a particular policy goal "d[id] not suffice to show actual malice" since it did not demonstrate that the defendants "realized that their statement was false or that they subjectively entertained serious doubts as to truth of their statement."  350 F.3d at 1284 (citation and internal brackets removed).  Plaintiff's conclusory assertions that Defendant Bezos is "bent on having indicted and/or removed from office President Trump" likewise does not establish show actual malice.

In the end, because Plaintiff cannot plausibly allege that the Post Defendants knew that the alleged statements about Plaintiff were false (or had reasons to doubt the truth), the Complaint must be dismissed for failure to plead actual malice.  *See Deripaska*, 282 F. Supp. 3d at 144 (dismissing where the plaintiff "d[id] not come close to plausibly alleging that the

---

political or profit motive does not suffice" to establish actual malice); *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 48 (D.D.C. 2002) (allegations that defendant's alleged "pre-existing agenda" against plaintiff was "not indicative of actual malice," and any argument to the contrary "may … be summarily rejected"), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003).

[defendant] acted with actual malice or reckless disregard for the facts …"); *Fairbanks*, 314 F. Supp. 3d at 92–93 (granting motion to dismiss where the plaintiff "has not pled facts sufficient to support her conclusory allegation that [the defendant] knew the falsity of her statement"); *Parisi v. Sinclair*, 845 F. Supp. 2d 215, 218–19 (D.D.C. 2012) (dismissing where plaintiff's complaint contained "*no* factual allegations, other than the plaintiffs' own assertions that the statements were false" to support actual malice claim).

### C.      Plaintiff Should Not Be Permitted to Amend His Complaint Yet Again

Dismissal of the claims against the Post Defendants should be with prejudice.  Plaintiff has already amended his complaint once, and, after repeated delays, has sought leave to do so a second time.  Even though the Post Article (and other articles about which Plaintiff threatened to sue, like the April Article) had been published by the time Plaintiff filed his motion for leave to file the SAC, the proposed SAC does not add any allegations to address any statements actually published by the Post.  Plaintiff should not be permitted to endlessly amend his complaint to tack on additional claims against the Post Defendants—who are only tenuously related to the original claims against the Government Defendants in the first place.

In any event, should Plaintiff request leave to amend a third time to add allegations as to the Post Article, that request should be denied as futile, because, for multiple reasons, Plaintiff cannot state a defamation claim based on the Post Article.  *See James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996) ("Courts may deny a motion to amend a complaint as futile … if the proposed claim would not survive a motion to dismiss.").  In particular, That article cannot be reasonably read as asserting (or even implying) that Plaintiff was receiving "hush money."[19]  Rather, it reports that the OSC was "*ask[ing] questions*" about the Infowars

---

[19] To plead a claim for defamation by implication, a plaintiff must make a "rigorous showing" "rigorous showing" that the language can be "reasonably read" to convey that unstated

payments, and "*exploring whether*" they were meant to influence Plaintiff's testimony.  Post Article at 2.  But as both this Court and the D.C. Circuit have recognized, merely raising questions is not defamatory, "however embarrassing or unpleasant to [the questions'] subject." *Deripaska*, 282 F. Supp. 3d at 145 (quoting *Abbas*, 783 F.3d at 1338–39).  And even if the Post Article could be read to make that charge (and it cannot), Plaintiff would not be able to show that the statements were published with actual malice for the same reasons set forth above.  The fact that Plaintiff, Stone and Infowars denied that the payments to him were related to the OSC investigation does not establish that the Post Defendants knew the allegation was false, under well settled law.  *See Lohrenz*, 350 F.3d at 1285.  Indeed, the fact that the Post Article includes those denials would "tend to rebut a claim of malice, not to establish one."  *Id*. at 1286 (citation omitted); *see also Tavoulareas*, 817 F.2d at 794 n.44; *OAO Alfa Bank v. Center for Pub. Integrity*, 387 F. Supp. 2d 20, 54-55 (D.D.C. 2005).

Because even a properly pleaded claim setting forth the statements actually published in the Post Article would have no more merit than the amorphous claim in the current Complaint, dismissal of the defamation claim should thus be with prejudice.

## III.   THE TORTIOUS INTERFERENCE CLAIM FAILS AS A MATTER OF LAW

### A.   Plaintiff Cannot Plead A Tortious Interference Claim Based on the Same Conduct Underlying His Meritless Defamation Claim

As an initial matter, the Complaint is as vague and deficient in alleging concrete facts to support Plaintiff's tortious interference claim against the Post Defendants as it is with respect to the defamation claim.  In attempting to plead the elements of the cause of action, Plaintiff alleges

---

implication, and there is certainly no language "affirmatively suggesting that [the Post Defendants] intend[] or endorse[]" that implication.  *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 596 (D.C. 2000).  *See also Deripaska*, 282 F. Supp. 3d at 145-46, 148.

only that "[t]he actions of Defendant Jeff Bezos … and at his direction his pliant reporter Defendant Manuel Roig-Franzia, were also intended and did tortuously [*sic*] interfere, [*sic*] with and destroy the business relationships of Plaintiff Corsi with Dr. David Jones, Alex Jones, and InfoWars …"  Compl. ¶ 63/67.  But he does not specify what those "actions" were.

To the extent that Plaintiff's claim is based on his allegation that the Post Defendants contacted "news and media outlets" (which could include Infowars) (*see id.* ¶ 69/73) his tortious interference claim arises out of the exact same alleged conduct as his defamation claim—the making of an allegedly false statement about Plaintiff to a third party.  But where a plaintiff's "defamation claim fails, so do [his] other tort claims based upon the same allegedly defamatory speech."  *Farah*, 736 F.3d at 540 (affirming dismissal of tortious interference claims in libel case brought by Plaintiff Corsi in another case).  Courts have recognized it is "hornbook law that 'a plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim.'"  *Montgomery v. Risen*, 197 F. Supp. 3d 219, 267 (D.D.C. 2016) (dismissing tortious interference claim in defamation case) (quoting *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 319–20 (D.C. Cir. 1994), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017)).  *See also Zandford v. Nat'l Ass'n of Sec. Dealers*, 19 F. Supp. 2d 1, 3–4 (D.D.C. 1998) ("Given the Court's determination that Zandford cannot make a prima facie showing of defamation, Zandford fails to show that such defamation interferes with his business relationships."); *cf. Browning*, 292 F.3d at 244 (applying statute of limitations period for defamation to tortious interference claim where the "tortious interference claim [wa]s … 'intertwined' with [the plaintiff's] defamation claim" because it was "based on the same underlying facts").  For that reason alone, the tortious interference claim must be dismissed.

**B.      Plaintiff Does Not Plausibly Allege the Elements of a Tortious Interference Claim**

Independently, Plaintiff's tortious interference claim fails as a matter of law for multiple reasons.  To plead a tortious interference claim, Plaintiff must plausibly allege "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage." *Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 498–99 (D.C. Cir. 1995) (quoting *Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407, 422–23 (D.D.C. 1988)).  Plaintiff's vague references to the Post Defendants' "actions" scarcely suffice to plead *any* of these elements, and the claim can therefore be dismissed on that basis off the bat.  *See Sharpe v. Am. Acad. of Actuaries*, 285 F. Supp. 3d 285, 292 (D.D.C. 2018) (dismissing tortious interference claim where plaintiff "d[id] not sufficiently plead facts from which to plausibly infer" the elements of the tort); *Johnson*, 202 F. Supp. 3d at 176–78 (dismissing interference claim where the complaint's "allegations [we]re devoid of specifics").  In any event, Plaintiff fundamentally cannot plead either the first or third elements, and so the claim must be dismissed with prejudice.

To start with, Plaintiff does not "plead the existence of a *valid* business expectancy with specificity." *Johnson*, 202 F. Supp. 3d at 176 (emphasis added) (citation omitted).  A valid business expectancy "must be 'commercially reasonable to anticipate." *Xereas v. Heiss*, 933 F. Supp. 2d 1, 11–12 (D.D.C. 2013) (quoting *Command Consulting Grp., LLC v. Neuraliq, Inc.*, 623 F. Supp. 2d 49, 52 (D.D.C. 2009)).  That requires "a *probability* of future contractual or economic relationship and not a mere possibility." *Id.* (citation omitted).  *See also Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*, 791 F. Supp. 2d 33, 56 (D.D.C. 2011) ("mere speculative contractual expectations or hope are insufficient") (internal quotation marks and

citations omitted); *Oceanic Expl. Co. v. ConocoPhillips, Inc.*, No. 04-cv-332, 2006 WL 2711527, at *19–20 (D.D.C. Sept. 21, 2006) (explaining that this element requires "something beyond a mere hope"). Where Plaintiff pleads that already-existing relationships were disrupted, the claim survives dismissal only if Plaintiff can plead specific facts "to substantiate [his] claim of an expectancy that those relationships would continue." *Econ. Research Servs., Inc. v. Resolution Econ., LLC*, 208 F. Supp. 3d 219, 228–30 (D.D.C. 2016); *see also Xereas*, 933 F. Supp. 2d at 11 (dismissing claim because plaintiff's "failure to identify any specific *future* employment prospect undermines his claim") (emphasis added). Plaintiff has not done so here.

Plaintiff alleges that he had "an existing business and contractual relationship with Dr. David Jones, Alex Jones, and InfoWars" that was "destroy[ed]" by the Post Defendant's "actions." Compl. ¶¶ 61/64, 63/67. But Plaintiff provides no clues as to the nature of that relationship beyond the (implicit) suggestion that he had been (for an unspecified amount of time) receiving $15,000 per month, and (for reasons he does not provide) he expected those payments to continue, apparently indefinitely. He does not allege the existence or terms of any contract that would have obligated Infowars to make such payments going forward. And though he claims that the payments were "legitimately earned compensation," he does not provide any detail about what he was being compensated for or why he expected to continue receiving that money. *Id.* ¶ 68/72. Certainly, an expectation of receiving gratuitous monthly payments of $15,000 can hardly be considered "commercially reasonable," and Plaintiff does not allege any facts to establish why his expectation was nevertheless valid in this case.

Documents incorporated into the Complaint and/or of which the Court can take judicial notice only reinforce that conclusion. Plaintiff alleges in the Complaint that, "[a]s a direct result" of the Post Defendants' unspecified "actions," Plaintiff learned from Dr. David Jones that

he was being "terminated." Compl. ¶ 39.  But on the very first page of Chapter 1 of *Silent No More*, Plaintiff states that, as of "August 28, 2018"—months before any of the Post Defendant's alleged "actions"—he had *already* "lost several lucrative consulting jobs [he] had in Washington, D.C., *including InfoWars*, where [he] had been working as Washington Bureau Chief since shortly after Donald Trump's inauguration."  *Silent No More* at 11 (emphasis added). It is therefore unclear what job Plaintiff is alleging was "terminated" in January 2019.

Moreover, in his complaints against Roger Stone and Infowars, he alleges that the defendants were making defamatory statements about him in videos and articles on the Infowars site as far back as October 2018—again, well before the Post began reporting the Post Article. *See, e.g.*, Infowars Complaint ¶¶ 42-47 (describing video posted October 26, 2018 in which Alex Jones stated that Plaintiff "seemed to be extremely mentally degraded to the point of what I would call dementia" and "whatever comes out of his mouth ain't the truth"); Stone Complaint ¶¶ 24 (describing article by Roger Stone posted on Infowars website stating that Plaintiff "was prepared to bear false witness against others in the Trump orbit if he thought it would save his own skin").  It is difficult to conceive how Plaintiff can claim that it was commercially reasonable for him to expect a continued business relationship (let alone one involving monthly $15,000 payments) with people who he himself alleges had been publicly describing him as a "mentally degraded" liar for months.

Plaintiff is also unable to plead the necessary element of "intentional interference."  The D.C. Circuit has explained that, "[a]s its name would suggest, *intentional* interference requires an element of intent."  *Bennett Enters.*, 45 F.3d at 498–99.  That means "a general intent to interfere or knowledge that conduct will injure the plaintiff's business dealings is insufficient to impose liability."  *Id.* (citation omitted).  Rather, a plaintiff must make "a 'strong showing of intent' to

disrupt ongoing business relationships.'" *Id.* (citation omitted).  In line with that requirement, courts also hold that "the defendant's interference must be improper." *Furash & Co. v. McClave*, 130 F. Supp. 2d 48, 55–56 (D.D.C. 2001); *see also Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*, 592 F. Supp. 2d 86, 99 (D.D.C. 2009) (same).

At the outset, although Plaintiff speculates about an elaborate conspiracy between Jeff Bezos, the Post Defendants and the OSC to "take down President Trump" by "interfering with [Plaintiff's] business relationships," Plaintiff "does not offer a single shred of fact to plausibly support the nefarious intent []he imputes to [the] defendants." *Soliman v. George Washington Univ.*, 658 F. Supp. 2d 98, 103–04 (D.D.C. 2009) (dismissing tortious interference claim against former coworkers who made derogatory comments about her, because the "comments may have been unwarranted in her own view, ... but [the plaintiff] no more than speculate[d] that these comments were made with the specific intent to interfere with her employment"); *see also Bennett*, 45 F.3d at 499 (reversing jury verdict where "[n]othing in the evidence supports more than the rankest speculation that [the defendant] or anyone acting on its behalf harbored any ill motive or intent to disrupt [the plaintiff's] economic advantage").

More fundamentally, Plaintiff cannot base a tortious interference claim on the Post Defendants' reporting a news story on a matter of obvious public concern.  Courts considering the issue have made clear that engaging in the practice of journalism is neither "improper" nor intended to disrupt contractual relationships.  Indeed, one court questioned "whether this common law cause of action could ever be stretched to cover a case involving news gathering and publication." *Seminole Tribe of Fla. v. Times Publ'g Co.*, 780 So. 2d 310, 318 (Fla. Dist. Ct. App. 2001); *see also Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 274 (7th Cir. 1983); *Interphase Garment Solutions, LLC v. Fox Television Stations, Inc.*, 566 F. Supp. 2d

460, 465 (D. Md. 2008).  Just last year, a court in New York reaffirmed that when "[t]he alleged interference is 'merely incidental to defendants' exercise of their constitutional right to [report] newsworthy information,' the defendants are acting with a 'legitimate' purpose and cannot be held liable for tortious interference."  *Highland Capital Mgmt., L.P. v Dow Jones & Co.*, No. 151322/2018, 2018 WL 4668424, at *3 (Sup. Ct. N.Y. Cty. Sept. 28, 2018) (citation omitted) (dismissing tortious interference claim based on reporter speaking with sources who were allegedly bound by non-disclosure agreements); *see also Huggins v. Povitch*, No. 131164/94, 1996 WL 515498, at *9 (Sup. Ct. N.Y. Cty. 1996) (dismissing tortious interference claim based on a television interview, because "conduct [that] is intended to foster public awareness or debate cannot be … the wrongful or improper conduct required to sustain a claim for interference").

In sum, even if Plaintiff's tortious interference claim were not redundant to his deficient defamation claim, it fails on its own merits and should be dismissed with prejudice.

## IV.    THE CLAIMS AGAINST DEFENDANT BEZOS ARE PATENTLY MERITLESS

In addition to the claims failing on the merits for all of the reasons set forth above, the claims against Defendant Bezos must be dismissed for the independent reason that Plaintiff fails to plausibly plead even the slightest basis to hold Mr. Bezos individually liable.

At the outset, the Complaint alleges incorrectly that Mr. Bezos is the "owner and Chief Operating Officer ('CEO') [*sic*] of The Washington Post."  Compl. ¶ 11.  In fact, as publicly available records confirm, Mr. Bezos is the owner of Nash Holdings, LLC, which is the owner of the Post.  He is not an officer—either Chief Executive or Chief Operating—of the company.  *See supra* note 3.  But even accepting those faulty allegations as true for purposes of this motion, the inclusion of Mr. Bezos as an individual defendant in this case is frivolous.

It is, of course, black letter law that an owner of a corporation (or member of an LLC) is

not liable for the actions of the company simply by virtue of his or her ownership interest.  *See*

*Kelleher v. Dream Catcher, L.L.C.*, 221 F. Supp. 3d 157, 158–60 (D.D.C. 2016) ("Our Court of

Appeals has recently emphasized that '[a] corporation is viewed as a distinct entity, even when it

is wholly owned by a single individual' ….") (quoting *Nat'l Sec. Counselors v. CIA*, 811 F.3d

22, 31 (D.C. Cir. 2016)) (one set of internal quotation marks omitted).  Plaintiff does not even

attempt to allege facts to support a claim based on "piercing the corporate veil" or "alter ego"

liability.  *See Motir Servs., Inc. v. Ekwuno*, 191 F. Supp. 3d 98, 109 (D.D.C. 2016) (dismissing

claim against owner of corporation where the complaint "lack[ed] any factual allegations

indicating" any of the elements for veil-piercing); *see also Kelleher*, 221 F. Supp. 3d at 158–59;

*United States ex rel. Landis v. Tailwind Sports Corp.*, 51 F. Supp. 3d 9, 63 (D.D.C. 2014).[20]

Plaintiff instead seems to be trying to hold Mr. Bezos liable as an officer of the Post

(even though he is not one).  An officer of a company may not be held liable "based merely on

the officer's position in the corporation ….  Liability must be premised upon a corporate

officer's meaningful participation in the wrongful acts."  *Carty v. CVS Pharmacy, LLC*, 264 F.

Supp. 3d 190, 195 (D.D.C. 2017) (quoting *Perry ex rel. Perry v. Frederick Inv. Corp.*, 509 F.

Supp. 2d 11, 18 (D.D.C. 2007)).  In order to survive a motion to dismiss, a plaintiff must plead

"an act or omission by the officer which logically leads to the inference that he had a share in the

wrongful acts of the corporation which constitute the offense."  *Lawlor v. D.C.*, 758 A.2d 964,

974–75 (D.C. 2000).  Plaintiff does not come close to doing so.

---

[20] Factors supporting piercing the corporate veil include "that corporate formalities were
disregarded, that the corporate defendant was purposely undercapitalized, or that the corporate
defendant's funds and assets were mingled with [the defendant's] or diverted for non-corporate
or personal uses."  *Motir Servs.*, 191 F. Supp. 3d at 109.  Again, Plaintiff does not even purport
to be alleging any of these factors.

Plaintiff peppers his Complaint with baseless contentions that the Post's actions were done "at the direction of" Mr. Bezos, and that Mr. Bezos was "acting in concert" with Defendant Mueller and the other Government Defendants.  Compl. ¶ 67/71; *see also id.* ¶¶ 39, 41, 63/67.  But these are precisely the type of "naked assertions devoid of further factual enhancement" that the Supreme Court has repeatedly emphasized are insufficient to survive a motion to dismiss.  *Iqbal*, 556 U.S. at 677–78 (citation, quotation marks, brackets omitted).  In particular, courts consistently reject attempts to shoehorn a defendant into a case by "merely tack[ing] on conclusory assertions that [particular actions] were done 'at [the defendant's] direction.'"  *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 493 (S.D.N.Y. 2017) (collecting cases).[21]  Simply put, "to show that … action was taken at the direction of another requires more than just the conclusion that that is what occurred."  *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 112 (D.D.C. 2010) (dismissing where allegation that company was "subject to the … Defendants' control [wa]s nothing more than formulaic recitation of an element of agency liability") (citation, quotation marks, and brackets omitted).  That is all Plaintiff offers here.

Accordingly, although the claims against Defendant Bezos would fail even if he were personally involved in the reporting or publication of the Post Article, he was not so involved, and Plaintiff does not plausibly allege otherwise.

---

[21] Likewise, the conclusory allegations that Mr. Bezos acted "in concert" with the government in an apparent scheme to take down President Trump do not remotely suffice to plausibly establish the type of conspiracy Plaintiff is suggesting.  *See, e.g.*, *Lyles v. Hughes*, 83 F. Supp. 3d 315, 323 (D.D.C. 2015) (granting motion to dismiss where the plaintiff's "paltry allegations of conspiracy [we]re conclusory at best"), *aff'd in relevant part*, No. 15-5106, 2015 WL 9007382 (D.C. Cir. Oct. 30, 2015).

## CONCLUSION

For all of the reasons set forth above, Defendant respectfully requests that the Court dismiss Plaintiff's Complaint as against the Post Defendants with prejudice, or, in the event the Court grants Plaintiff's motion for leave to file the SAC, which contains identical allegations as to the Post Defendants, the Court should dismiss the SAC as against the Post Defendants with prejudice.

Dated: June 12, 2019

Respectfully submitted,

/s/ Laura R. Handman
Laura R. Handman (DC Bar No. 444386)
Eric J. Feder (DC Bar No. 1048522)

DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue N.W., Suite 800
Washington, DC  20006-3401
(202) 973-4200
(202) 973-4499 (fax)
laurahandman@dwt.com
ericfeder@dwt.com

*Attorneys for Defendants WP Company LLC d/b/a The Washington Post, Manuel Roig-Franzia, and Jeff Bezos*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**JEROME CORSI,**

               **Plaintiff,**

**v.**

**ROBERT MUELLER, individually and in
his official capacity as Special Counsel,
FEDERAL BUREAU OF
INVESTIGATION, NATIONAL
SECURITY AGENCY, CENTRAL
INTELLIGENCE AGENCY, UNITED
STATES DEPARTMENT OF JUSTICE,
JEFF BEZOS, THE WASHINGTON
POST, and MANUEL ROIG-FRANZIA,**

               **Defendants**.

Civil Action No. 1:18-cv-2885-ESH

---

**DECLARATION OF ERIC J. FEDER IN SUPPORT OF
THE POST DEFENDANTS' MOTION TO DISMISS**

Pursuant to 28 U.S.C. § 1746, I, ERIC J. FEDER, declare and state as follows:

       1.       I am an associate of the law firm of Davis Wright Tremaine LLP ("DWT") and a

member of the Bars of the District of Columbia and of this Court.  I submit this declaration in

support of the motion by Defendants WP Company LLC d/b/a The Washington Post ("WP"),

Manuel Roig-Franzia, and Jeff Bezos (collectively, the "Post Defendants") to dismiss the First

Amended Complaint (ECF No. 15) (the "Complaint") against them, or, in the event the Court

grants Plaintiff's pending motion for leave to file a Second Amended Complaint (ECF No. 41),

to dismiss the Second Amended Complaint against them.  I make this declaration based on my

personal knowledge for the sole purpose of attaching copies of documents that are incorporated

by reference in or relied upon by the Complaint, and/or of which the Court can take judicial notice.

2.      Attached as Exhibit 1 hereto is a true and correct copy of the statement of the information regarding the ownership, management and circulation of *The Washington Post* newspaper (the "Post"), which was reported by WP to the United States Postal Service pursuant to 39 U.S.C. § 3685, as that information appeared on page A10 of the September 30, 2018 edition of *The Washington Post* newspaper (the "Post"), pursuant to the requirement in the same statute that such information be published annually.

3.      Attached as Exhibit 2 hereto is a true and correct copy of the masthead of the Post, listing the editors of the newspaper and the officers of WP, as published on page A20 of the June 11, 2019 edition of the Post.

4.      Attached as Exhibit 3 hereto is a true and correct copy of select excerpts from the hardcover version of the book *Silent No More: How I Became a Political Prisoner of Mueller's "Witch Hunt,"* by Jerome Corsi, Ph.D, published by Post Hill Press in 2019.

5.      Attached as Exhibit 4 hereto is a true and correct copy of an article published in the Post on January 24, 2019 by Rosalind S. Helderman and Manuel Roig-Franzia headlined "Witness in special counsel probe, former Stone associate, collected payments from Infowars through job Stone arranged," as publicly available on the Internet at the URL https://wapo.st/2FOU760.

6.      Attached as Exhibit 5 hereto is a true and correct copy of the complaint (without its accompanying exhibits) filed on February 7, 2019, in this Court in *Corsi v. Stone*, No. 1:19-cv-00324-TJK (D.D.C.), ECF No. 1.

7.     Attached as Exhibit 6 hereto is a true and correct copy of the complaint (without

its accompanying exhibits) filed on March 7, 2019, in this Court in *Corsi, et al. v. Infowars, LLC,*

*et al.*, No. 1:19-cv-00656-ESH (D.D.C.), ECF No. 1.

I declare under the penalty of perjury that the foregoing is true and correct.

EXECUTED this  12th day of June 2019,

ERIC J. FEDER

# **EXHIBIT 1**

Statement Required by The Act of August 12, 1970, Section 3685, Title 39, United States Code, showing ownership, management and circulation of

## THE WASHINGTON POST

Published Daily and Sunday at 1301 K Street, NW, Washington, DC  20071.

Filing Date October 1, 2018

The owner is WP Company LLC, 1301 K Street, NW, Washington, D.C. 20071, all of the membership interests of which are owned by Nash Holdings LLC, P.O. Box 94314, Seattle, WA 98124.  Jeffrey P. Bezos, P.O. Box 94314, Seattle, WA 98124, is the owner of Nash Holdings LLC.

| | AVERAGE NO. COPIES (MON-SUN) EACH ISSUE DURING PRECEDING 12 MONTHS | ACTUAL NO. COPIES OF SINGLE ISSUE PUBLISHED NEAREST TO FILING DATE (SEPT. 23, 2018) |
|---|---|---|
| **EXTENT AND NATURE OF CIRCULATION** | | |
| A.   TOTAL NO. COPIES (Net Press Run) | 309,198 | 438,635 |
| B.   PAID AND/OR REQUESTED CIRCULATION | | |
|     1. Sales through dealers and carriers, street vendors, and counter sales | 286,158 | 403,950 |
|     2. Mail Subscriptions (Paid and/or Requested) | 645 | 849 |
| C.   TOTAL PAID AND/OR REQUESTED CIRCULATION (Sum of B1 and B2) | 286,803 | 404,799 |
| D.   FREE DISTRIBUTION BY MAIL, CARRIERS OR OTHER MEANS, SAMPLES, COMPLIMENTARY, AND OTHER FREE COPIES | 8,962 | 9,577 |
| E.   TOTAL DISTRIBUTION (Sum of C and D) | 295,765 | 414,376 |
| F.   COPIES NOT DISTRIBUTED | 13,433 | 24,259 |
| G.   TOTAL (Sum of E and F – should equal Net Press Run shown in A) | 309,198 | 438,635 |

I certify that the statements by me above are correct and complete.

(Signed) Frederick J. Ryan, Jr.

Publisher and Chief Executive Officer

S1380 3x6

# **EXHIBIT 2**

# The Washington Post

**FREDERICK J. RYAN JR., Publisher and Chief Executive Officer**

News pages:
**MARTIN BARON**
Executive Editor
**CAMERON BARR**
Managing Editor
**EMILIO GARCIA-RUIZ**
Managing Editor
**TRACY GRANT**
Managing Editor
**SCOTT VANCE**
Deputy Managing Editor
**BARBARA VOBEJDA**
Deputy Managing Editor

Editorial and opinion pages:
**FRED HIATT**
Editorial Page Editor
**JACKSON DIEHL**
Deputy Editorial Page Editor
**RUTH MARCUS**
Deputy Editorial Page Editor
**JO-ANN ARMAO**
Associate Editorial Page Editor

**Vice Presidents:**

JAMES W. COLEY JR. ..................................................................................Production
L. WAYNE CONNELL.............................................................................Human Resources
KATE M. DAVEY..................................................................................Revenue Strategy
ELIZABETH H. DIAZ....................................................Audience Development & Insights
GREGG J. FERNANDES......................................................Customer Care & Logistics
STEPHEN P. GIBSON..................................................................Finance & Operations
SCOT GILLESPIE .........................................................................................Engineering
KRISTINE CORATTI KELLY.......................................................Communications & Events
JOHN B. KENNEDY...........................................................General Counsel & Labor
MIKI TOLIVER KING...........................................................................................Marketing
SHAILESH PRAKASH...............................Digital Product Development & Engineering
JOY ROBINS .......................................................................................Client Solutions

The Washington Post
1301 K St. NW, Washington, D.C. 20071  (202) 334-6000

# EXHIBIT 3

*NEW YORK TIMES* BESTSELLING AUTHOR

# JEROME R. CORSI, Ph.D.

*HOW I BECAME A POLITICAL PRISONER*
*OF MUELLER'S "WITCH HUNT"*



# SILENT
# NO MORE

# SILENT
# NO MORE

In *Silent No More: How I Became a Political Prisoner of Mueller's "Witch Hunt"*, *New York Times* bestselling author of *Killing the Deep State* Jerome R. Corsi, Ph.D. meticulously details the psychological torment he was subjected to in what the media has simply called, "The Mueller Investigation."

Rather than conducting an honest investigation, Mueller's Special Prosecutors reinforced a prefabricated narrative aiming to charge President Trump with treason. *Silent No More* exposes the inner workings of this governmental escapade, and clearly states why Mueller has no case against the President.

# SILENT NO MORE

*HOW I BECAME A POLITICAL PRISONER*
*OF MUELLER'S **"WITCH HUNT"***

## JEROME R. CORSI, Ph.D.



Post Hill
PRESS

A POST HILL PRESS BOOK
ISBN: 978-1-64293-217-1
ISBN (eBook): 978-1-64293-218-8

Silent No More:
How I Became a Political Prisoner of Mueller's "Witch Hunt"
© 2019 by Jerome R. Corsi, Ph.D.
All Rights Reserved

Cover art by Cody Corcoran

No part of this book may be reproduced, stored in a retrieval system, or transmitted by any means without the written permission of the author and publisher.



Post Hill Press
New York • Nashville
posthillpress.com

Published in the United States of America

*Dedicated to:*

President Donald J. Trump,
with whom I have had a cordial and
very respectful relation
over many years.

Jim Garrow,
whose advice has proved invaluable My Loving Family,
from whom Mueller & Co.
have threatened to separate me.

And
The Volunteer Staff of CorsiNation.com,
whose dedication to God and to the Constitution
continue to inspire me.

# CONTENTS

Prologue         My Kafkaesque Nightmare.........................9

**Chapter 1**    It Begins.....................................................11
**Chapter 2**    Enter David Gray.......................................21
**Chapter 3**    Meet Roger Stone ....................................33
**Chapter 4**    We Head to Washington ...........................45
**Chapter 5**    We Regroup...............................................59
**Chapter 6**    A Hard Rain Falling.................................68
**Chapter 7**    The Exercise Remembering 2016 ............78
**Chapter 8**    Before the Grand Jury ..............................91
**Chapter 9**    Assange, Russia, and Hillary..................108
**Chapter 10**   Round Two: More Fear and Loathing ....128
**Chapter 11**   The Mueller Inquisition Blows Up .........147
**Chapter 12**   A Plea Deal to Die For...........................167

Conclusion       Looking for America...............................187

*PROLOGUE*

## My Kafkaesque Nightmare

Now, as I write this in my senior years, I find myself threatened with imprisonment for the first time in my life. With the confusion and frustration that prevailed over the Robert Mueller prosecutors after two months of trying to cooperate with them, I anticipate now I may be sentenced so severely for one crime or another that I will die in prison, all because of the way Robert Mueller's "witch hunt" prosecution operates.

My Kafkaesque nightmare began by spending the last two months—September and October 2018—being mentally tortured by Mueller's Deep State prosecutors, while being held incommunicado with my cellphone and laptop confiscated. So being isolated, one step short of being incarcerated. I was interrogated for up to eight hours at a stretch in six sessions over the two months in question, all occurring within a windowless conference room deep within the bowels of an unmarked FBI building in southeast Washington, D.C.

Every night now I am plagued by the most terror-inspiring dreams of finding myself going insane in solitary confinement—something I know the Deep State monsters would enjoy. From the moment my last book, *Killing the Deep State: The Fight to Save President Trump*, became a *New York Times* bestseller, I knew the totalitarian masters of the Deep State minions had targeted me to be censored, silenced, and ultimately incarcerated.

The pages of this book should warn all readers that the United States under the Deep State masters has begun to descend into a political hell that I previously thought could only happen under Hitler's

**JEROME R. CORSI, PH.D.**

Gestapo, Stalin's KGB, or Mao's Cultural Revolution. My particular Kafkaesque nightmare is nothing more than punishment for the crime of being a vocal supporter of Donald Trump and for having worked with Roger Stone to promote Trump's 2016 presidential campaign. Had I supported Hillary Clinton, I would today be a Deep State role model and hero.

My "crimes" against the Deep State are compounded by the twenty books I have authored or co-authored since 2004—first joining the Swift Boat movement against John Kerry, followed by exposing Barack Obama as a radical socialist with intellectual roots in communism and a history of being a cultural Muslim since his childhood. My book exposing Obama's birth certificate fraud earned me from the Hard Left the permanent slander of being dismissed as a "conspiracy theorist."

As my attorney David Gray said to me in the midst of this experience, "You have to look back and realize there are a lot of Democratic Party corpses in your wake."

In reading the pages that follow, I have only one request: Please understand the nightmare I am now experiencing could and most likely will happen to you or someone near to you if you do not stand up and oppose the Deep State. In the Deep State dystopia being planned by the hard left, there will be no freedom left for those who dare express allegiance to the flag of the United States and the constitutional freedoms bequeathed all Americans by our founding fathers. This will be especially true if that allegiance is compounded by a Judeo-Christian belief in God or more particularly, a decision to accept Jesus Christ as your personal savior.

November 5, 2018

New Jersey

## *CHAPTER 1*

# It Begins

IT WAS TUESDAY, August 28, 2018, three days before my seventy-second birthday, when the doorbell rang at our home in a wooded area of northern New Jersey at approximately 3:30 PM.

My wife, Monica, and I were in my study discussing family financing. Since 2016, I had lost several lucrative consulting jobs I had in Washington, D.C., including InfoWars, where I had been working as Washington Bureau Chief since shortly after Donald Trump's inauguration.

Since the election of Donald Trump as president, the hard left has targeted InfoWars as the spearhead to attack economically. The goal was to force InfoWars and all reporters associated with Alex Jones off the internet. The intent was to punish economically and silence all conservative and libertarian critics of the hard left's increasingly aggressive socialist goals. Not stopping at imposing political censorship through social media giants including Google, YouTube, Facebook, and Twitter, the hard left also threatened corporate clients who hired as consultants so-called "conspiracy theorists" such as me.

In the ensuing two years since the 2016 surprise election of President Trump, the hard left has intensified into a violent "resist and obstruct" movement designed ultimately to use the criminal investigation of Robert Mueller's Special Counsel office as a means of criminalizing politics. The ultimate goal of the hard left is to first impeach, then imprison Donald Trump through utterly false charges the Trump campaign colluded with Russia to steal the presidency from Hillary Clinton.

## *CONCLUSION*

# Looking for America

THIS IS NOT the USA!

The hell I went through trying to cooperate with Mueller and intending at all times to tell the truth is not the USA.

Under Mueller, this is the USSA, modeled after the USSR, the Union of Socialist Republics, commonly known as the Soviet Union in Russia.

I have lived seventy-two years and written twenty books since 2004, seven of which were *New York Times* bestsellers, two of which were number one.

I have never been accused of committing a crime in my life, not until I met Mueller.

Now, I am a criminal because I made the stupid mistake of talking to Mueller's prosecutors for forty hours in six grueling sessions over two months.

My crime was that my memory of events in 2016 is not perfect. This I fully admitted, repeatedly.

Mueller's henchmen—Jeannie Rhee, Aaron Zelinsky, and Andrew Goldstein—sat across the table from me and my lawyer, David Gray, determined to quiz me in increasingly granular detail from an eight-inch binder of "files" that contain my emails, my schedules, my published articles, my phone records, and I don't know what else from 2016.

Much of that material I gave them myself when I turned over my computers, my cellphone, my email usernames and passwords, my

Verizon records, my tweets, and my Google account—basically my life in their hands, stripped to the bones.

The binder had my name on it, but as I have noted, Zelinsky refused to answer my question if that binder was all about me. "I won't tell you if this binder is about you, and I won't tell you how many binders like this I have," he insisted.

Over the forty hours, I cannot believe how arrogant these three henchmen and their army of FBI agents are. The prosecutors threw questions at me in rapid-fire fashion. Then they get and angry and belligerent, when my recollection of the truth disagrees with their narrative.

These grand inquisitors, like all grand inquisitors throughout history, insist they only want "the truth." But "the truth" Mueller's grand inquisitors wanted was "the truth" the prosecutors sought from me to fit into their predetermined agenda.

But it is apparent their agenda is to frame Roger Stone for "Russian collusion"—something Hillary Clinton and John Podesta are one-thousand times more guilty of doing than Roger Stone and Donald Trump. But, the real agenda is to impeach President Trump.

But because I have never met or spoken with Julian Assange and because I did not have a contact that passed me information from Assange about the stolen DNC emails in his possession, Rhee, Zelinsky, and Goldstein blow up the interview and threaten to ruin my life.

Amazingly, Rhee, Zelinsky, and Goldstein did not want to hear about the crimes I could document for Hillary Clinton, for John Podesta, for Perkins Coie, for Eric Holder and Loretta Lynch, plus dozens of other Democratic Party officials and their operatives in the CIA, the NSA, and the DOJ, who are still today attempting a traitorous coup d'état against President Trump.

I wrote a *New York Times* bestselling book about that too—it is titled *Killing the Deep State: The Fight to Save President Trump*.

## SILENT NO MORE

That book is still selling brusquely and the fight to save President Trump is still ongoing. Yet I am the "conspiracy theorist" that Zelinsky claims "lives in a different rule" because I dared to join the Swift Boat veterans in challenging John Kerry's Vietnam War record, because I dared to suggest Barack Obama has a hard left, socialist agenda and lacks the ability to show his original 1961 Hawaiian birth certificate (if such a document even exists).

But my true crime to people like Rhee, Zelinsky, and Goldstein is that I support Donald Trump.

Mueller and company are part of the continuing Deep State coup d'état that seeks to protect Deep State criminals in the CIA and other U.S. intelligence agencies as well as the Department of Justice and FBI.

With this witch hunt predicated on the hoax "Russian collusion" argument, Mueller and company are masquerading as law enforcement agents.

I can attest after my nightmare before with Mueller's Special Counsel office that the USA has become the USSA because I've just experienced the "third degree," lacking only a rubber hose and sleep deprivation to resemble the worst interrogations communists in Stalin's USSR were capable of performing before you were sent to the Gulag to freeze to death working in hard labor.

Make no mistake, Rhee, Zelinsky, and Goldstein are Deep State criminals.

This is what the nation must realize if we have any chance of preserving the freedoms our founding fathers bequeathed us—freedoms countless generations of Americans have fought, bled, and died to preserve—all to be thrown away because the Democrats refuse to investigate themselves.

Sure, Mueller can send me to prison for the rest of my life. He can bankrupt us, ruin our family, and destroy any chance I might have to live my senior years in peace. Mueller can put me in solitary confinement and drive me insane if he so chooses. But I will go to prison

### JEROME R. CORSI, PH.D.

protesting my innocence. I did not "willingly and knowingly" provide false information to the FBI, or anyone else.

My memory may not be perfect, but I have based my career on telling inconvenient truths to a growing Deep State establishment that is determined to destroy the Constitution and deny the existence of God, while throwing the nation into a global governance system under which we will lose our sovereignty.

That is what life in the USSA has become.

We all face prison now, if only for thought crimes, if Mueller and company are allowed to rule the land.

Mueller and company could not care that my wife is crying, that CNN had a black SUV parked outside our home bothering us and our neighbors, that our friends are calling hoping that I am able to stay out of prison, destroying the daily peace of thousands.

Mueller and company want us disgraced as a family simply because I could not give Mueller the answers his henchmen keep drilling for in forty hours of their grand inquisition.

But I am the one who has to answer the question, "Is Dad going to prison?"

I have written this book in the belief that there are enough people left in this country who continue to adhere to the constitution and believe in God that Mueller and his Deep State co-conspirators will be stopped before they complete the transformation of the USA into the USSA.

All my life, I have believed that the United States is an exceptional country. I refuse to accept that all those who have fought, bled, and died to preserve our freedoms as Americans will have done so in vain.

In conclusion, I affirm that principle that I strive to live by:
IN THE END, GOD ALWAYS WINS!

I am with God. Are you?



Jerome R. Corsi received a Ph.D. from Harvard University in Political Science in 1972. He is an investigative journalist and senior staff writer for several conservative websites. Corsi is coauthor of the No. 1 *New York Times* bestseller *Unfit for Command*, and is author of the No. 1 *New York Times* bestseller *The Obama Nation*. Since then, he has devoted his time to writing on politics and economics, two fields in which he has considerable experience. In his career, he has written numerous other *New York Times* bestselling nonfiction books.

# "I HAVE WRITTEN THIS BOOK IN THE FEAR THAT BEFORE I WAS FINISHED, THE FBI WOULD SHOW UP AT MY DOOR..."

In late 2018, in an FBI closed conference room with no windows, Dr. Corsi was confronted for hours upon hours at a time for detailed questioning about events that occurred in 2016. Dr. Corsi's inquisition was worthy of the Gestapo or KGB, designed to break even the most cooperating witness. Over a period of two months, three of Mueller's top prosecutors and an army of FBI agents—up to nine government officials at a time—questioned Dr. Corsi with his attorney, David Gray.

Throughout this harrowing ordeal, Dr. Corsi handed over his personal computers, his cell phone, all of his email accounts, his Twitter account, and his Google account. Finding no "smoking gun," Mueller's prosecutors blew up the meetings. Dr. Corsi refused to lie to the prosecutors to give them the ammunition they needed to prosecute Roger Stone, and as a result he was told he would be charged with a criminal offense for lying to the FBI and the Special Prosecutor.

At seventy-two years of age, Dr. Corsi was subjected to extreme mental anguish, imagining that he may never see his family again as a free man.

Dr. Corsi creates a compelling case indicating that the entire matter is an investigation in search of a crime—to force lying testimony from witnesses if that's what it takes to achieve Deep State political objectives.

USD $28.00 / CAD $37.00



PostHillPress

ISBN 978-1-64293-217-1



9 781642 932171

52800

# EXHIBIT 4

The Washington Post

Politics

# Witness in special counsel probe, former Stone associate, collected payments from Infowars through job Stone arranged

By Manuel Roig-Franzia and
Rosalind S. Helderman
January 24

Over the past several months, author and conspiracy theorist Jerome Corsi has emerged as one of special counsel Robert S. Mueller III's most vexing witnesses in his probe of Russian interference in the 2016 campaign.

Corsi — perhaps best known for promoting the false idea that former president Barack Obama was not born in the United States — has released internal special counsel documents, fulminated against alleged plea-deal offers and published a hastily written e-book outlining his account of interactions with his onetime ally, the longtime Trump adviser Roger Stone, a subject of intense scrutiny in Mueller's probe.

At the same time, Corsi says, he has been collecting what he describes as $15,000-a-month payments from Infowars, a website that has attacked the special counsel investigation as a deep-state conspiracy designed to topple President Trump.

An attorney for Infowars confirmed that these payments continued for the past six months as severance since Corsi lost his post as the website's Washington bureau chief — a job that Stone helped arrange, according to both Corsi and Stone.

The revelation of Corsi's arrangement with Infowars offers new context to the now-frayed relationship between Corsi and Stone, and how the on-again, off-again alliance between two of America's foremost conspiracy theorists has drawn the attention of Mueller's investigators.

Stone has said that research conducted by Corsi informed his predictions in 2016 that WikiLeaks would publish material damaging to Hillary Clinton's presidential campaign. Mueller has charged Russian intelligence officers with hacking Democratic emails and providing them to WikiLeaks. For months, he has been investigating whether Stone was working in coordination with the group, which Stone adamantly denies.

As part of the investigation into Stone, Mueller's prosecutors have interviewed a number of his associates and zeroed in on his relationship with Corsi, including emails between the two men in which Corsi indicated he had insight into WikiLeaks' plans, according to Corsi.

On Thursday, Corsi's stepson, Andrew Stettner, appeared before a grand jury hearing evidence in the case for about an hour. Afterward, his attorney Larry Klayman told reporters that Stettner had been questioned about his handling of Corsi's computers.

Investigators have also asked questions about Corsi's payments from Infowars, according to a person familiar with the special counsel investigation. Mueller's team appears to be exploring whether the payments were made to ensure that Corsi would offer investigators a version of events favorable to Stone, the person said.

Corsi said in an interview that he does not remember being asked by Mueller's investigators about the payments. But he

1

added that his brain was "mush" after 40 hours of questioning over several days and that he may have forgotten.

"It's really pretty far-fetched," Corsi said of the notion he was paid to keep quiet. "I'm the guy who has talked the most. I haven't been hushed by anything."

Stone, who has said he has not been contacted by the special counsel, called the suggestion that he helped Corsi get work to silence him "both ridiculous and false."

The extent of the special counsel's interest in Corsi's arrangement with the website is unclear. An attorney for Infowars said the site has not received any request for information from Mueller. A spokesman for the special counsel's office declined to comment.

After The Washington Post made inquiries about the payments last week, Corsi said he learned from Alex Jones's father, David, that the payments would stop, according to a legal complaint Corsi filed this week against The Post.

An Infowars attorney disputed that, saying that Corsi was fired in June and was paid the remainder of a one-year contract that ended this month. His Infowars pay had already been scheduled to end this month, the attorney said.

"Any claim that he stopped receiving those payments because of The Washington Post asking questions does not appear to be supported by any facts I know of," Infowars attorney Marc Randazza said.

In a letter to Corsi dated Jan. 18 — a day after The Post first interviewed him — David Jones wrote that he had agreed to pay the remainder of Corsi's contract after he was terminated in June "because of our history and contract considerations."

"As I discussed with you some time ago I cannot indefinitely pay your salary continuation," Jones wrote in the letter, which was posted online by Stone. Jones added that he would terminate the contract as of Jan. 31.

In an interview last week with The Post, Corsi offered two explanations for the payments that have drawn the interest of prosecutors. Initially, he described them as consulting fees related to the "exploratory" phase of a "fake news" project that he and David Jones — a former dentist who is the director of human resources for Infowars — were considering launching. Corsi said that the payments were "not directly related to Infowars."

Corsi later described the payments as severance after he left his post of Washington bureau chief for Infowars over the summer, a position that Stone helped him secure in early 2017 after Trump took office.

Stone, Corsi and Alex Jones all said that the Infowars job and the payments Corsi received after leaving are not related to Corsi's role in the Mueller probe.

"I assisted him because he was constantly whining about being broke," Stone said in an interview.

Corsi declined to comment on Stone's characterization of his finances.

In an Infowars column published Jan. 18, Jones wrote that "hiring Corsi had nothing whatsoever to do with WikiLeaks or any kind of 'hush money' operation, which is an absurd claim."

He noted that Corsi was hired almost two years before being interviewed in the special counsel's investigation and he

described payments to Corsi as "routine six months severance pay" following Corsi's departure from Infowars in June.

Corsi filed a complaint Monday against The Post; its owner, Jeffrey P. Bezos; and Manuel Roig-Franzia, one of the authors of this article, who had interviewed Corsi about his relationship with the website. The complaint amended a previously filed lawsuit that names as defendants Mueller, the FBI, the National Security Agency and the Central Intelligence Agency. It seeks $1.6 billion in damages, including at least half of that from Bezos.

In the lawsuit, Corsi claimed The Post's reporting amounted to "tortious interference" with his business relationship with Infowars.

A Post spokeswoman declined to comment on the lawsuit.

Corsi and Stone, who have become intertwined in the Mueller probe, were first brought together by Donald Trump.

Stone has previously told The Post that he first became aware of the conspiracy theorist and conservative writer when Trump posed a question to him in 2011: "Who is this guy, Jerome Corsi?"

When Stone asked Trump why he wanted to know about Corsi, Trump responded: "I've been talking to him."

Corsi had recently published a book titled "Where's the Birth Certificate: The Case That Barack Obama Is Not Eligible to Be President." Trump became the most ardent public proponent of Corsi's theory, staging splashy public appearances to taunt Obama to provide more proof about his birth.

Both men were ardent supporters of Trump's 2016 campaign and collaborated in hopes of getting the New York developer elected to the nation's highest office.

During the campaign, Stone has said he hired Corsi to conduct research about the Clintons and the Democrats. Later, they would offer conflicting accounts of their work together.

A key moment came on July 22, 2016, when WikiLeaks published tens of thousands of internal emails from the Democratic National Committee. The cache revealed tensions within the party during the primary contest between Sen. Bernie Sanders (I-Vt.) and Hillary Clinton. The revelations resulted in the resignation of the party chairwoman.

There was widespread speculation about what else WikiLeaks might have and when the group would release it. Stone saw an opportunity.

On July 25, 2016, Stone emailed Corsi and asked him to try to make contact with WikiLeaks founder Julian Assange and get copies of hacked emails in his possession, according to a draft court document drawn up by Mueller's investigators. In November, Corsi publicly released the document, which he said he been provided by the special counsel's office during failed plea negotiations.

Stone has said he was reacting to claims Assange had made on television about having damaging material about Clinton, characterizing his interest in the potential disclosures as no different from that of journalists and political operatives at the time.

When investigators first asked Corsi about the email, he claimed that he told Stone that trying to reach Assange could result in an investigation and they should wait for WikiLeaks to release material publicly, according to the draft court

filing.

But, according to the filing, Corsi actually forwarded Stone's email to a London-based associate and later wrote Stone an email about WikiLeaks' plans. "Word is friend in embassy plans 2 more dumps," Corsi wrote Stone on Aug. 2, 2016, according to the draft filing.

Corsi has said he surmised what WikiLeaks would do based on public reporting at the time but did not make contact with Assange.

That same month, Corsi has said in interviews, he told Stone that he believed — based on his own analysis of the DNC emails released in July — that WikiLeaks had hacked emails from Clinton campaign chairman John Podesta.

He has said he believes his tip is why Stone tweeted "it will soon [be] the Podesta's time in the barrel" on Aug. 21, 2016 — about six weeks before WikiLeaks began releasing Podesta's emails.

Stone has denied that Corsi told him WikiLeaks had Podesta's emails and said his tweet was based on unrelated research Corsi had provided him about John and his brother Tony Podesta's financial ties to Russia.

Stone's tweet was one of several statements he made before the election suggesting he was in contact with Assange and had advance knowledge of WikiLeaks's plans to release hacked emails — comments now under scrutiny by the special counsel.

Since the election, Stone has insisted he had no contact with Assange and did not know what the group planned. He has denied all wrongdoing and said he has been unfairly targeted by Mueller.

Stone and Corsi's relationship continued after Trump's election victory.

Stone suggested that they both go to work for Infowars, Corsi said in an interview. Randazza, the Infowars attorney, told The Post that Corsi was one of about 15 people whom Stone recommended to Jones as possible chiefs of the new Washington bureau for the conspiracy site. Randazza said Jones believed Corsi was the best and most experienced of the list.

Stone became a co-host and frequent commentator on the site, a position he maintains to this day. Corsi got the bureau chief job in Washington.

Corsi, who has a securities license, said he also took an interest in the business operations of the site, approached Alex Jones about financing options for Infowars.

"Alex was not wanting investors," Corsi said in an interview. "We had some differences. Those differences, over time I think, led to our parting of the ways."

In the column published by Infowars, Alex Jones wrote that Corsi's employment with the company ended in June after Corsi's "failure to adequately establish a Washington bureau, his failure to maintain White House press credentials and his generally poor work performance."

Corsi said in an interview that he could not remember if he "was fired or I quit."

"We just kind of mutually — without talking about it — decided I wasn't working there anymore," Corsi said.

Three months after his split with Infowars, Corsi was subpoenaed in the Mueller probe. At the time, Corsi's attorney said that he would cooperate fully with the investigation.

It wasn't long before his role as a witness caused friction with Stone and the two began attacking each other publicly. In November, Corsi asserted in interviews that Stone had urged him to come up with a cover story to explain the Podesta tweet by sending a research memo nine days after the tweet had been posted.

Stone has said that the memo was simply memorializing conversations they had had before the tweet and called Corsi's claim "both categorically false and ludicrous — not to mention illogical."

Corsi also said in November that he'd been cooperating with Mueller's team but had decided to reject a plea deal proposed by prosecutors because it included a requirement that he admit to lying about his interactions with Stone.

From their respective corners of the Internet, the two conspiracy maestros have spent the months since then in verbal combat with Mueller and each other.

In his lawsuit, Corsi declared that Mueller and the media were in cahoots to set in motion a "legal coup d'etat" to either indict Trump or remove him from office. On Infowars last week, Stone and Alex Jones discussed a grand scheme by prosecutors and the media to arrest both of them, as well as Jones's father, Trump and Vice President Pence, to install House Speaker Nancy Pelosi as president and Hillary Clinton as vice president. Stone then predicted that Pelosi would resign and Clinton would become president.

As their feuds with each other and with the special counsel's office have deepened, both Corsi and Stone have taken to appealing to a higher power.

Corsi took to Twitter recently to accuse Mueller and the "Deep State" of trying to destroy him and his family.

"If I can hold a pen, I will not be silenced," he tweeted. "In the end, God always wins."

On Instagram, Stone declared that Corsi, a friend turned enemy, would suffer for not standing by him: "God will strike this liar down."

*Spencer S. Hsu contributed to this report.*

**Manuel Roig-Franzia**
Manuel Roig-Franzia is a feature writer in The Washington Post's Style section, where he profiles national figures in the worlds of politics, the law and the arts. He previously served as bureau chief in Miami for The Post's National staff and in Mexico City for the Post's Foreign staff. He is the author of a biography of Sen. Marco Rubio.  Follow 🐦

**Rosalind S. Helderman**
Rosalind Helderman is a political enterprise and investigations reporter for The Washington Post. She joined The Post in 2001.  Follow 🐦

**<u>EXHIBIT 5</u>**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DR. JEROME CORSI, Individually
Denville, NJ, 07834

Plaintiff

v.

ROGER STONE, Individually
4300 Bayview Drive
Fort Lauderdale, FL, 33308

Defendant.

**Case Number:**

**COMPLAINT**

## INTRODUCTION

Plaintiff, DR. JEROME CORSI ("Plaintiff" or "Corsi") hereby files this action against ROGER STONE ("Defendant Stone") for Defamation, Intentional Infliction of Emotional Distress and Assault

## JURISDICTION AND VENUE

1.      This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

2.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), (3) in that a substantial part of the events or omissions giving rise to Plaintiff Corsi's claims arose herein.

## THE PARTIES

3.      Plaintiff, Dr. Jerome Corsi, is an author and political commentator who publishes works in this judicial district and nationwide. Plaintiff Corsi is a citizen of New Jersey.

4.      Defendant, Roger Stone, is an individual and a citizen of Florida and a resident of

1

Fort Lauderdale, Florida. Defendant Stone was recently indicted by Special Counsel Robert Mueller as part of the alleged "Russian Collusion' investigation.  His address is 4300 Bayview Drive, Fort Lauderdale, FL, 33308

## **GENERAL ALLEGATIONS**

5.      Defendant Stone was recently indicted by Special Counsel Robert Mueller ("Mueller Indictment") as part of his "Russian Collusion" investigation for the alleged crimes of perjury, witness tampering and obstruction of justice. The indictment comprises seven different felony counts. *See* Exhibit 1 – Mueller Indictment. Importantly, Plaintiff Corsi was not accused of any wrongdoing or illegality in the Mueller Indictment, in which he named as Person 1, a material witness to the alleged crimes committed by Stone.

6.      Specifically, the seven count Mueller Indictment against Defendant Stone involves alleged lying under oath - that is, perjury - witness tampering and obstruction of justice by threatening to kill a material witness, Randy Credico ("Credico") and his dog if Credico did not lie to government authorities concerning his involvement with Roger Stone. Credico is Person 2 in the Mueller Indictment of Defendant Stone. *Id.* Person 1 in this Mueller Indictment is Plaintiff Corsi.

7.      Even before Defendant Stone was indicted, he began a public relations campaign in this district, nationally and internationally to smear, intimidate and threaten Plaintiff Corsi, a material witness in the "Russian Collusion" investigation.  Plaintiff Corsi is listed as Person 1 in the Mueller Indictment and was not indicted along with Defendant Stone, as he testified truthfully to the grand jury and in interviews.

8.      To the contrary, Plaintiff Corsi has never defamed or disparaged Defendant Stone.

9.      Defendant Stone knew that he was going to be indicted, and therefore began this

public relations campaign to smear, defame, intimidate and threaten Plaintiff Corsi, even before

his actual indictment on January 25, 2019, in order to try to influence public opinion and Special

Counsel Robert Mueller – by trying to attribute guilt to Plaintiff Corsi and not him - as well as to

try to raise money for his legal defense. This pattern and practice of defaming, intimidating and

threatening Plaintiff Corsi, and his legal counsel, is ongoing, so Plaintiff Corsi reserves the right

to amend this Complaint.

10.    Defendant Stone likes to portray himself as Mafia, frequently making reference to

Mafia figures who he admires, as well as other unsavory types who have been alleged to have

engaged in unethical and/or illegal behavior.  He frequently makes reference to his heroes being

Hyman Roth in the 'Godfather," who was the movie version of Meyer Lansky, and Roy Cohn,

not to mention, Richard Nixon, for his role in Watergate. In this regard, after Stone was indicted

he held a press conference on the courthouse steps of the federal courthouse in Ft. Lauderdale,

where he was booked, with his arms defiantly in the air in the "victory' pose used by Nixon after

he resigned in disgrace as a result of the Watergate scandal. At the time, Stone had been

employed by a Nixon group called CREEP, or the Committee to Reelect the President.

Defendant Stone even has a large tattoo of Richard Nixon affixed to his back. Thus, given his

admiration for persons such as these, particularly Mafia figures, his actions as pled herein can be

taken as threats, as well as being defamatory. And, Plaintiff Corsi is 72 years old. Defendant

Stone's intentional infliction of emotional distress and coercion and threats are intended to try

even cause Plaintiff Corsi to have heart attacks and strokes, in order that Plaintiff will be unable

to testify at Stone's criminal trial. Tellingly, Defendant Stone threatened kill a material witness

and his dog, Credico, Person 2 in the Mueller Indictment, "Mafia style."  Defendant Stone also

fashions himself and indeed has the reputation, at a minimum, as being the preeminent "dirty

trickster." *See* "Get Me Roger Stone" on Netflix.

11.     Plaintiff Corsi has been named as a material witness to Defendant Stone's upcoming prosecution, which has prompted Defendant Stone to try to intimidate, coerce and threaten Plaintiff Corsi by defaming him and threatening him with physical violence, which is ironically what he was criminally indicted for, in part.

12.     By defaming Plaintiff Corsi, Defendant Stone is hoping to not only intimidate Plaintiff Corsi to severely harm and damage his reputation, but also to coerce and threaten Plaintiff Corsi to testify falsely if subpoenaed to be called as a material witness in Defendant Stone's ensuing criminal trial. He is also trying divert funds away from Plaintiff Corsi's legal defense fund, while boosting his own legal defense fund.

13.     Defendant Stone has also used and continues to employ surrogates, either out in the open or secretly, to defame Plaintiff Corsi, such as his "friend" Michael Caputo, Alex Jones and J. Owen Stroyer of InfoWars, Cassandra Fairbanks, and reporter Chuck Ross of The Daily Caller, to name just a few. More surrogates will be identified during discovery and they may be joined, with leave of court to amend this Complaint, as defendants herein. The use of surrogates is consistent with Defendant Stone's reputation as a "dirty trickster" who works as well under "cover of darkness" to harm and damage others who he sees for whatever reason as adversaries, political or otherwise as in the case of Plaintiff Corsi. Plaintiff Corsi is not Defendant Stone's adversary, as he simply is committed as Person 1 in the Mueller Indictment to testify truthfully if subpoenaed to testify at Stone's criminal trial.

14.     Defendant Stone is no stranger to defamation lawsuits. As reported by Splinter News, Defendant Stone was forced to - as part of a settlement in another defamation suit – apologize in newspapers and on social media for lying about Chinese Businessman Guo Wengui

on InfoWars, after having falsely published that Mr. Wengui is a "turncoat criminal who is convicted of crimes here and in China."[1]

15.     Defendant Stone has therefore engaged in illegal witness tampering and intimidation, in violation of 18 U.S.C. § 1512 by virtue of the defamatory and threatening acts and practices as alleged herein. Not coincidentally, this was what largely he was indicted for by Special Counsel Robert Mueller.

<u>DEFENDANT STONE'S DEFAMATORY STATEMENTS</u>

16.     Before Defendant Stone was indicted, on or about January 18, 2019, he appeared on InfoWars, where he made several false, misleading and defamatory statements in this district, nationally and internationally  regarding Plaintiff Corsi (the "InfoWars Video").[2] The same video was published on Defendant Stone's YouTube channel, "*Stone Cold Truth*," on January 18, 2019.[3]

17.     At 2:09 in the InfoWars Video, Defendant Stone falsely publishes that Plaintiff Corsi was "fired from World Net Daily."

18.     At 2:27 in the InfoWars Video, Defendant Stone falsely and misleadingly publishes that, "He (Corsi) was perfectly willing to lie, to perjure himself saying that a memo that he had wrote me was written on the 30th for the purposes of cover-up…. which is further proof that Jerry lied under oath."

19.     At 2:55 in the InfoWars Video, Defendant Stone falsely and misleadingly publishes, "and then states that I knew about John Podesta's emails being stolen in advance, the only proof of that is Jerry's feeble alcohol affected memory – it's a lie…."

---

[1] Sophie Weiner, *Roger Stone Lied About a Chinese Businessman on InfoWars and Now He Has to Tell Everyone*, Splinter News, Dec. 17, 2018, available at: https://splinternews.com/roger-stone-lied-about-a-chinese-businessman-on-infowar-1831162926
[2] https://www.infowars.com/watch/?video=5c3fbf24fe49383dcf6996e4
[3] https://www.youtube.com/watch?v=cJyfgdvtFx8

20.     At 3:35 in the InfoWars Video, Defendant Stone falsely and misleadingly publishes that "Jerry was prepared to stab a principle Trump supporter in the back, he was perfectly prepared to bear false witness against me, even though I had done nothing in my entire life other than help him."

21.     At 4:20 in the InfoWars Video, Defendant Stone falsely and misleadingly publishes that "all I ever did was show Jerry Corsi friendship and support and try to help him and his family and what I get is Judas Iscariot, the willingness to testify against me and help the deep state bury me….and then he makes up this story about helping me formulate a cover story."

22.     At 6:26 in the InfoWars Video, Defendant Stone falsely publishes that "you can always tell when Jerry Corsi is lying because his lips are moving…."

23.     Defendant Stone made these false, misleading and defamatory statements with malice and with full knowledge that they were false and misleading, and/or at a minimum, with a reckless disregard for its truthfulness. These statements falsely and misleadingly state that Plaintiff Corsi was fired from World Net Daily, that he committed perjury (a federal offense), and that he is an untruthful person.

24.     On January 2, 2019, Defendant Stone published an article on www.infowars.com titled "*ROGER STONE BELIEVES JEROME CORSI WORKS FOR MUELLER*[4]" in which Defendant Stone falsely, misleadingly, and maliciously writes, "Before you decide that Corsi is a hero you should be well aware of the fact that the good doctor was prepared to bear false witness against others in the Trump orbit if he thought it would save his own skin."

25.     Defendant Stone made these false, misleading and defamatory statements with malice and with full knowledge that they were false and misleading, and/or at a minimum, with a reckless disregard for its truthfulness. These statements falsely and misleadingly state that

---

[4] https://www.infowars.com/roger-stone-the-treachery-of-jerome-corsi/

Plaintiff Corsi committed perjury (a federal offense), and that he is an untruthful person.

26.     In another appearance on InfoWars, which was posted to YouTube[5] on January 17, 2019, Defendant Stone at 6:22 falsely and misleadingly publishes that "He [Corsi] was perfectly willing to bear false witness against me on multiple points that are complete fabrications."

27.     In another appearance on InfoWars, which was posted to YouTube[6] on January 24, 2019, Defendant Stone at 5:58  falsely and misleadingly publishes that "the good doctor [Corsi] has told a number of lies. In fact, he's starting to conflate his lies…. he was perfectly willing to lie about me…. but now lying about Alex Jones, lying about InfoWars, lying about Dr. Jones, who's one of the nicest, gentlest, sweetest, most honest men I have ever met, it's beyond the pale…. Jerry Corsi can no longer be believed."

28.     In the same appearance, Defendant Stone at 8:34 falsely and misleadingly publishes that, "I think you've [Corsi] been deep state from the beginning. Your whole birther thing is used as a club to destroy conservatives….I look forward to our confrontation. I will demolish you. You're a fraudster, out of your alcoholic haze you have made up lies about David Jones and Alex Jones and Roger Stone and now I suspect they want you to lie about the President." This is clearly a threat, as well as being defamatory. It is akin to the threats against Person 2 in the Mueller Indictment, Randy Credico, who Defendant Stone, as set forth in the Mueller Indictment, based on Stone's own words contained in his own documentary evidence, threatened kill along with Credico's dog.

29.     Defendant Stone made these false, misleading and defamatory statements with malice and with full knowledge that they were false and misleading, and/or at a minimum, with a

---

[5] https://www.youtube.com/watch?v=GJd8YBDvm1Q
[6] https://www.youtube.com/watch?v=fXUlJZRxe6E

reckless disregard for their truthfulness. These statements falsely and misleadingly state that Plaintiff Corsi committed perjury (a federal offense), is an untruthful person, and is an alcoholic. They also contain threats against Plaintiff Corsi.

## FIRST CAUSE OF ACTION
### *Defamation*

30.    Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

31.    Defendant Stone published malicious, false, misleading and defamatory statements of and concerning Plaintiff Corsi in this judicial district, nationwide, and worldwide.

32.    These false and misleading statements were published with malice, as Defendant Stone knew that they were false and misleading, or at a minimum acted with a reckless disregard for the truth.

33.    Plaintiff Corsi has been severely harmed and damaged by these false and misleading statements because they subjected him to hatred, distrust, ridicule, contempt, and disgrace.

34.    Plaintiff Corsi has been damaged by these false and misleading statements because they injured Plaintiff Corsi in his profession and business as a journalist and author, whose credibility is the most important trait, as well as severely injured and damaged him personally.

## SECOND CAUSE OF ACTION
### *Defamation Per Se*

35.    Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

36.    Defendant Stone, as alleged herein, published numerous false, misleading and

defamatory statements to severely harm and damage Plaintiff Corsi, which were republished elsewhere, and through surrogates, which publish the falsity that Plaintiff Corsi has committed crimes, including perjury, and engaged in moral turpitude in the form of alcoholism, as set forth in the preceding paragraphs.

37.     These false, misleading and defamatory statements were published in this district and on the internet and elsewhere, domestically and for the entire world to see and hear and specifically Stone published false and misleading facts, *inter alia*, that Plaintiff's conduct, characteristics or a condition is incompatible with the proper exercise of his lawful business, trade, profession or office.

38.     These false and misleading statements were published with malice, as Defendant Stone knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

39.     This statements are *per se* defamatory because they falsely and misleadingly publish that Plaintiff Corsi committed perjury, which is a federal offense and felony. Defamation *per se* gives rise to the presumption that severe harm and damage has arisen by virtue of the false and misleading statements.

40.     These false, misleading, and defamatory statements are defamatory *per se* and these false and misleading statements severely harmed and damaged Plaintiff Corsi in his profession and business as a journalist and author, whose credibility is the most important trait, as well as personally.

### THIRD CAUSE OF ACTION
#### *Defamation by Implication*

41.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

42. Defendant Stone published numerous false, misleading and defamatory statements about Plaintiff Corsi, as set forth in the preceding paragraphs.

43. These false, misleading and defamatory statements were published on the internet and published and republished elsewhere in this district, domestically and for the entire world to see and hear.

44. These false and misleading statements were published with malice, as Defendant Stone knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

45. These statements created the false and misleading implication that Plaintiff Corsi is dishonest, committed perjury and is an alcoholic, among other false and misleading statements as pled in the preceding paragraphs.

46. Plaintiff Corsi has been severely harmed and damaged by these false and misleading statements because they subject him to hatred, distrust, ridicule, contempt, and disgrace.

47. Plaintiff Corsi has been damaged by these false and misleading statements because the statements severely harmed and damaged Plaintiff Corsi in his profession as a journalist and author, whose credibility is the most important trait, as well as personally.

### FOURTH CAUSE OF ACTION
#### *Intentional Infliction of Emotional Distress*

48. Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

49. Defendant Stone engaged in extreme and outrageous conduct by threatening Plaintiff Corsi, in concert with Stone, who has made death threats to at least one witness involved in Special Counsel Mueller's Russian collusion investigation, Person 2 Randy Credico.

50. Defendant Stone knowingly and intentionally threatened Plaintiff Corsi, in a manner similar to other death threats he made to at least one material witness, involved in Special Counsel Mueller's Russian collusion investigation, such as Randy Credico, Person 2 in the Mueller Indictment.

51. Defendant Stone's extreme and outrageous conduct directly caused Plaintiff Corsi severe emotional distress and resulting severe harm and damage.

## FIFTH CAUSE OF ACTION
### *Assault*

52. Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

53. Defendant Stone placed Plaintiff Corsi in apprehension of an imminent harmful or offensive contact and physical harm and death, by coercing and threatening Plaintiff Corsi, in a similar manner he has used to make death threats to at least one material witness involved in Special Counsel Mueller's Russian collusion investigation, such as Person 2 in the Mueller Indictment, Randy Credico.

54. The threats issued by Defendant Stone are credible, as he portrays himself as a "mafia" figure, as set forth above.

55. Plaintiff Corsi did not consent to Defendant Stone' conduct.

56. As a direct and proximate result of Defendant Stone's wrongful conduct, Plaintiff Corsi suffered conscious pain, suffering, severe emotional distress and the fear of imminent serious bodily injury or death, and other mental and physical injuries, and Plaintiff was severely harmed and damaged thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dr. Jerome Corsi prays for judgment against Defendant Stone as

follows:

a.      Awarding Plaintiff Corsi compensatory including actual, consequential, incidental and punitive damages for malicious tortious conduct in an amount to be determined at trial and in excess of $25, 000,000 U.S. Dollars. While Stone feigns being financially destitute as a result of his legal problems and uses this to raise money for his legal defense fund, on information and belief he is wealthy, perhaps hiding his wealth in overseas bank accounts.

b.      Awarding Plaintiff Corsi attorney's fees and costs.

c.      Granting any further relief as the Court deems appropriate including preliminary and permanent injunctive relief, as well as the entry of a gag order against Defendant Stone in his criminal prosecution before this Court in order that he be prevented from intimidating, coercing and threatening material witnesses, such as Plaintiff Corsi, who are likely to be subpoenaed to testify at his trial. In this regard, Plaintiff Corsi will also, with leave of court requested, file an amicus brief arguing for a gag order on Defendant Stone in the related criminal case *United States of America v. Stone*, 19-cr-18 (D.D.C).

Dated: February 7, 2019                          Respectfully Submitted,


                                                  */s/ Larry Klayman*
                                                 Larry Klayman, Esq.
                                                 KLAYMAN LAW GROUP, P.A.
                                                 D.C.  Bar Number: 334581
                                                 2020 Pennsylvania Ave NW #800
                                                 Washington, DC, 20006
                                                 Telephone:  (310)-595-0800
                                                 Email: leklayman@gmail.com
                                                 *Counsel for Plaintiff*

# **<u>EXHIBIT 6</u>**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DR. JEROME CORSI, Individually
Denville, NJ, 07834

And

LARRY KLAYMAN, Individually
7050 W. Palmetto Park Rd. #15-287
Boca Raton, FL, 33433

              Plaintiffs

              v.

INFOWARS, LLC
100 Congress Ave., 22nd Floor
Austin, TX 78701

And

FREE SPEECH SYSTEMS, LLC
100 Congress Ave., 22nd Floor
Austin, TX 78701

And

ALEX E. JONES, Individually
3019 Alvin Devane Blvd., Suite 300-350
Austin, TX 78741

And

DAVID JONES, Individually
3019 Alvin Devane Blvd., Suite 300-350
Austin, TX 78741

And

OWEN SHROYER, Individually
3019 Alvin Devane Blvd., Suite 300-350
Austin, TX 78741

              Defendants.

**Case Number:**

**COMPLAINT**

**INTRODUCTION**

Plaintiffs DR. JEROME CORSI ("Plaintiff Corsi or Dr. Corsi") and LARRY KLAYMAN ("Klayman") hereby files this action against INFOWARS, LLC ("Defendant InfoWars"), FREE SPEECH SYSTEMS, LLC ("Defendant Free Speech Systems"), ALEX E. JONES ("Defendant Alex Jones"), DAVID JONES ("Defendant David Jones") and OWEN SHROYER ("Defendant Shroyer") for Defamation, Intentional Infliction of Emotional Distress, and Assault, and violation of the Lanham Act.

**JURISDICTION AND VENUE**

1.      This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

2.      This Court has federal question jurisdiction over this case pursuant to 28 U.S.C § 1331.

3.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), (3) in that a substantial part of the events or omissions giving rise to Plaintiffs' claims arose in this district. Defendants' actions are targeted to influence Special Counsel Robert Mueller's Russian collusion investigation and prosecution of Roger Stone - who is a colleague of the Defendants - which is centralized in this judicial district, and the defamatory and other illegal acts occurred herein.

**THE PARTIES**

4.      Plaintiff Corsi is an author and political commentator who publishes works in this judicial district and nationwide. Plaintiff Corsi is a citizen of New Jersey.

5.      Plaintiff Klayman is a public interest legal advocate, private practitioner and litigator who represents Plaintiff Corsi with regard to Special Counsel Robert Mueller's

("Mueller") Russian collusion investigation.  Plaintiff Klayman is also a media personality and author, columnist and syndicated radio talk show host. Plaintiff Klayman is a citizen of Florida.

6.      Defendant InfoWars is a Texas limited liability company with principal offices located in Austin, TX.

7.      Defendant Free Speech Systems is a Texas limited liability company with principal offices located in Austin, TX.

8.      Defendant Alex Jones is a well-known extreme "conspiracy theorist" and media personality who creates content that is broadcasted on the radio and posted on the internet at www.infowars.com and elsewhere on the internet and other social media sites. Defendant Alex Jones is a citizen of Texas.

9.      Defendant David Jones is Defendant Alex Jones's father and holds the official title of Director of Human Relations for Defendant Free Speech Systems. On information and belief, Defendant David Jones is the owner of Defendants InfoWars and Free Speech Systems and he manages the business activities for Defendants InfoWars and Free Speech Systems, as well as Defendant Alex Jones' other companies. Defendant David Jones is a citizen of Texas. At all material times he worked in concert with the other Defendants and Roger Stone and furthered and ratified and furthered the illegal acts set forth in this Complaint.

10.     Defendant Shroyer is a newscaster for Defendant InfoWars. Defendant Shroyer is a citizen of Texas.

## GENERAL ALLEGATIONS

11.     Defendant InfoWars and Defendant Free Speech Systems are both owned, controlled, and operated by Defendant Alex Jones and David Jones. Defendant Free Speech Systems owns www.infowars.com, where content created by Defendants Alex Jones and Shroyer

are posted and broadcast into this district, nationally and internationally.

12.     Defendant Alex Jones hosts *The Alex Jones Show*, which is broadcast on radio and internet social media networks throughout the United States of America and internationally, including this judicial district, and online.

13.     Defendant Shroyer hosts *The War Room* along with Roger Stone ("Stone"), which is broadcast on radio and internet social media networks throughout the United States of America and internationally, including this judicial district, and online.

14.     Defendants' reach and influence are enormous. On information and belief, Defendant Alex Jones and InfoWars has a radio audience of over two million people. Before it was banned from YouTube, Defendant Alex Jones' and InfoWars' channel had more than 2.4 million subscribers.[1]

15.     Defendants, each and every one of them, in concert, do substantial business and promote and sell various goods in this judicial district and nation-wide, including medicine, supplements, and "tchotchkes" with InfoWars branding. The money earned from these sales funds the conspiracy between Defendants and Stone to defame, intimidate, coerce and threaten Plaintiffs in order to try to improperly influence the Mueller Russian collusion investigation and to coerce false testimony from Plaintiff Corsi favorable to Stone in his upcoming criminal prosecution.

16.     Stone also does business promotes and sells various goods in this judicial district and nation-wide, including medicine, supplements, books, and "tchotchkes" with his own branding. The money earned from these sales funds Stone's legal defense fund and the

---

[1] Casey Newton, *YouTube deletes Alex Jones' channel for violating its community guidelines*, The Verge, Aug. 6, 2018, available at: https://www.theverge.com/2018/8/6/17656708/youtube-alex-jones-infowars-account-deleted-facebook-apple-spotify

conspiracy between Defendants and Stone to defame, intimidate, coerce and threaten Plaintiffs in order to try to improperly influence the Mueller Russian collusion investigation and to coerce false testimony from Plaintiff Corsi favorable to Stone in his upcoming criminal prosecution.

17.     Defendants have a long and sordid history of publishing and broadcasting defamatory material, including falsely, recklessly and baselessly accusing the families of the schoolchildren who lost their lives during the 2012 Sandy Hook Elementary School massacre of staging the massacre and faking the deaths of their children.[2]

18.     The Sandy Hook families had to endure years of abuse and torture from Defendants before finally filing suit against numerous parties involved with InfoWars, including Defendant Alex Jones and Shroyer, for defamation.

19.     As just one example, a Florida woman was arrested for making  death threats to a parent of a Sandy Hook victim.[3] According to the U.S. Department of Justice, the motivation behind the threats was the lies propagated by Defendants that the Sandy Hook massacre was a hoax.[4]

20.     Furthermore, Defendant Alex Jones in concert with the other Defendants propagated and promoted the "Pizzagate" conspiracy on his show, accusing a restaurant called Comet Ping Pong in the Washington D.C. area of operating a child sex ring in its non-existent basement that purportedly involved Hillary Clinton and John Podesta. This caused one of his listeners to shoot up the restaurant after being told by Defendant Jones to "self-investigate" the

---

[2] Aaron Katersky, *Families of Sandy Hook shooting victims win legal victory in lawsuit against InfoWars, Alex Jones*, ABC News, Jan. 11, 2019, available at: https://abcnews.go.com/US/families-sandy-hook-shooting-victims-win-legal-victory/story?id=60314174
[3] Daniella Silva, *Conspiracy Theorist Arrested for Death Threats Against Sandy Hook Parent*, NBC News, Dec. 7, 2016, available at: https://www.nbcnews.com/news/us-news/conspiracy-theorist-arrested-death-threats-against-sandy-hook-parent-n693396
[4] *Id.*

"Pizzagate" conspiracy theory.[5]

21.     Defendants, acting in concert, propagated these outrageous lies with no regard for the grief of their victims in order to gain notoriety, fame, and profit.

22.     Defendants, acting in concert, as part of their latest scheme for notoriety, fame, and profit, are now working in concert with Stone to defame, intimidate, and threaten Plaintiffs.

23.     Stone, who recently been indicted on seven counts of perjury, witness tampering and obstruction of justice by Special Counsel Robert Mueller and then placed under a total gag order by the jurist, the Honorable Amy Berman Jackson,  presiding over his prosecution for, in part, even threatening her,  has appeared numerous times on shows broadcasted by Defendant InfoWars, and hosted by Defendants Alex Jones and Shroyer, where Stone and Defendants have published malicious false, misleading, and defamatory statements concerning Plaintiffs.

24.     Again, Stone was recently indicted by Special Counsel Robert Mueller ("Mueller Indictment") as part of his "Russian Collusion" investigation for the alleged crimes of perjury, witness tampering and obstruction of justice. The indictment comprises seven different felony counts. *See* Exhibit 1 – Mueller Indictment.  Importantly, Dr. Corsi was not accused of any wrongdoing or illegality in the Mueller Indictment, in which he named as Person 1, a material witness to the alleged crimes committed by Stone. (Note: The facts set forth in all Exhibits attached to and referenced in this Complaint are factually incorporated into this Complaint by reference).

25.     Specifically, the seven count Mueller Indictment against Stone involves alleged lying under oath - that is, perjury - witness tampering and obstruction of justice by threatening to

---

[5] James Doubek, *Conspiracy Theorist Alex Jones Apologizes For Promoting 'Pizzagate'*, NPR, Mar. 26, 2017, available at: https://www.npr.org/sections/thetwo-way/2017/03/26/521545788/conspiracy-theorist-alex-jones-apologizes-for-promoting-pizzagate

kill a material witness, Randy Credico ("Credico") and his service dog, if Credico did not lie to government authorities concerning his involvement with Roger Stone. Credico is Person 2 in the Mueller Indictment of Stone. *Id.* Person 1 in this Mueller Indictment is Dr. Corsi.

26. Even before Stone was indicted, he began a public relations campaign in this district, nationally and internationally to maliciously defame, smear, intimidate and threaten Dr. Corsi and Plaintiff Klayman, Plaintiff Corsi's lawyer and defense counsel.

27. As just one example, in an article from The New Yorker, Stone was quoted as saying about Plaintiff Corsi, "He's certifiably insane, and he has told multiple provable lies."[6] This malicious defamatory statement, among others, was published in concert with Defendants.

28. Stone knew that he was going to be indicted, and therefore began this public relations campaign to maliciously defame smear, intimidate and threaten Plaintiff. Corsi and Plaintiff Klayman, even before his actual indictment on January 25, 2019, in order to try to influence public opinion and Special Counsel Robert Mueller – by trying to attribute guilt to Plaintiff Corsi and not him - as well as to try to raise money for his legal defense. This defamatory public relations campaign is and continues to be calculated to coerce Plaintiff Corsi to testify falsely at Stone's upcoming criminal trial before Judge Jackson. This pattern and practice of defaming, intimidating and threatening Plaintiff Corsi and Plaintiff Klayman is pervasive and ongoing, and therefore Plaintiffs reserve the right to amend this Complaint. Defendants, as alleged herein, are acting in concert with Stone to engage in criminal witness tampering and obstruction of justice not just with regard to Plaintiff Corsi, who is Person 1 in the indictment of Stone, and thus a material witness, but also Dr. Corsi's attorney Larry Klayman.

---

[6] Jeffrey Toobin, *Roger Stone's and Jerome Corsi's Time in the Barrel*, The New Yorker, Feb. 18 & 25 Issue, available at: https://www.newyorker.com/magazine/2019/02/18/roger-stones-and-jerome-corsis-time-in-the-barrel

This action by Defendants, each and every one of them, jointly and severally against Plaintiff Corsi and his attorney Plaintiff Klayman constitute crimes pursuant to 18 U.S.C. § 1512.

29. Stone likes to portray himself as Mafia, and indeed on information and belief has Mafia connections, frequently making reference to Mafia figures who he admires, as well as other unsavory types who have been alleged to have engaged in unethical and/or illegal behavior. For example, he frequently makes reference to his heroes being Hyman Roth in the 'Godfather," who was the movie version of Meyer Lansky, and Roy Cohn, not to mention, Richard Nixon, for his role in Watergate. In this regard, after Stone was indicted he held a press conference on the courthouse steps of the federal courthouse in Ft. Lauderdale, where he was booked, with his arms defiantly in the air in the "victory' pose used by Nixon after he resigned in disgrace as a result of the Watergate scandal. At the time, Stone had been employed by a Nixon group called CREEP, or the Committee to Reelect the President. Defendant Stone even has a large tattoo of Richard Nixon affixed to his back. Thus, given his admiration for persons such as these, particularly Mafia figures, his actions as pled herein can be taken as threats, as well as being defamatory. And, Plaintiff Corsi is 72 years old and thus very vulnerable emotionally and physically to these threats. Stone's intentional infliction of emotional distress and coercion and threats are intended to try even cause Plaintiff Corsi to have heart attacks and strokes, in order that Plaintiff will be unable to testify at Stone's criminal trial. Tellingly, Stone threatened kill a material witness and his service dog, Credico, Person 2 in the Mueller Indictment, "Mafia style." Stone also fashions himself and indeed has the reputation, at a minimum, as being the preeminent "dirty trickster." *See* "Get Me Roger Stone" on Netflix.

30. By defaming Plaintiffs, Stone is hoping to not only intimidate Plaintiffs to severely harm and damage their reputations, but also to coerce and threaten Plaintiff Corsi to

testify falsely if subpoenaed to be called as a material witness in Stone's ensuing criminal trial. He is also trying divert funds away from Dr. Corsi's legal defense fund, while boosting his own legal defense fund.

31.     Defendants and Stone's conspiracy to defame, smear, intimidate, tamper with and threaten Plaintiffs is calculated to improperly and illegally influence the Russian collusion investigation, for which Stone has already been criminally indicted and to coerce false testimony favorable to Stone at his upcoming prosecution.  This illegal conduct is also maliciously intended to harm Plaintiffs' reputations and credibility as Stone fears that Dr. Corsi will testify truthfully if subpoenaed by Special Counsel Mueller at Stone's upcoming criminal prosecution.

32.     Stone has also used and continues to employ surrogates, either out in the open or secretly, to defame Plaintiffs, such as Defendants herein, and his "friend" Michael Caputo, Cassandra Fairbanks, reporter Chuck Ross of The Daily Caller, and Tom Fitton of Judicial Watch, to name just a few.

33.     Tellingly, in a video published by The Daily Caller, Defendant Shroyer appearing with Stone, admits that he will serve as a surrogate for Stone if Stone receives a gag order, which he has. [7]  The other Defendants, like Stoyer, are also surrogates of Stone.

34.     Stone's illegal and improper attempts to influence the Russian collusion investigation has even been recognized by the presiding judge, the Honorable Amy Berman Jackson ("Judge Jackson"), who has now issued a complete "gag" order on Stone after Stone attempted to incite violence against Judge Jackson by putting a picture of her face and gun crosshairs up on his Instagram account.[8]

---

[7] https://www.youtube.com/watch?v=SSDkh5RYtGo
[8] *Judge in Roger Stone case orders hearing after he appeared to threaten her on Instagram*, Washington Post, Feb. 19, 2019, available at:
https://www.washingtonpost.com/politics/2019/02/18/roger-stone-deletes-photo-judge-presiding-

35.     In her minute order of February 21, 2019 imposing the total "gag" order on Stone, Judge Jackson directly cites and references his use of surrogates:

> Furthermore, the defendant may not comment publicly about the case indirectly by having statements made publicly on his behalf by surrogates, family members, spokespersons, representatives, or volunteers.

36.     Further evidence of Stone's collaboration with Defendants, as well as Stone's pattern and practice of defamatory, intimidating, coercive, threatening and defamatory conduct is set forth in an *amicus curiae* brief filed by Plaintiff Klayman on behalf of Plaintiff Corsi in Stone's criminal case. Such evidence is attached hereto as Exhibit 2 and incorporated herein by reference, as well as civil complaint filed by Corsi and Klayman against Stone, and in a civil complaint filed by Klayman against Fitton. *See* Exhibits 3, 4, and 5, which are incorporated herein by reference.

37.     Defendants have, by working in concert with Stone, therefore engaged in illegal witness tampering, intimidation and threats in violation of 18 U.S.C. § 1512 by virtue of the defamatory and threatening acts and practices as alleged herein. Not coincidentally, this was what largely Stone was indicted for by Special Counsel Robert Mueller.

<u>DEFENDANTS' DEFAMATORY CONDUCT</u>

38.     Stone has appeared numerous times on programs of the Defendants, *The Alex Jones Show* and The *War Room*, which are hosted by Defendant Alex Jones and Shroyer where numerous false, misleading, malicious and defamatory statements of and concerning Plaintiffs were made, published, and or ratified by all of the Defendants, each and every one of them.

39.     Plaintiffs have demanded retraction and correction of the defamatory videos and publications set forth below and generally in this Complaint, but Defendants have refused,

---

over-his-case-says-he-didnt-mean-threaten-her/?utm_term=.2d3c5afa6326

thereby ratifying any and all defamatory statements contained therein.

40.     Defendants, at a minimum, acted recklessly, as they have known Plaintiff Corsi for a long time, and even worked with him and are also familiar with Plaintiff Klayman, so they were well aware that the statements made by Stone, and their own false, misleading, malicious and defamatory statements were, indeed, false, as well as their ratification of the malicious false statements published by Stone on their networks and media sites.

41.     As the content containing the malicious false, misleading, and defamatory statements were published on the internet, it is proliferated like a "cancerous virus," and is now available for viewing from countless sources, thereby exponentially increasing the prejudicial and defamatory impact and severe damage inflicted on Plaintiffs. Judge Jackson, in issuing her two gag orders against Stone, herself recognized how postings on the internet proliferate widely and once made cannot be taken back.

### I.     The October 26, 2018 Video

42.     In a video from October 26, 2018, Defendant Alex Jones, acting in concert with the other Defendants, makes several false, misleading, malicious and defamatory statements about Plaintiff Corsi.[9]

43.     At 0:45, Defendant Alex Jones maliciously and falsely published that Plaintiff Corsi "seemed to be extremely mentally degraded to the point of what I would call dementia."

44.     In the same video, Defendant Alex Jones, acting in concert with the other Defendants, maliciously fabricates a story where he purportedly saw Plaintiff Corsi at a steakhouse "on the ground at another table" and that his security staff "thought he was dead in the elevator."

45.     At 5:08, Defendant Alex Stone, acting in concert with the other Defendants, after

---

[9] https://www.youtube.com/watch?v=UuXPAn0nZo8

accusing Plaintiff Corsi of having suffered a stroke, publishes maliciously that "whatever comes out of his mouth ain't the truth."

46.     Tellingly and not at all coincidentally, Stone appeared as a guest on the same video, as evidence of Defendants working in concert with Stone.

47.     These malicious false, misleading, and defamatory statements were published by Defendants to discredit Plaintiff Corsi in order to preserve the reputation of their co-conspirator, Stone before Mueller's Russian collusion investigation, as Stone has been indicted and Plaintiff Corsi named a material witness.

### II.     *The January 18, 2019 Video*

48.     Before Stone was indicted, on or about January 18, 2019, he appeared on *The War Room* with Defendant Shroyer, where he made several malicious false, misleading, and defamatory statements in this district,  nationally and internationally  regarding Plaintiffs (the "January 18 Video").[10] The same video was published on Stone's YouTube channel, "*Stone Cold Truth*," on January 18, 2019.[11]

49.     These malicious false, misleading, and defamatory statements were adopted and published by each and every one of the Defendants, rendering them joint tortfeasors and jointly and severally liable.

50.     At 2:09 in the January 18 Video, Stone maliciously and falsely published that Plaintiff Corsi was "fired from World Net Daily."

51.     At 2:27 in the January 18 Video, Stone maliciously falsely and misleadingly published that, "He (Corsi) was perfectly willing to lie, to perjure himself saying that a memo that he had wrote me was written on the 30th for the purposes of cover-up…. which is further

---

[10] https://www.infowars.com/watch/?video=5c3fbf24fe49383dcf6996e4
[11] https://www.youtube.com/watch?v=cJyfgdvtFx8

proof that Jerry lied under oath."

52.     At 2:55 in the January 18 Video, Stone maliciously falsely and misleadingly published, "and then states that I knew about John Podesta's emails being stolen in advance, the only proof of that is Jerry's feeble alcohol affected memory – it's a lie…."

53.     At 3:35 in the January 18 Video, Stone maliciously falsely and misleadingly published that "Jerry was prepared to stab a principle Trump supporter in the back, he was perfectly prepared to bear false witness against me, even though I had done nothing in my entire life other than help him."

54.     At 4:20 in the January 18 Video, Stone maliciously falsely and misleadingly published that "all I ever did was show Jerry Corsi friendship and support and try to help him and his family and what I get is Judas Iscariot, the willingness to testify against me and help the deep state bury me….and then he makes up this story about helping me formulate a cover story."

55.     At 6:26 in the January 18 Video, Stone maliciously falsely published that "you can always tell when Jerry Corsi is lying because his lips are moving…."

56.     At 1:25 in the January 18 Video, Stone maliciously falsely published that "He's (Klayman) never actually won a courtroom victory in his life."

57.     At 1:30 in the January 18 Video, Stone maliciously falsely published, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'"

58.     In actuality and truth, Plaintiff Klayman left Judicial Watch on his own accord in order to run for U.S. Senate in Florida in 2003-2004.

59.     Not coincidentally, Plaintiff Klayman has a jury verdict and judgment against Fitton's Judicial Watch for having defamed him with malice. Punitive damages were also

awarded by the jury in the U.S. District Court for the Southern District of Florida. *See* Exhibit 5-1.

60.     At 1:37 in the January 18 Video, Stone maliciously falsely published, "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Corsi's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong"

61.     In actuality, Plaintiff Klayman has been a practicing attorney for over four decades and has won numerous cases on behalf of his clients and also against the government for constitutional and other violations.   He is the founder of both Judicial Watch and Freedom Watch, a former candidate for the U.S. Senate in Florida, a former trial attorney and prosecutor of the Antitrust Division of the U.S. Department of Justice, where he was a member of the trial team that successfully broke up the AT&T monopoly and created competition in the telecommunications industry. Among many other legal victories, Plaintiff Klayman also won landmark decisions at the chairman and general counsel of Freedom Watch enjoining the illegal mass surveillance by the National Security Agency. *Klayman v. Obama*, 1:13-cv-851 (D.D.C). *See* Exhibit 6 --*Klayman biography*, which is incorporated herein by reference. Stone knew this when he published the malicious false and misleading statements about Klayman and thus willfully and maliciously defamed Plaintiff Klayman.

62.     At 2:01 in the January 18 Video, Stone maliciously falsely and misleadingly published that Plaintiff Klayman is a "piece of garbage."

63.     At 4:11 in the January 18 Video, Stone maliciously falsely and misleadingly published, "For those people out there who think…that Larry Klayman's IQ is higher than 70, you're wrong…"

64.     Defendants published these malicious false, misleading, and defamatory statements with malice and with full knowledge that they were false and misleading, and/or at a minimum, with a reckless disregard for its truthfulness. These statements falsely and misleadingly state that Plaintiff Corsi was fired from World Net Daily, that he committed perjury (a federal offense), and that he is an untruthful person. They also create the false and misleading implication that Plaintiff Klayman is unqualified to be an attorney, public advocate and is a bad and loathsome person. Plaintiff Klayman is also an author, columnist and nationally syndicated radio and internet talk show host on Radio America, his show titled "*Special Prosecutor with Larry Klayman.*" *See* www.radioamerica.com. The malicious false and misleading published statements as alleged herein also severely damaged Plaintiff Klayman personally and professionally in this regard, particularly since he and his show compete with Defendant InfoWars and and the other Defendants in media markets in this district, nationally and internationally. Plaintiff Corsi also competes with Defendant InfoWars and the other Defendants in media markets in this district, nationally and internationally.

### III.     Other Malicious Defamatory Publications

65.     In another appearance on InfoWars which was posted to YouTube[12] on January 17, 2019, Stone at 6:22 maliciously falsely and misleadingly published that "He [Corsi] was perfectly willing to bear false witness against me on multiple points that are complete fabrications."

66.     In another appearance on InfoWars, this time on *The Alex Jones Show* from January 21, 2019, Stone maliciously falsely and misleadingly published that "the good doctor [Corsi] has told a number of lies. In fact, he's starting to conflate his lies…. he was perfectly willing to lie about me…. but now lying about Alex Jones, lying about InfoWars, lying about Dr.

---

[12] https://www.youtube.com/watch?v=GJd8YBDvm1Q

(David) Jones, who's one of the nicest, gentlest, sweetest, most honest men I have ever met, it's beyond the pale…. Jerry Corsi can no longer be believed."[13]

67.    In the same appearance, Stone maliciously falsely and misleadingly published that, "I think you've [Corsi] been deep state from the beginning. Your whole birther thing is used as a club to destroy conservatives…. I look forward to our confrontation. I will demolish you. You're a fraudster, out of your alcoholic haze you have made up lies about David Jones and Alex Jones and Roger Stone and now I suspect they want you to lie about the President." This is clearly a threat, as well as being maliciously defamatory. It is akin to the threats against Person 2 in the Mueller Indictment, Randy Credico, who Defendant Stone, as set forth in the Mueller Indictment, based on Stone's own words contained in his own documentary evidence, threatened kill along with Credico's service dog. Later Stone threatened the judge presiding over his criminal prosecution, the Honorable Amy Berman Jackson.

68.    In the same January 21, 2019 video, at 43:40, Defendant Alex Jones maliciously and falsely accuses Plaintiff Corsi of being a "spook, back and forth with different agencies," falsely saying that Dr. Corsi had worked with different government agencies.

69.    Defendant Alex Jones further maliciously falsely accuses Plaintiff Corsi of sometimes "not being able to walk," creating the false and defamatory implication that he is an alcoholic.

70.    Defendants in concert published these false, misleading, and defamatory statements in concert with Stone with malice and with full knowledge that they were false and misleading, and/or at a minimum, with a reckless disregard for their truthfulness. These statements falsely and misleadingly published that Plaintiff Corsi committed perjury (a federal offense), is an untruthful person, and is an alcoholic. They also contain threats against Plaintiff

---

[13] https://www.youtube.com/watch?v=ANfe9d7YzL0 (Beginning at 38:00)

Corsi and his legal counsel Larry Klayman. Defendants, working in concert with Stone, obviously believe that in order to advance their interests and improper if not criminal motivations, they also have to destroy and severely harm the legal counsel of Plaintiff Corsi, who is representing Plaintiff Corsi before Special Counsel Robert Mueller, congressional committees and generally and will also counsel Plaintiff Corsi should he be subpoenaed to testify truthfully in Stone's upcoming criminal trial for perjury, witness tampering, threatening to kill a material witness and his service dog, as well as obstruction of justice.

### FACTS PERTAINING TO DEFENDANTS' UNFAIR COMPETITION

71.    In addition to being an investigative journalist/author and a public interest litigator/advocate, respectively, Plaintiffs Corsi and Plaintiff Klayman are both competitors to Defendants as conservative media personalities, broadcasters, authors and columnists on social media and elsewhere.

72.    For instance, Plaintiff Klayman also hosts an online radio show and produces videos that are posted on the internet, issues press releases, commentary and other publications.

73.    Defendants have made, adopted, and or ratified numerous false or misleading statements of fact of and concerning Plaintiffs during their various programs and media postings and publication, which all contain significant advertisement or promotions.

74.    These false and/or misleading facts materially prejudice the viewers and/or listeners as to the quality, nature, and contents of Plaintiffs' services, which has caused significant competitive and commercial injury to Plaintiffs, as well as loss of good will and reputation.

75.    Plaintiffs, like Defendants, rely on viewer and listener financial support and sales in order to continue their work. Defendants' false and/or misleading statements concerning

Plaintiffs is meant to, and has, diverted financial support and sales away from Plaintiffs and to Defendants instead.

## FIRST CAUSE OF ACTION
### *Defamation*

76.    Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

77.    Acting in concert Defendants published malicious, false, misleading and defamatory statements of and concerning Plaintiffs in this judicial district, nationwide, and worldwide.

78.    These false and misleading statements were published with malice, as Defendants knew that they were false and misleading, or at a minimum acted with a reckless disregard for the truth.

79.    Plaintiffs have been severely harmed and damaged by these false and misleading statements because they subjected him to hatred, distrust, ridicule, contempt, and disgrace.

80.    Plaintiffs have been damaged by these false and misleading statements because they severely injured Plaintiff Corsi and Plaintiff Klayman in their profession and businesses, as well as severely injured and damaged them personally, financially and in terms of their good will and reputations.

## SECOND CAUSE OF ACTION
### *Defamation Per Se*

81.    Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

82.    Acting in concert, Defendants as alleged herein, published numerous false, misleading and defamatory statements to severely harm and damage Plaintiffs, which were

republished elsewhere, and through surrogates, which published the falsity that Plaintiffs have committed crimes, including perjury, and engaged in moral turpitude in the form of alcoholism, and committed sexual misconduct, as set forth in the preceding paragraphs.

83.    These false, misleading and defamatory statements were published in this district and on the internet and elsewhere, domestically and for the entire world to see and hear and in so doing Defendants published false and misleading facts, *inter alia*, that Plaintiffs' conduct, characteristics or a condition are incompatible with the proper exercise of their lawful business, trade, profession or office, as well as personally.

84.    These false and misleading statements were published with malice, as Defendants knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

85.    This statements are *per se* defamatory because they falsely and misleadingly published that Plaintiff Corsi committed perjury and Plaintiff Klayman had committed sexual misconduct which are federal offense and felony. Defamation *per se* gives rise to the presumption that severe harm and damage has arisen by virtue of the malicious false and misleading statements.

86.    These malicious false, misleading, and defamatory statements are defamatory *per se* and these false and misleading statements severely harmed and damaged Plaintiff Corsi in this profession and business as a journalist, author and political commentator, whose credibility is the most important trait, as well as personally and Plaintiff Klayman in his profession as a public interest and private advocate and litigator and as an author, columnist and radio and internet radio talk show and syndicated host, as well as personally.

### THIRD CAUSE OF ACTION
***Defamation by Implication***

87.     Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

88.     Acting in concert, Defendants published numerous false, misleading and defamatory statements about Plaintiffs, as set forth in the preceding paragraphs.

89.     These false, misleading and defamatory statements were published on the internet and published and republished elsewhere in this district, domestically and for the entire world to see and hear.

90.     These false and misleading statements were published with malice, as Defendants knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

91.     These statements created the false and misleading implication that Plaintiff Corsi is dishonest, committed perjury and is an alcoholic, and that Plaintiff Klayman committed sexual misconduct and is incompetent, among other false and misleading statements as pled in the preceding paragraphs.

92.     Plaintiffs have been severely harmed and damaged by these false and misleading statements because they subject him to hatred, distrust, ridicule, contempt, and disgrace.

93.     Plaintiffs has been damaged by these malicious false and misleading statements because the statements severely harmed and damaged Plaintiffs in their professions as journalists, authors, columnists, pubic interest and private practitioner lawyers and radio talk show hosts, whose credibility is the most important trait, as well as personally.

**FOURTH CAUSE OF ACTION**
***Intentional Infliction of Emotional Distress***

94.     Plaintiffs re-alleges and incorporates by reference the allegations in the preceding

paragraphs of the Complaint as if fully set forth herein.

95.     Acting in concert, Defendants engaged in extreme and outrageous conduct by threatening Plaintiffs, in concert with Stone, who has made death threats to at least one witness involved in Special Counsel Mueller's Russian collusion investigation, Person 2 Randy Credico, as well as incited violence against Judge Amy Berman Jackson by posting a meme on Instagram with a crosshairs and gun pointed at the jurist's head, for which Stone was sanctioned with a total gag order and threat of incarceration if this type of violative conduct of the Court's gag order occurred again, which it apparently has. *See* Exhibit 7.

96.     Defendants knowingly and intentionally threatened Plaintiffs, in a manner similar to other death threats co-conspirator Stone made to at least one material witness, involved in Special Counsel Mueller's Russian collusion investigation, such as Randy Credico, Person 2 in the Mueller Indictment, as well as Judge Amy Berman Jackson.

97.     Defendants' extreme and outrageous conduct directly caused Plaintiffs severe emotional distress and resulting severe harm and damage.

## FIFTH CAUSE OF ACTION
### *Assault*

98.     Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

99.     Acting in concert, Defendants placed Plaintiffs in apprehension of an imminent harmful or offensive contact and physical harm and death, by coercing and threatening Plaintiffs, in a similar manner that co-conspirator Stone has used to make death threats to at least one material witness involved in Special Counsel Mueller's Russian collusion investigation, such as Person 2 in the Mueller Indictment, Randy Credico and Judge Amy Berman Jackson.

100. The threats issued by Defendants are credible, as co-conspirator Stone portrays and sees himself as a "Mafia" figure, as set forth above.

101. Furthermore, as set forth above, acting in concert Defendants have a pattern and practice of calling their followers "to arms," which has resulted in deadly violence against their victims.

102. Plaintiffs did not consent to Defendants' conduct.

103. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered conscious pain, suffering, severe emotional distress and the fear of imminent serious bodily injury or death, and other mental and physical injuries, and Plaintiffs were severely harmed and damaged thereby.

**SIXTH CAUSE OF ACTION**
***Unfair Competition – Lanham Act 15 U.S.C. § 1125(a)***

104. Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

105. Defendants have and are engaged in acts of unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a) and common law

106. Defendants have made false and/or misleading statements that have deceived and/or had the tendency to deceive a substantial segment of the receiving audience.

107. Defendants' false and/or misleading statements misrepresent the nature, characteristics, and qualities of Plaintiff Klayman and Plaintiff Corsi's goods or services.

108. Defendants false and/or misleading statements are material because that were highly likely to mislead and influence supporters' decisions to provide financial support and sales to Defendants instead of Plaintiffs

109. These false and misleading statements were made in interstate commerce, as they

were widely broadcast on radio, on the internet, in social media, and elsewhere in this district, nationally and internationally.

110.    Plaintiffs have suffered significant damages, which are ongoing, due to Defendants' false and/or misleading statements. By law these damages are calculated based on Defendants' gross sales and receipts, which are trebled, plus an award of attorneys fees and costs.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

a.    Awarding Plaintiffs compensatory including actual, consequential, incidental and punitive damages for malicious tortious concerted conduct, jointly and severally in an amount to be determined at trial and in excess of $50, 000,000 U.S. Dollars for each Plaintiff.

b.    Awarding Treble Damages Under the Lanham Act, 15 U.S.C. 1125(a).

c.    Awarding Plaintiffs attorney fees and costs

d.    Granting such other relief as the Court deems appropriate and necessary including preliminary and permanent injunctive relief.

**PLAINTIFFS DEMAND TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**.

Dated: March 7, 2019                                    Respectfully Submitted,

_____*/s/ Larry Klayman*_____
Larry Klayman, Esq.
KLAYMAN LAW GROUP, P.A.
D.C.  Bar Number: 334581
2020 Pennsylvania Ave NW #800
Washington, DC, 20006
Telephone: (310)-595-0800
Email: leklayman@gmail.com

*Counsel for Plaintiffs Corsi and Klayman*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**JEROME CORSI,**

                  **Plaintiff**,

**v.**

**ROBERT MUELLER, individually and in his official capacity as Special Counsel, FEDERAL BUREAU OF INVESTIGATION, NATIONAL SECURITY AGENCY, CENTRAL INTELLIGENCE AGENCY, UNITED STATES DEPARTMENT OF JUSTICE, JEFF BEZOS, THE WASHINGTON POST, and MANUEL ROIG-FRANZIA,**

                  **Defendants**.

Civil Action No. 1:18-cv-2885-ESH

## [PROPOSED] ORDER

Upon consideration of the motion to dismiss of Defendants WP Company LLC d/b/a The Washington Post, Manuel Roig-Franzia, and Jeff Bezos, it is hereby **ORDERED** that the motion is **GRANTED**.

**SO ORDERED** this _____ day of _____, 2019.

_____
Hon. Ellen S. Huvelle
United States District Judge