UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
---------------------------X

JEROME CORSI,

        Plaintiff

            v.           Civil Action 18-2885 (ESH)

ROBERT MUELLER, et al.,

        Defendants

---------------------------X

                        Washington, D.C
                Wednesday, October 2, 2019
                      2:40 p.m.


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:  Larry E. Klayman, Esq.
                  KLAYMAN LAW GROUP, P.A.
                  2020 Pennsylvania Avenue, NW, Suite 800
                  Washington, DC 20006
                  (310) 595-0800

For the Defendants:      Elizabeth Murray Tulis, Esq.
                  Laura Katherine Smith, Esq.
                  U.S. DEPARTMENT OF JUSTICE
                  Civil Division, Federal Programs Branch
                  1100 L Street NW
                  Washington, DC 20005
                  (202) 514-9237

Court Reporter:     Lisa Walker Griffith, RPR
                  U.S. District Courthouse, Room 6507
                  Washington, D.C.  20001
                  (202) 354-3247

**P R O C E E D I N G S**

1

2          THE COURTROOM DEPUTY:  This is civil

3  action 18-2885, Jerome Corsi versus Robert Mueller, et. al.

4          Counsel, please approach the lectern and identify

5  yourselves for the record, starting with the plaintiff.

6          MR. KLAYMAN:  Your Honor, Larry Klayman on behalf

7  of Dr. Jerome Corsi.  Nice to be before you again.  It has

8  been some years.

9          And I would ask, if I may, Your Honor, Mrs. Corsi

10  may sit with Dr. Corsi.  She is in the back there.

11          THE COURT:  Yes.

12          MR. KLAYMAN:  Thank you very much.

13          MS. TULIS:  Good afternoon, Your Honor, Elizabeth

14  Tulis from the Department of Justice Civil Division for the

15  government defendants.

16          MS. SMITH:  Laura Smith from the Civil Division

17  for Mr. Mueller in his personal capacity.

18          THE COURT:  I would like Mr. Klayman to begin.

19          We are here on three motions.  The government has

20  made a motion to dismiss, Mr. Mueller has also made motions

21  to dismiss, and you have made a motion for leave to amend

22  the complaint to add a count based on First Amendment

23  retaliation.  I would benefit greatly if I could make sure I

24  understand all the allegations so I don't have any confusion

25  here.  Okay?

1          Now, first of all, did your client ever actually

2    meet Mr. Mueller -- I can't tell -- face to face?

3          MR. KLAYMAN:  He was dealing with the top

4    prosecutors in the office, Aaron Zelinski, and Mr. Cohen,

5    and Jeannie Rhee.

6          THE COURT:  Do I take that to be a no?

7          MR. KLAYMAN:  Excuse me?

8          THE COURT:  I take that to mean he did not meet

9    Mr. Mueller.

10         MR. KLAYMAN:  Not to the best of my knowledge.

11         THE COURT:  So when you say that Mr. Mueller

12   threatened him, that's not quite accurate, correct?

13         MR. KLAYMAN:  What we're saying is, Your Honor, is

14   they did so at the direction of Mr. Mueller, of the special

15   counsel, Robert Mueller.  These were the top prosecutors in

16   the office, Aaron Zelinski and Jeannie Rhee and the others.

17   In fact, Jeannie Rhee was a partner of Robert Mueller, they

18   were very close, at WilmerHale.

19         THE COURT:  You are assuming -- when you say, at

20   their direction, it isn't based on what anybody said.  It is

21   your inference that because he was the special counsel that

22   he must be running the show.

23         MR. KLAYMAN:  He is the one that has the mandate

24   from the justice department.  He is the one who is

25   responsible.  He is the guy in charge.  The buck stops on

1    his desk.

2         THE COURT:  Well, that's an interesting point, the

3    buck stops here.  You agree with me that, at least for

4    purposes of Bivens, there is no respondeat superior

5    liability.

6         MR. KLAYMAN:  No, I don't agree with that, Your

7    Honor.  But we did, in any event, plead that it was at his

8    direction.  There is an important case here, Trulock versus

9    Freeh, which I litigated when I was running Judicial Watch.

10   We cited it.

11        THE COURT:  I read it.

12        MR. KLAYMAN:  Yes.  In fact, we named FBI Director

13   Louis Freeh, at that time, and at that point we didn't have

14   any discovery, and we alleged that he ordered his FBI agents

15   to violate the First Amendment and 14th Amendment rights of

16   my client, Trulock.  And the Fourth Circuit allowed that

17   case to go forward.  It denied the motion -- it reversed on

18   a grant of a motion to dismiss --

19        THE COURT:  I have to ask --

20        MR. KLAYMAN:  -- by the Eastern District.

21        THE COURT:  Did they raise the issue of respondeat

22   superior?  I didn't see it in here.  I know there was a

23   question of qualified immunity, and there wasn't much that

24   anybody had to say about the First Amendment.  I'm sure you

25   argued very well, but the fact of the matter is, I don't

1    think they addressed your allegation.

2            MR. KLAYMAN:  Your Honor, it has been many years,

3    but I'm sure they did.  They were very thorough.  They had

4    their top people on the case from the Justice Department.

5    It's not every day that you sue the director of the FBI.

6            THE COURT:  I'll look, but I don't know that the

7    Fourth Circuit ever dealt with it.

8            MR. KLAYMAN:  Let me point this out as well, Your

9    Honor, is that we're entitled, if Your Honor want to

10   question us, to take discovery on this point before Your

11   Honor even considers a motion to dismiss on this point.  We

12   can sit Mr. Mueller down for deposition and ask him, and get

13   his documents, get his e-mails, his texts, everything else.

14           THE COURT:  I'm sure would you like to get

15   discovery, but all I want to know is, what is the evidence

16   in your complaint that -- other than the fact he is in

17   charge of the office.  That's all I want to know.

18           Do you have any other evidence?

19           MR. KLAYMAN:  The evidence is the mandate that he

20   got from the Department of Justice which puts him in charge,

21   him, Robert Mueller, in charge.  He is responsible for what

22   goes on in the office, and he had to have communicated with

23   his former partner, Jeannie Rhee, at WilmerHale, who was the

24   top prosecutor in that office.

25           THE COURT:  He had to by inference, not that he

1  did.  You don't know whether he did or not.

2        MR. KLAYMAN:  We need discovery to look into that.

3        THE COURT:  You don't know, sitting here today,

4  whether he directed anybody to threaten the plaintiff.

5  Correct?  That's a yes or no.

6        MR. KLAYMAN:  I know by virtue of his mandate.

7        And, your Honor, I might add one other thing, and

8  I'm sure Your Honor may have seen this.  I mean, there was

9  so much publicity going on in this case with regard to my

10  client, Dr. Jerome Corsi --

11        THE COURT:  I read a lot of it.  He did a lot of

12  talking to the press.

13        MR. KLAYMAN:  Yes, he did.

14        THE COURT:  Made for interesting reading.

15        MR. KLAYMAN:  He did.  And consequently, because

16  this is all over the media, I'm sure that Special Counsel

17  Mueller must have seen that, and seen what he was alleging,

18  that Mueller himself was responsible for what was going on

19  here.

20        THE COURT:  Well, I don't know whether he alleged

21  that, but I just -- if you could go back to the question, do

22  you know whether he directed Jeannie Rhee to threaten your

23  client that he would go to jail if he didn't agree to

24  certain facts he contested?  Do you know that as we sit

25  here?

1          MR. KLAYMAN:  Well, I'm the lawyer, Your Honor.

2          THE COURT:  I know.  Do you have facts that could

3   help me on that beyond the mandate?

4          MR. KLAYMAN:  I've been a lawyer for 42 years.

5   I've been in Washington for many years.  I know the way

6   things work in Washington.

7          THE COURT:  All right.

8          MR. KLAYMAN:  Prosecutors don't go off the

9   reservation like this unless the top dog is telling them

10  what to do.

11         THE COURT:  Okay.  That's an inference.

12         Second of all, where is your law to say that for

13  purposes of personal, individual liability, he can be liable

14  for actions of subordinates?

15         MR. KLAYMAN:  I just cited the Trulock case as one

16  example.

17         THE COURT:  Can you give me a page?  I couldn't

18  find anything about --

19         MR. KLAYMAN:  Your Honor, let me say something.  I

20  have great respect for you, I have great respect for this

21  Court, but it seems to me right now that you are looking for

22  a way to dismiss Special Counsel Robert Mueller.

23         THE COURT:  Well, they are.

24         MR. KLAYMAN:  We live in a world, Your Honor --

25  let me just say something here -- we live in a world where

1   the American people are now beginning to understand that in

2   Washington there is a certain protected class that is held

3   above the law.  We know that no one is above the law.  In

4   fact, that is in some of the decisions dealing with

5   qualified immunity, dealing with Bivens, is that Special

6   Counsel Robert Mueller should not get any special

7   consideration because of his former position, either in

8   terms of special counsel or FBI director or anything else.

9         We pled what we needed to plead in the compliant.

10  We're entitled --

11        THE COURT:  That's for me to decide.

12        MR. KLAYMAN:  I know it is, Your Honor.  I'm an

13  advocate here.

14        THE COURT:  Okay.  But you will help me if I could

15  kindly just make sure I understand what is happening in this

16  complaint, which is my job.  That is what a motion to

17  dismiss and Bivens motion is all about.

18        Can you tell me, does Count IV still exist now

19  that you dismissed Bezos, the Washington Post and the

20  reporter, is there an allegation that this defendant,

21  Mueller, had anything to do with the interference of

22  contractual relations with people like David Jones?

23        MR. KLAYMAN:  The fact that the Washington Post

24  was dismissed, I tried keep the case narrow, I reconsidered

25  it, Dr. Corsi agreed, there is an operative part of the

1    factual of this complaint which deals with the Washington

2    Post.  As we alleged, the Washington Post received leaked

3    grand jury information concerning matters that were -- that

4    Dr. Corsi was dealing with, which were in the scope of

5    special counsel's investigation.  So yes, they are part of

6    this case in terms of the facts.  They're not defendants.

7            THE COURT:  I know that.  I'm only focusing on

8    Count 4, which has to do with him no longer getting this

9    15,000 a month.  I wasn't sure, once we got rid of the main

10   actors in that, whether or not there was any allegation in

11   there that Mr. Mueller did anything to cause his termination

12   vis-a-vis David Jones and InfoWars.

13           MR. KLAYMAN:  It's the same argument that I just

14   made, Your Honor, is that these things in a case that's this

15   high profile with such high powered federal prosecutors --

16   and I'm a former alumnus of the Department of Justice

17   myself.  I never rose to the level of Aaron Zelinsky or

18   Jeannie Rhee or the others on this case.  But in this

19   particular case, with the spotlight on Special Counsel

20   Robert Mueller, with the fact that he had a press secretary

21   that was involved, obviously, in informing him what was

22   going on in the case, the fact that there is so much media

23   coverage, the fact that mandate runs to him, obviously

24   Robert Mueller was the guy who made the decisions here on

25   what was going to happen.  And let's --

1      THE COURT:  No, I want my question answered, sir.

2  I just want to know what he did to cause this gentleman to

3  lose this job of $15,000 a month.

4      MR. KLAYMAN:  Yes.  They subpoenaed his book

5  publisher.  Well, that's just one thing.  Also, they

6  interfered with his relationship with InfoWars by leaking

7  grand jury information, and leaking information that could

8  have only be obtained through surveillance of him without

9  probable cause at the time.  This has nothing to do with the

10 crime that was alleged to have been committed, if it had

11 ever been put to paper in terms of the plea agreement, of

12 course, a plea agreement.  So, yes, it is part of what went

13 on in that office, and he is responsible for what went on in

14 that office.

15     THE COURT:  So you are saying that the leaked

16 grand jury -- you gave me two examples in your complaint.

17 One had to do with something about a doctor.

18     MR. KLAYMAN:  Yes, there was a doctor in Fort

19 Lauderdale where they leaked information and allegations

20 were made in the media that somehow Dr. Corsi had done

21 something improper with that doctor.  That doctor was put in

22 front of the grand jury.

23     THE COURT:  The other one had to do with, he was a

24 person of interest or -- to the prosecutor.  But you are

25 saying that those two pieces of information landed up

1  causing him to lose his book deal because that interfered

2  with Amazon and with InfoWars?

3            MR. KLAYMAN:  That was not with regard to the book

4  deal specifically, although all of this leakage of grand

5  jury information -- and I might add, Dr. Corsi is not the

6  only one who was subjected to it throughout this regrettable

7  investigation --

8            THE COURT:  Please --

9            MR. KLAYMAN:  I'm going to answer your question.

10           -- is that it all contributed to him losing his

11  positions with regard to InfoWars.  The book ultimately was

12  published, but he suffered a lot of loss of reputation,

13  emotional distress.  The cumulative impact of this entire

14  affair, and I use the word "affair," was to harm him

15  emotionally, in terms of his reputation, and financially.

16  He is on his knees financially, Your Honor.

17           THE COURT:  Why did he sue InfoWars?

18           MR. KLAYMAN:  He sued InfoWars because InfoWars

19  defamed him.  Regrettably, working for InfoWars at the time

20  was Roger Stone, the infamous Roger Stone, who, by the way,

21  is going the trial November 4.  Roger Stone, by using

22  InfoWars, defamed Dr. Corsi.  They also defamed me, and they

23  feared Stone allegedly was doing the same thing with Corsi,

24  trying to intimidate him in terms of testifying if he ever

25  should be called before the trial that is scheduled for

1  November 4 -- and he will testify truthfully if he is --

2  trying to intimidate him in terms of his testimony, because

3  Stone fears the testimony, and in the process defame his

4  lawyer as well, which was me.  So yes, there is litigation

5  pending.

6          THE COURT:  Defamation by InfoWars, what did they

7  say about Dr. Corsi?

8          MR. KLAYMAN:  I would be happy to go through it,

9  Your Honor.

10          THE COURT:  Just answer the question:  What was

11  defamatory?

12          MR. KLAYMAN:  That he is a liar, an alcoholic,

13  that he can't be believed.

14          THE COURT:  And did one of those, he can't be

15  believed, have to do with the fact that, before the grand

16  jury, he did admit that there was a scheme with Stone to try

17  to cover up Stone's -- to explain away Stone's August

18  e-mail?

19          MR. KLAYMAN:  I'm not going to speak for Dr. Corsi

20  on that.  His testimony speaks for itself.

21          THE COURT:  You're the lawyer though.

22          MR. KLAYMAN:  To the extent that Your Honor knows

23  what's going on proves the grand jury leaks, because I have

24  never written or said anything about that, but the fact that

25  you know about it, I guess, validates the grand jury leaks.

1          THE COURT:  I only learned about it because he

2     spoke to the papers.  He disclosed, did he not, the supposed

3     draft indictment and statement of offense?

4          Can I make this part of the record, because I

5     think it is pretty important.

6          MR. KLAYMAN:  Sure, you can put that in there.

7          THE COURT:  This is the statement of offense that

8     was presented to him, I assume, at some point to get him to

9     plea.  This is the indictment or the draft, this is an

10    information that is the subject of what you say is false.

11         MR. KLAYMAN:  Among other things.  He is not an

12    alcoholic.  He is not an alcoholic.

13         THE COURT:  No, no.  This is the proposed

14    information plea agreement by the prosecutors.

15         MR. KLAYMAN:  I understand.  But you asked me why

16    Dr. Corsi sued infowars.

17         THE COURT:  No, no, I am going to make this part

18    of record, the plea agreement, the information and the

19    statement of offense which your client gave to the

20    Washington Post.

21         MR. KLAYMAN:  Happy to have it as part of the

22    record.

23         THE COURT:  Okay.

24         MR. KLAYMAN:  Because it shows one other thing

25    which is essential to this case.

1          THE COURT:  Which is?

2          MR. KLAYMAN:  That Dr. Corsi had his First

3    Amendment rights violated in such a way that it implicated

4    Bivens.  Your Honor made a ruling on that in a case with

5    regard to the Voice of America.

6          THE COURT:  I know that case.

7          MR. KLAYMAN:  I commend you for it, because it is

8    a correct decision.  The difference between that case and

9    this case is that we have Robert Mueller in this case.

10          THE COURT:  No, this is a criminal case.  That was

11    civil.

12          MR. KLAYMAN:  This is not criminal.  We're in a

13    civil court right now, Your Honor.

14          THE COURT:  No, no.  He was conducting a criminal

15    investigation.  The people in the Navob case, N-A-V-O-B,

16    that was an employment matter.

17          MR. KLAYMAN:  But I commend you for that decision,

18    you made the right decision, Your Honor.

19          THE COURT:  Thank you.

20          MR. KLAYMAN:  It confirms with Trulock, it

21    confirms with the Hartman case, and Judge Kotelly issued

22    one, Loumiet, at 12 cv 1130 on November 28, 2017.

23          Four cases stand for the proposition that this

24    case should proceed against Robert Mueller under Bivens.

25          THE COURT:  Can I ask a question about those

1    cases, but first, let us -- you've read the information, it

2    is a short paragraph.

3          MR. KLAYMAN:  I've read it.

4          THE COURT:  Okay.  And the statement of offense?

5          MR. KLAYMAN:  I haven't read it recently.  I

6    didn't think it was going to come up today.

7          THE COURT:  But reading this, is it your position

8    that there is no probable cause?  That's what I don't

9    understand.  He said -- he explains it, talking to the

10   press, it was an intentional lie.

11         MR. KLAYMAN:  With all due respect -- I respect

12   you, like I said, but I'm a strong advocate.  You know me as

13   a strong advocate, I'm sure, is that this has nothing do

14   with this case.  You are not here to litigate whether there

15   was probable cause.  You didn't sit on the grand jury.  You

16   are not Judge Beryl Howell.  With respect to the grand jury

17   leaks, I asked Beryl Howell to look into the grand jury

18   leaks.  She wouldn't.

19         THE COURT:  I didn't know that.

20         MR. KLAYMAN:  Yes, and in this and other cases.

21   We can get to that, too, because this is our only remedy for

22   you to order the remedies cited by the government with

23   regard to grand jury leaks.  You should order a evidentiary

24   hearing on the grand jury leaks, and if you find that there

25   were, hold appropriate persons, including Mueller, in

```
 1   contempt of court.

 2           THE COURT:  Let me ask you this:  Your remedy

 3   is -- what are you seeking against Mr. Mueller in Count II?

 4   Are you suing him in his official or individual capacity?

 5           MR. KLAYMAN:  We're suing him in both.  That's

 6   why -- let me -- I can get to another issue.

 7           THE COURT:  Well, let's stick with --

 8           MR. KLAYMAN:  We're suing him individually, but

 9   we're suing him in both capacities.

10           THE COURT:  But you said it's not Bivens, so how

11   can you sue him -- what is your basis for suing him in both

12   capacities?

13           MR. KLAYMAN:  Well, we're suing the office of

14   special counsel for the grand jury leaks, for instance, that

15   he authorized, and we're suing him individually for

16   violating the first and fourteenth constitutional rights of

17   my client.  The First Amendment claims are particularly

18   strong --

19           THE COURT:  I just want to focus on the grand jury

20   leaks, Count II.  Count II, just so I understand, you are

21   suing him both individually and officially.

22           MR. KLAYMAN:  That's correct.

23           THE COURT:  And the remedy is contempt.

24           MR. KLAYMAN:  The remedy would be contempt.  Your

25   Honor has the authority under the statute cited by the
```

1  government to order a contempt proceeding on that, and if

2  you find contempt, to mete out the appropriate remedy.

3  THE COURT:  You went to the grand jury judge, who

4  is in charge, what was her response?

5  MR. KLAYMAN:  There was no response.  She never

6  responded to my communication.

7  THE COURT:  What is to stop you from going back

8  there?  The procedure says the grand jury judge, who is

9  still there, is to handle matters --

10  MR. KLAYMAN:  I'm asking Your Honor to refer the

11  matter to her.  I think you have more weight than I do with

12  Judge Howell.  I like Judge Howell.  I think she likes me,

13  but she ignored this.  This is a very politicized case.

14  There has never been a case more political than this in my

15  lifetime; probably yours, too, Your Honor, we're a similar

16  age.

17  THE COURT:  I had all of the Abramoff cases.  I've

18  had plenty of political cases.  Let's go on--

19  MR. KLAYMAN:  -- Williams and Connolly.  I commend

20  you for that too.  I know you are seasoned trial lawyer, and

21  I think you understand that we're entitled to have this case

22  go forward.  If Your Honor has any questions about Mueller's

23  involvement, we can take discovery on that issue.  We could

24  take it in front of you, bring him in here.

25  THE COURT:  You agree, on qualified immunity you

1    don't get discovery necessarily.

2           MR. KLAYMAN:  They invoked the Westfall Act.

3    We're entitled to discovery under the Westfall Act if they

4    invoke it.  That case is Wuterich, W-U-T-E-R-I-C-H, versus

5    Mertha, 562 F.3d 375 (D.C.Cir.2009).  We're entitled to

6    discovery.  This isn't my first rodeo on these case kinds of

7    cases, Your Honor.

8           THE COURT:  At one point in time, in your pleading

9    by the way, I thought we were going to have an easy time of

10   it.  You -- I quote you, let's see -- said that he acted

11   within the scope of his employment, I will give you, so I

12   thought that was pretty clear.

13          MR. KLAYMAN:  Well, if that was said, I don't

14   recollect that being said, but clearly we've said it about a

15   hundred times otherwise, and he didn't act within the scope

16   of his employment.  Let me read to you this, because there

17   is another D.C. case, Rasul versus Myers, 512 F.3d 644

18   (D.C.Cir.2008), which looks to the restatement with regard

19   to qualified immunity:  Conduct not within the scope of

20   employment, if it is different in kind from that authorized

21   far beyond the authorized time or space limits or too little

22   actuated by the purpose of the master.

23          And, Your Honor, in the Trulock case, where we

24   dealt with qualified immunity and the Fourth Circuit said,

25   No qualified immunity, we're going forward with that case,

1    Trulock is at 275 F.3d 39 (4th Cir. 2001) at pages 397 to

2    398, quote:  "A public official may not misuse his power to

3    retaliate against an individual for the exercise of a valid

4    constitutional right."

5           Now, the Fourth Circuit is a very prestigious

6    circuit, it is not far from here, in Richmond, Your Honor.

7    It's D.C. circuit.  Second Circuit, Fourth Circuit are the

8    most prestigious circuits in this country, and that's what

9    they said about qualified immunity.

10          THE COURT:  Can I go back to your Trulock.  There

11   was a small discussion of respondeat superior, and they say

12   the complaint alleges that Sanchez was speaking at the

13   request of the FBI.  There is no allegation that any of

14   these three individuals were personally complicit in his

15   alleged misrepresentation.  It says that there cannot be, in

16   a Bivens suit, respondeat superior.

17          So that is your case, sir.

18          MR. KLAYMAN:  And they went on to find that

19   Trulock would be subject to moving forward -- not Trulock,

20   Freeh, in the First Amendment area.  That language you read,

21   I believe, was with regard to the 14th amendment claim.  It

22   is factually specific.  The First Amendment claim we allege,

23   as we did here, that going in, breaking into Trulock's

24   house, getting into his computer, breaking in without his

25   password, without a warrant, constituted a deprivation of

1  free speech, because he was trying to publish a book about

2  the FBI's failure to investigate --

3          THE COURT:  Sir, sir.  You are --

4          MR. KLAYMAN:  -- the theft of nuclear codes by-

5          THE COURT:  I read the case.  I don't need to be

6  reminded.  But I'm just telling you, as to Freeh and the

7  supervisors, if Lee says to the Fourth Amendment they found

8  no respondeat superior, they found no respondeat superior,

9  but they didn't find the allegations which had been made by

10  you to be sufficient.

11          Can I go back a minute to --

12          MR. KLAYMAN:  Let me just clarify that.  That was

13  only in the context of the 14th amendment.

14          THE COURT:  Fourth.  You've made your point.  I

15  understand.

16          Now, you said to me in your pleading, your

17  opposition to the government's motion, quote:  "The tortious

18  conduct set forth herein were also clearly performed within

19  the scope of his office or employment," end quote.

20          So is that your position now, or have you changed

21  it?

22          MR. KLAYMAN:  That's a misquote, Your Honor.

23          THE COURT:  It is not a misquote.  I just read it.

24          MR. KLAYMAN:  I know, but I'm not bound by it.

25  That's me, that's not my client.  So that is not applying

1   with regard to the Bivens action.  I don't know where you

2   are -- you are pulling that out right now.

3            THE COURT:  This has to do with the abuse of

4   process and tortious interference.

5            MR. KLAYMAN:  In that context, we can certainly

6   plead in the alternative, and there's another case --

7            THE COURT:  Go back to what we're talking about,

8   Mr. Klayman.  I don't need a case, I want to know --

9            MR. KLAYMAN:  That was a misquote, and I'm

10  correcting it right now.  If, in fact, it says what you say

11  it says, there is a case style, and this is an important

12  case, too, again, a circuit case, Fields versus Wharrie,

13  there is no immunity to a prosecutor, and that's

14  740 F.3d 1107 (7thCir.2014), for presenting false testimony

15  in the course of a prosecution.

16            And that's what was happening here.  They were

17  coercing -- trying to coerce my client to lie under oath,

18  otherwise he was going to be indicted for perjury.  He is in

19  his early 70s, he would be put away for life, and he had the

20  strength to stand up to the prosecutor and say no.

21            THE COURT:  Mr. Klayman, it is important to get

22  some things clear.  There are two charges here for abuse of

23  process and tortious interference.  Those are torts, they

24  have nothing to do with Bivens or First Amendment

25  retaliation, but they do have to do with the fact of whether

1    or not he can have a -- the U.S. can substitute for him.

2    That's a question of whether or not he was operating in the

3    scope of his employment.

4            You state clearly, and I will quote it again:

5    "The tortious conduct set forth herein were also clearly

6    performed within the scope of his office and employment."

7            I just want to know if that is your position

8    regarding the two torts in Counts 3 and 4.

9            MR. KLAYMAN:  I'll have to go back and look at the

10   context, Your Honor.  I can certainly file a supplement on

11   that and give you my position on that.

12           THE COURT:  No, we're here today.  I want your

13   position.  I want to know whether you are claiming something

14   to do with the Westfall certification.

15           MR. KLAYMAN:  Yes, I'm claiming that he was not

16   acting within the scope of his authority.  I'm saying there

17   are two reasons to bring --

18           THE COURT:  So you are telling me --

19           MR. KLAYMAN:  -- Mueller here.  Number one, with

20   regard to what you are asking for, if you are not going to

21   accept what is pled in the complaint, let's put him on the

22   stand or we can take a supervised deposition with a master

23   or whatever you want.  I'll treat him respectfully, and so

24   will Dr. Corsi.

25           THE COURT:  Is your only goal here to have

1   discovery?

2          MR. KLAYMAN:  No, it is not my only goal.  My only

3   goal is to get a remedy here.

4          THE COURT:  What do you say on --

5          MR. KLAYMAN:  I'm old enough, I don't need to take

6   any more depositions if I don't have to.

7          THE COURT:  What do you say in response to the

8   clear law that 6(e), there is no private right of action

9   under 6(e)?

10          MR. KLAYMAN:  What I say is that a case of first

11   impression, we've never had a factual situation before where

12   the chief judge refuses to look into allegations of grand

13   jury leaks, not just from me but from a number of different

14   people.

15          Again, it is another story.  I mean this with

16   complete respect.  I don't live in Washington any more, Your

17   Honor.  I don't want to live in Washington any more --

18          THE COURT:  Is this relevant?

19          MR. KLAYMAN:  I'll tell you what's wrong with it.

20   What is wrong with it is that our justice system is broken

21   down, that many people, not saying you, on the judicial

22   bench protect the powers to be, protect the Washington club.

23          THE COURT:  Okay.

24          MR. KLAYMAN:  And they're immune, whether Democrat

25   or Republican.  I've always been nonpartisan in that regard.

1    I sued George W. Bush for illegal surveillance and other

2    things.  I've sued them for Haliburton.  The fact is, where

3    we are today, if you are a part of this elite Washington

4    establishment, even the courts protect you.  I hope that

5    doesn't happen here.

6              THE COURT:  I have immunity, thank you.

7              Let's see if we can figure out what else I need to

8    know to understand your complaint.

9              So, you agree with me that for purposes of the

10   Westfall certification, even if he committed a wrong, that

11   doesn't preclude the government from stepping in.  You know

12   the case from law school, a handyman goes to fix your Maytag

13   machine and rapes you, your employer can be liable for that.

14   Doesn't matter, in other words, that you commit --

15             MR. KLAYMAN:  Let me give you an example.

16             Your prior law firm, Williams & Connolly, I've

17   litigated them for nearly my entire adult life, particularly

18   David Kendall, who is a very fine lawyer.  The government

19   invocated -- this was over a variety of matters involving

20   Hillary Clinton and Bill Clinton -- the government invoked

21   Westfall.  So the government came in for the government

22   under Westfall, but they also had a private lawyer.  That

23   was David Kendall, from your former firm, Williams &

24   Connolly.  So they can have private representation, Mueller

25   can have private representation.  They can have the

1   government there to protect the government's interests as

2   well.

3           But before that happens, before Westfall is

4   invoked, I'm entitled to discovery on behalf of my client as

5   to whether or not the special counsel was acting within the

6   scope of his authority.  I'm entitled to that discovery.

7   That's why I gave you that case.

8           THE COURT:  Can you give me any kind of discovery

9   that would be relevant here?  You didn't ask for discovery.

10  I mean you didn't file any specific --

11          MR. KLAYMAN:  In this court, Your Honor, you have

12  to get pass the motion to dismiss, as you know, before we

13  have a case management conference and before Your Honor sets

14  a discovery schedule.  So I was trying to adhere to the

15  local rules of this Court.

16          THE COURT:  You haven't ask for any jurisdictional

17  discovery.

18          MR. KLAYMAN:  We've asked for discovery generally

19  in our briefs, yes, with regard to the these matters.

20          THE COURT:  But no specific --

21          MR. KLAYMAN:  Yes, we did, we asked for it in the

22  context of Westfall.

23          THE COURT:  So you're abandoning your position

24  that he was operating within the scope of his employment.

25          MR. KLAYMAN:  Yes.

1           THE COURT:  Well, we'll ignore that statement by

2     you.

3           Can you tell me of any Bivens action that has been

4     recognized not just for First Amendment retaliation

5     prosecution but one where it involves an investigation and

6     plea negotiations?

7           Is there any criminal case that Bivens has been

8     applied to where we have Mr. Corsi -- Dr. Corsi was never

9     indicted, never went back to the grand jury and lied, never

10    took the plea, so I want to know whether the threat of a

11    plea, say, "you go along with this or we're going to send

12    you to jail for a long time," is there any case like that,

13    that Bivens has been applied?

14          MR. KLAYMAN:  Your Honor, I will file a

15    supplemental pleading.  I don't have that right now.  But if

16    you put together Bivens, you put together your case with

17    regard to Voice of America and the Safavi case, the Hartman

18    case, U.S. Supreme Court 547 U.S. 252 --

19          THE COURT:  Well, you know --

20          MR. KLAYMAN:  Can I finish for the record?

21          Loumiet, 12 cv 1130, November 28, 2017,

22    Judge Kotelly's order, and the Trulock case, and the Fields

23    versus Wharrie case that I just cited with regard to false

24    testimony, clearly false testimony is outside of the scope

25    of official conduct suborning perjury, threatening people to

1    suborn perjury.  So, yes, it falls within Bivens, and even

2    if this is a case of first impression, and I suspect there

3    are cases out there.

4         THE COURT:  It is important if it is a case of

5    first impression.

6         MR. KLAYMAN:  I don't think it is a case of first

7    impression.

8         THE COURT:  Give me one where somebody didn't

9    plea, didn't lie, according to him, and didn't get indicted.

10   He was not a defendant.  Some people would say that's a nice

11   thing to have happened.  Tell me a case where somebody, they

12   say to you, "If you don't say this, we're going to indict

13   you," but they don't indict him, and he doesn't take the

14   plea, and he is standing here today not as a defendant.

15        MR. KLAYMAN:  Your Honor, I will take a look.  I

16   didn't think that it was necessary, given the cases that we

17   have, but let's just use a little logic here, if we may.

18        Are you telling me that when I was a Justice

19   Department lawyer, I could tell somebody to lie?  I would

20   lose my license for that.

21        Are you telling me that is not a crime to coerce

22   somebody into lying?  That is what is played in the

23   complaint.  Is that --

24        THE COURT:  Let's go back.

25        In the complaint, what is the lie that he is

1    supposedly being forced to say?

2            MR. KLAYMAN:  He supposed to say he had contact

3    with WikiLeaks in conjunction with Roger Stone.

4            THE COURT:  That he was sort of like a

5    intermediary.

6            MR. KLAYMAN:  Correct.

7            THE COURT:  Do I ignore the fact that he tells the

8    New York Times that that was basically true, but he wasn't

9    intentionally lying?  I don't know how I can jibe those

10   things.  I don't know how you, in good faith --

11           MR. KLAYMAN:  What he told the New York Times is,

12   A, not on the record; B, I'm not going to testify for my

13   client.  I was not there in the grand jury proceeding.  My

14   co-counsel, David Gray, in that matter, I came in later, was

15   there.

16           THE COURT:  He was the lawyer.

17           MR. KLAYMAN:  Yes.

18           THE COURT:  Okay.  But --

19           MR. KLAYMAN:  I came in later, but I was not there

20   during that period.

21           THE COURT:  We know from what I am going to put in

22   the record, there was this e-mail, a long e-mail, and I --

23   it will be in the record, but he did send something.

24           You know, you say the only reason that Mueller

25   should know that it was a lie is he told them; he,

1   Dr. Corsi.

2          Well, why does Mueller have to believe him?

3          You are sort of taking the position, "I told you,

4   Mr. Mueller, that isn't true; therefore, you can't indict

5   me."  That's what you're saying.

6          Is there any other reason that you can't threaten

7   him with an indictment?

8          MR. KLAYMAN:  You can't threaten somebody with an

9   indictment when you know it not to be true.  The fact is

10  that he was not indicted.  And there were other things that

11  were going on too, Your Honor, which is part of this whole

12  course of conduct.  His religion was being mocked by Jeannie

13  Rhee.  You want to get outside the record, I can speel like

14  crazy here.

15         THE COURT:  No, no, I'm in the record.  I'm not

16  talking about harassment.  I'm just telling you that there

17  is, in this statement of offense, he wrote an e-mail on

18  August 2, which you may say he didn't intend to be a

19  go-between, the WikiLeaks and Stone.  But you have to admit

20  that that e-mail is subject to certainly different

21  interpretations.

22         My only point for you, sir, is that because your

23  only basis for saying that, "I was threatened with an

24  indictment that was unfair or a retaliation of my First

25  Amendment rights," is that, "I told him that I wasn't the

1    intermediary."  Why does he have to believe that?

2          MR. KLAYMAN:  Dr. Corsi -- and again, discovery

3    will bear this out, if they want to move for summary

4    judgment, that's their right after discovery.  They can do

5    that, and Your Honor can reconsider this entire matter.  But

6    the fact is, we pled what we had to plead in the complaint,

7    and that's where it stands on 12(b)6 right now, as a matter

8    of law.

9          THE COURT:  I am going to your one specific

10   paragraph.  You say in there that, "Mr. Mueller knows it

11   wasn't true because I told him."

12         I'm asking you, why does that in any way show that

13   Mueller acted improperly?

14         MR. KLAYMAN:  He had to know, Your Honor.  First

15   of all, Your Honor is up to date --

16         THE COURT:  He had --

17         MR. KLAYMAN:  -- on the public relations and what

18   is in the media.  Dr. Corsi was at the center of Mueller's

19   attempts to link the president with Russian collusion.

20   That's why they worked on him to do it.

21         THE COURT:  Why is it that Mueller has to know

22   that he is threatening him with something that is not true?

23   The only evidence is that -- according to your complaints,

24   is that Dr. Corsi told him it's not true.  Dr. Corsi told

25   him he was not an intermediary.

1          MR. KLAYMAN:  And that's enough.  I take issue

2    with the government, and other defense counsel do this too,

3    citing the Twombly case.  The judges get to decide what is

4    plausible or not.  You know what?  You didn't get to decide

5    that, Your Honor, with all due respect to you, if it is

6    plead in the complaint.  If you look at page 2 --

7          THE COURT:  Of the complaint?

8          MR. KLAYMAN:  No, the Twombly case, Bell Atlantic

9    Corporation versus Twombly, 550 U.S. 544.  This is taken out

10   of context by any judge that wants to get rid of a case for

11   whatever political purpose he or she decides of the day.  I

12   go through this all the time, not just with appointees of

13   Democrat administrations but also Republican.  Frankly, it's

14   a disgrace.

15         Twombly does not say that.  It says:  "This case

16   presents the antecedent question of what a plaintiff must

17   plead in order to state a Section 1 claim."

18         This is a Sherman Act case.  I'm a former

19   antitrust lawyer with the antitrust division.

20         "Federal Rule of Civil Procedure 8(a)(2) requires

21   only a short and plain statement of the claim showing that

22   the pleader is entitled to relief in order to give the

23   defendant fair notice of what the claim is and the grounds

24   upon which it rests."  Conley versus Gibson, 355 U.S. 41.

25         I have a little more to read.  This is important

1   because this is routinely misquoted not just by the

2   government when it sits in the role of defense counsel, but

3   private counsel throughout, defense counsel.

4           "While a complaint attacked by a Rule 12(b)6

5   motion to dismiss does not need detailed factual

6   allegations, the plaintiff's obligation to provide the

7   grounds of his entitlement to relief requires more than

8   labels and conclusions and a formulaic recitation of a cause

9   of action's elements will not do."

10          "Factual" -- This is crucial:  "Factual

11  allegations must be enough to raise a right to relief above

12  the speculative level of the assumption that all of the

13  complaint's allegations are true."

14          Applying these general standards to a Section 1

15  claim, stating a claim requires a complaint with enough

16  factual matter, just enough factual matter to suggest an

17  agreement.  Asking for plausible grounds does not impose a

18  probability requirement at the pleading stage.  It simply

19  calls for enough --

20          THE COURT:  Mr. Klayman, no, no, I'm speaking.

21  I'm speaking.

22          MR. KLAYMAN:  Okay.  If I may finish afterwards.

23          THE COURT:  I'm trying to get answers.

24          You say here defendants knew this to be false, and

25  that's paragraph 55, and you go on in 56:  "Plaintiff Corsi

1   informed defendants that the testimony they wanted from him

2   was not true."

3           I just want to understand, yes or no, is that the

4   basis for your statement that he threatened him to testify

5   to things that were not true, they were not true based on

6   what Dr. Corsi told him.

7           MR. KLAYMAN:  That is not all of it, and what I'm

8   saying is --

9           THE COURT:  Is there something in the complaint --

10          MR. KLAYMAN:  Yes, it is in the complaints, Your

11  Honor.  We set off a number of facts.  The facts are

12  detailed.  Then we say that the prosecutors were acting at

13  the direction of Special Counsel Mueller.

14          THE COURT:  I know that.

15          MR. KLAYMAN:  Are you telling me it is not

16  plausible that Mueller doesn't know what's going on?  Are

17  you telling me --

18          THE COURT:  No, that's not what I'm discussing.

19          MR. KLAYMAN:  -- that we went through $45 million

20  in investigation, and the head guy doesn't know what is

21  going on?

22          THE COURT:  No.  I'm asking, how do the

23  prosecutors, including Mr. Mueller, know that they are

24  threatening him with an information which we've now put in

25  the record, and a statement of offense that was for his

1    consideration, how did they know it's false.  And the only

2    allegation is -- in the complaint is, this statement of

3    offense is false, or parts of it, because he told them.

4    That's what I want to understand.

5            You are saying:  You, Judge, should believe that

6    they threatened him to have him testify falsely because he

7    told them it was false.

8            MR. KLAYMAN:  Yes, he told them it was false.

9            THE COURT:  And that is the basis of your claim.

10   That's all I want to know.

11           MR. KLAYMAN:  That's a basis of my claim, not the

12   basis.

13           THE COURT:  I don't know what else there is.

14           MR. KLAYMAN:  The threats are when someone is

15   browbeating you, mocking your religion, calling you a liar

16   because you wrote a book about where the birth certificate

17   of Barack Obama --

18           THE COURT:  But where in the complaint, let's --

19           MR. KLAYMAN:  You've been going outside of the

20   complaint, so I thought --

21           THE COURT:  I'm only using the information.  I'm

22   using the information because you didn't tell me in the

23   complaint what were the charges, so I had to get them.  Your

24   client was kind enough to give it to me.

25           MR. KLAYMAN:  Your Honor, if you want more

1   specificity in the complaint, I can certainly add that

2   specificity into the complaint.  And we've done oral

3   argument, and you can have the magic language, and we'll put

4   it in there.  But I believe the complaint is specific

5   enough, and that's why I was saying, if you are telling me

6   it is not plausible that Mueller knew what was going on and

7   didn't order it, then we live on a different planet.  We

8   live on Pluto.

9           THE COURT:  Okay.  I'll be in Mars.

10          Now, you ask -- in the second cause of action, you

11  say:  "Wherefore, plaintiff requests" -- this is 6(e) --

12  "preliminary injunctive relief and permanent injunctive

13  relief."  That's all you ask for.  Civil contempt is a big

14  difference --

15          MR. KLAYMAN:  That is equitable relief, which

16  means you can order a contempt proceeding or you can refer

17  it.

18          THE COURT:  I don't think I can.  I can refer it

19  to Judge Howell?

20          MR. KLAYMAN:  Yes.  You can use your judicial

21  authority to do the right thing.

22          THE COURT:  Have you filed a formal paper

23  consistent with the rule about complaining about 6(e)?

24          MR. KLAYMAN:  I haven't.  Because at this point,

25  when I began representing Dr. Corsi, the grand jury was no

1   longer in operation.

2           THE COURT:  But she is still there.  If it had

3   been a contempt, it would be a contempt on her authority,

4   right?

5           MR. KLAYMAN:  I have experience here in other

6   matters where she simply turned a blind eye to that issue.

7           THE COURT:  But you recognize that that exists, to

8   go to her.

9           MR. KLAYMAN:  It does.  But as a practical matter,

10  it does not exist.  This is our only adequate remedy.

11          THE COURT:  It does not exist because she has not

12  been receptive.

13          MR. KLAYMAN:  Rule 6(a) --

14          THE COURT:  Can you answer, is that the reason it

15  does not exist?  She has not been receptive.

16          MR. KLAYMAN:  That's one reason, but there is

17  another reason.  The rules of criminal procedure is

18  legislation.  It was legislated by Congress.  Granted, it

19  does not set forth a specific remedy, but certainly

20  equitable remedies are within the power of this Court to

21  enforce.

22          You here, Your Honor, you took an oath -- you

23  generally, judges -- to enforce the law.  When you see --

24  also, your bar association rules, if you see that a crime is

25  being committed, you have a duty to report that to

1    appropriate authorities.

2            So I'm asking you --

3            THE COURT:  I'm not in control --

4            MR. KLAYMAN:  -- to use your authority to get an

5    investigation of this once and for all.

6            THE COURT:  You are asking me to supplant Judge

7    Howell, who is the chief judge and responsible for grand

8    jury.

9            MR. KLAYMAN:  I'm not asking you to supplant her,

10   I'm asking to you make a referral.

11           THE COURT:  I don't make referrals.  You can file

12   before her yourself.  That's the procedure.

13           MR. KLAYMAN:  My previous referral, with all due

14   respect, was thrown in the trash.

15           THE COURT:  All right.  But you admit that the

16   procedure exists and it didn't work for you.

17           MR. KLAYMAN:  Well, they nothing works in this

18   town any more when you are dealing with someone like Robert

19   Mueller.  It doesn't matter whether it is him, a Republican

20   or anybody else.

21           THE COURT:  You will agree that your complaint

22   asked for injunctive relief against Mueller for Count II.

23           MR. KLAYMAN:  Yes.

24           THE COURT:  You agree that I don't have any power

25   to enjoin.

1          MR. KLAYMAN:  I believe you can enjoin the

2   government because he was working as a official of the

3   Department of Justice to not leak any more information.

4          We're going through a volatile period.  We are

5   going through a likely impeachment.  There are counter

6   allegations about what went on in the Mueller investigation.

7   Stuff can start flying out of files again.  It's very

8   harmful.

9          THE COURT:  It may be that --

10          MR. KLAYMAN:  So in joint future grand jury leaks,

11   you can do that.

12          THE COURT:  Has there been a grand jury leak

13   involving your client since the investigation ended in March

14   2019?  Mueller has resigned, he is no longer special

15   counsel.

16          Count II is against Mueller only, right?  Your

17   6(e), it says Mr. Mueller.

18          MR. KLAYMAN:  Well, which would be his office.

19   That's why I say, we did bring a case in official and

20   personal capacity.

21          THE COURT:  You say Defendant Mueller, I don't

22   know if it is official or personal.  If it is official, then

23   you have a whole different --

24          MR. KLAYMAN:  It's both.  They violated my

25   client's constitutional rights of secrecy, of privacy.  We

1   have a right of privacy in our constitution.  We can put in

2   other contexts too.

3          THE COURT:  You would agree with me, sir, would

4   you not, that you don't have the right to sue Mr. Mueller

5   for any kind of injunctive relief.

6          MR. KLAYMAN:  I don't agree with that, no.

7          THE COURT:  You know that you can only sue him

8   individually for money damages under Bivens.

9          MR. KLAYMAN:  And we have.  It is not an adequate

10  remedy.

11         THE COURT:  Count II.

12         MR. KLAYMAN:  With regard to Rule 6(e), I'm not

13  asking to go through the statute cited by the government.

14  I'm asking you to go through your authority in a factual

15  situation that has never before been at issue, as far as I

16  know, in front of this Court or any other court.  And as I

17  previously said, and Your Honor already knows, the grand

18  jury is no longer in operation.

19         THE COURT:  So why would an injunction make any

20  sense?

21         MR. KLAYMAN:  To enjoin future conduct.  There's a

22  whole body of case law, and I can supplement with that as

23  well.

24         THE COURT:  I don't need that.  I need to know

25  what imminent threat there is that justifies an injunction

```
1    given the fact that he is not there any more.  It may be

2    that the grand jury stuff gets disclosed --

3           MR. KLAYMAN:  You can do what Judge Amy Berman

4    Jackson did, in my view, in the instance of Roger Stone

5    correctly, and put a gag order on everybody in that regard,

6    not to be leaking to harm people.

7           We're coming up on a trial on November 4 of Roger

8    Stone.  My client is person number one, material witness

9    number one.

10          THE COURT:  Is he going to testify?

11          MR. KLAYMAN:  It has not been determined.  If he

12   is subpoenaed to testify, he will do so truthfully.  Getting

13   back to your previous question, that's correct why Stone

14   defamed him and defamed me.  This is a reaction to what

15   could happen.  I mean, it likely will happen.  The stuff is

16   going to start leaking again.

17          THE COURT:  I should take Count III -- I'm

18   sorry -- II, as a claim both individual only for injunctive

19   relief against Mueller and in his official capacity, which

20   means the government has the right to step in.

21          MR. KLAYMAN:  That's correct.  And individually.

22          THE COURT:  I don't know that they have a right to

23   step in individually, but okay.  All right.  We'll talk to

24   the government about that.

25          I guess I have one or two questions about your
```

1   motion to amend, if I may.

2           MR. KLAYMAN:  If I may add, Your Honor, as we pled

3   in that, as you are gathering your thoughts, under rule 15A,

4   leave to amend is to be freely granted.  You can even move

5   to amend after trial, as you know.  Your Honor is a very

6   fine trial lawyer, as well as judge.

7           THE COURT:  Only if it is not futile.  That's what

8   I'm worried about.

9           MR. KLAYMAN:  It is not futile for the reasons

10  we've discussed.

11          THE COURT:  What do you think about the arguments

12  that plea bargaining is not without -- I'm sure, if you were

13  ever a prosecutor -- without its hard side to it.  If they

14  believe -- just hypothetically, if they believe what is in

15  this information to be true, can you, in good faith, tell me

16  they couldn't say, "Plead to this or else you don't get a

17  deal, you don't get a deal."  I mean, he has the right not

18  to get a deal.

19          MR. KLAYMAN:  You may know where that -- I was

20  successful in getting two preliminary injunctions against

21  the National Security Agency for illegal surveillance.

22          THE COURT:  Right.

23          MR. KLAYMAN:  Judge Leon called it almost or well

24  in at the time.  The NSA grabs every single e-mail

25  communication --

1           THE COURT:  Can you stick with the First Amendment

2   claim.

3           MR. KLAYMAN:  I'm telling you -- you asked me how

4   they know.  They knew my client was telling the truth

5   because they had access to the NSA, FBI, to all of his

6   communications, and they knew that, in fact, he was never in

7   communication with WikiLeaks.  The government knows that.

8   To the extent it denies that, it is simply lying.

9           THE COURT:  Okay.  I don't know that that is what

10  they said at the --

11          MR. KLAYMAN:  We know the NSA grabs every

12  communication going back five years.  There is now a request

13  to reauthorize provisions of the USA Freedom Act and Patriot

14  Act.  The government has always had the ability, and

15  undoubtedly they used it in this case, and that's why we're

16  alleging illegal surveillance as well, under the Fourth

17  Amendment.

18          They knew what the facts were.  My client was

19  being set up.  He was being set up to get him to say

20  something to implicate the president, to harm the president,

21  to take the president down.  Because he is a supporter of

22  the president, he became public enemy number one, which is

23  the way it is in this town today.

24          THE COURT:  Mr. Klayman, skip the "this town

25  today."  I've heard it now.  I want to go back.

1          Is there anything, just hypothetically, take my

2    hypothetical for a minute, what is wrong with the government

3    playing hardball and saying, "We think you did this.  Here

4    is your e-mail, sir, here is what we know.  We don't buy it.

5    We're going to indict you.  If you want a deal, this is what

6    you agree to"; he says, "I don't want a deal.  It's not what

7    I am going to do"; and lo and behold, lucky him, he doesn't

8    get indicted.  Under those circumstances, where is the

9    problem?

10         And don't talk to me about this town.  Tell me

11   what is wrong with my hypothetical.

12         MR. KLAYMAN:  It is a beautiful town, I lived here

13   for over 20 years.  I'm talking about the way things go on

14   in the courts and politically right now.

15         THE COURT:  I don't need to be educated on your

16   view of the town.

17         MR. KLAYMAN:  Here is the point.  This was not

18   just, "We don't think you are telling the truth," this

19   was -- what was said is, "We want you to say this, and if

20   you don't say this and you don't implicate the president,

21   and you don't implicate communications with WikiLeaks, you

22   are going down, and you are going to be doing life

23   imprisonment."  If that is the way this country operates

24   today, I want out.

25         THE COURT:  You are not going to have that option

1    necessarily.

2              MR. KLAYMAN:  Maybe I will.

3              THE COURT:  But there is nothing in any of these

4    statement of facts that really takes down the president,

5    doesn't even mention the president.

6              What I'm trying to understand, if the prosecution

7    has evidence including e-mails, they have evidence, they

8    don't -- your client may not agree with it, and obviously he

9    is free to say that, and he is free not to take the plea,

10   but what is wrong with the prosecutor saying, "I'm going to

11   indict you for this if you don't plea to what I say"?

12             MR. KLAYMAN:  Because it went beyond that.  They

13   were telling him to lie.  They told him specifically what to

14   lie about.

15             THE COURT:  What was the lie?

16             MR. KLAYMAN:  That he had communications with

17   WikiLeaks.  They knew that he didn't.  They have access to

18   all of his e-mails, all of his text messages.  He turned

19   over all of his computer material to them.

20             THE COURT:  Didn't he destroy stuff?

21             MR. KLAYMAN:  He didn't destroy anything.  That

22   was what Stone was alleged to have done, not my client.

23             THE COURT:  Okay.  I have one further question

24   about your First Amendment so I can understand.  These are

25   all very novel, and creative on your part, allegations.

1            Your case, the one that you are rightly proud of,

2    Trulock --

3            MR. KLAYMAN:  Thank you for the compliment.

4            THE COURT:  Yes, you did a good job.

5            -- says something that I think is very important.

6    Trulock, T-R-U-L-O-C-K, versus Freeh, the former FBI head,

7    275 F.3d 391 (4thCir.), argued by Mr. Klayman.  They sent it

8    back down you afterwards, obviously due to his advocacy.

9            They said, to establish a First Amendment

10   retaliation claim, which is what you bring here, a plaintiff

11   must prove three elements, that is speech was protected.

12           Which speech, in your mind, is protected here?

13           MR. KLAYMAN:  The right to tell the truth.

14           THE COURT:  So was that ever violated?

15           MR. KLAYMAN:  Yes, it is violated, because he is

16   being threatened with retaliation if he does tell the truth.

17           THE COURT:  But he never did testify falsely.

18           MR. KLAYMAN:  Obviously my client didn't.  He

19   wasn't indicted.  But he was only indicted -- not indicted

20   for this reason, Your Honor:  Above all the people who were

21   charged in this -- who were, excuse me, under investigation

22   who were targets, Dr. Corsi was the only one who ever pushed

23   back.  He is the only one who said, "No, I will not roll

24   over."

25           It was not General Michael Flynn.  He wasn't

1    George Papadopoulos.  He wasn't a cast of characters.

2              THE COURT:  But does that put him in a position

3    under the next one.  His speech was protected, so you are

4    saying that speech was to tell the truth.  But he did tell

5    the truth.  We know that.

6              MR. KLAYMAN:  But he was retaliated against.  And

7    that's why your case is so important, Your Honor.  Your case

8    is a landmark case.

9              THE COURT:  Thank you.  We've finished with all

10   the compliments.  I think my case is distinguishable.

11             Second, defendants allege --

12             MR. KLAYMAN:  It is distinguished.

13             THE COURT:  It is distinguishable.

14             The second:  "The defendant allege retaliatory

15   action adversely affected his constitutionally protected

16   speech."

17             So in what way did these threats of indictment

18   adversely effect his constitutionally protected speech?

19             He never lied, he said.  We'll take that as a

20   given.  What retaliatory action adversely affected his

21   constitutional --

22             MR. KLAYMAN:  As a result of him trying to tell

23   the truth, he was vilified, he had grand jury information

24   leaked.  There was illegal surveillance.  In all kinds of

25   ways his reputation was destroyed, his family was

1    implicated.  That's why Ms. Corsi is here.  They lost nearly

2    everything.  They can't make a living any more.

3         THE COURT:  It says, "adversely affected his

4    constitutionally protected speech," not that he suffered

5    something, but that generally speaking, it means in the law

6    that in some way his right to free speech was chilled.

7         Was he chilled?

8         MR. KLAYMAN:  Yes, because he was threatened and

9    retaliated against.

10        THE COURT:  Did he in any way cave?

11        MR. KLAYMAN:  He was seriously considering caving.

12   During that period, he was significantly harmed.  He was

13   viewed as a felon in the public domain.  He still suffers

14   from that stigma.

15        THE COURT:  I know you are talking about harm.

16   This is the element of it.  It is not a question of whether

17   he suffered harm.  It is whether his alleged retaliatory

18   action adversely affected his speech.  That means that in

19   some fashion his speech had to be affected.

20        MR. KLAYMAN:  He was threatened with prosecution

21   unless he said what the prosecutor wanted.  Now, look at

22   Trulock --

23        THE COURT:  I'm reading to you from Trulock.

24        MR. KLAYMAN:  Yes, and they found that, in fact,

25   it was true for Trulock.  Because Trulock was out there, he

1   was still talking about what really happened with Wen Ho

2   Lee.  He was trying to write a book.  They didn't prevent

3   him from publishing the book.  He could have gone to a

4   publisher with or without the approval of the department of

5   energy or the FBI.  But it was enough that they retaliated

6   against him to have the Fourth Circuit say this thing should

7   proceed pass a motion to dismiss.

8              THE COURT:  Thank you very much, Mr. Klayman.

9              MR. KLAYMAN:  Thank you, Your Honor.

10             THE COURT:  All right.  Let's hear from the

11   government.

12             MS. TULIS:  Good afternoon, Your Honor.

13             THE COURT:  One second.  I am going to mark here

14   as Exhibit A, with the consent, do you have any objection of

15   putting in the papers that he gave to the press, Dr. Corsi,

16   which includes a statement of offense and an information and

17   a plea agreement?

18             MS. TULIS:  Your Honor, the government has no

19   objection to the Court taking judicial notice of public

20   documents such as newspaper articles.

21             Obviously, as Your Honor of course knows, you may

22   take judicial notice of documents such as articles in the

23   press, for the purpose of the content of those articles

24   rather than the truth of any matters in the articles.  I

25   would need to look at the documents to know specifically

1   what they are, but we -- the government does not make --

2   can't make any representations about the authenticity or

3   truth of any of the matters you might be looking at right

4   now.

5          THE COURT:  Well, unless I'm wrong -- Mr. Klayman,

6   you can correct me -- when this was given to the Washington

7   Post by Dr. Corsi, it represented the papers that he had

8   been presented with during his discussions with Jeannie Rhee

9   and three other prosecutors, correct?

10          What was published in the newspapers was given to

11   them.  Do you want to look at them?

12          Mr. Klayman, I'm asking whether I correctly

13   understood that these were the papers presented to your

14   client during the plea negotiations by three or four

15   prosecutors, and that he then turned around and took those

16   papers and gave them to the press.

17          I'll show you the papers.  They were published in

18   the newspapers.  I'm not taking these papers or --

19          MR. KLAYMAN:  That's correct.  But that's all that

20   went on in the proceedings with the prosecutor.

21          THE COURT:  No, no.  But these were the proposed

22   plea papers.  Correct?  That's all I'm asking.

23          MR. KLAYMAN:  At that time, and there were other

24   threats made too.

25          THE COURT:  All right.  So I'm marking these.

1          MS. TULIS:  Yes, Your Honor.  Just to be clear --

2          THE COURT:  This is Court's Exhibit A.

3          MS. TULIS:  -- to these being included as

4     documents that Mr. Corsi represented being given to him.  We

5     are not --

6          THE COURT:  This is what he is saying, somewhere

7     in there he is claiming that, "What is in there, I'm not

8     going to agree to, because it is a lie, and they're

9     threatening me with this lie," right?

10          MS. TULIS:  Again, Your Honor, to the extent you

11     want to incorporate these as allegations of Mr. Corsi, in

12     terms of what he was given, that we don't object to the

13     Court taking judicial notice of the fact Mr. Corsi has

14     alleged certain things or that he was given certain

15     documents and that he is alleging that these are the

16     contents of the documents he was given.

17          The government -- what I can't do at this point,

18     Your Honor, is agree that those are, in fact, documents he

19     was given, if Your Honor makes -- understands.

20          THE COURT:  Well, it's easier dealing with

21     Mr. Klayman, believe it or not.

22          MS. TULIS:  I apologize, Your Honor.  Again, we

23     want to make sure that we keep this as a facial motion to

24     dismiss.

25          THE COURT:  I understand.  I'm not putting it in

1    for the truth of it, but the whole case turns around the

2    fact that they say, "You have to plead, and if you don't,

3    you are going to go to jail for life."

4            So what is it that they're asking him to plead to?

5            He says it's these documents.  If you want to

6    contest that, this is not a question of summary judgment.

7    This is merely he says, "This is what they wanted me to

8    plead to."

9            MS. TULIS:  Absolutely, Your Honor.  We do not

10   have any objection to Your Honor referring to those

11   documents for purposes of understanding what Mr. Corsi is

12   alleging in this case.

13           THE COURT:  Okay.  What, in your view, is his

14   alleged retaliatory action that adversely affected his

15   constitutionally protected speech, and do you agree that

16   there is protected speech here?

17           MS. TULIS:  Your Honor, if I may, because I'm only

18   representing the government defendants, if you have

19   questions about the proposed First Amendment claim, I'll

20   have Ms. Smith address those.

21           THE COURT:  Okay.  Then we should -- I'm sorry, I

22   didn't organize myself here on that basis.  I guess the only

23   thing I have to ask you is your response.

24           Now that Mr. Klayman has decided to abandon his

25   position that this was within the scope of employment, he

```
1   seems to be looking for a discovery to challenge the

2   Westfall, what do you say about that?

3           MS. TULIS:  Your Honor, I will also let Ms. Smith

4   address the Westfall Act.  With respect to the complaint as

5   pleaded, the government's position is that it is facially

6   deficient in all the aspects that are detailed in our

7   briefing.  For those reasons, the government has moved to

8   dismiss under Rule 12(b)1 and under Rule 12(b)6.

9           THE COURT:  Let me get this straight.

10          What is your argument on the Fourth Amendment;

11  you, the government, and not Mueller --

12          MS. TULIS:  Yes, Your Honor.

13          THE COURT:  -- standing.

14          MS. TULIS:  Yes, Your Honor.  Clapper v. Amnesty

15  International makes clear that such speculative and

16  unsupported allegations that are not plausible on their face

17  cannot support standing for a Fourth Amendment claim of the

18  sort he --

19          THE COURT:  Do you consider these similar to the

20  claims that the same gentleman, on behalf of Dr. Corsi,

21  Mr. Klayman made in his Klayman versus Obama, Klayman versus

22  National Security Agency, and Montgomery versus Comey?  Are

23  these the kinds of claims that were made there?

24          MS. TULIS:  Your Honor, if anything, Mr. Corsi's

25  claims are even thinner in terms of alleging an injury that
```

1  could support standing, so those cases certainly provide a

2  ground to dismiss for lack of understanding.

3          THE COURT:  Why are the current ones thinner?

4          MS. TULIS:  I believe the only allegations, the

5  only factual allegation in support of Mr. Corsi's Fourth

6  Amendment claim is that he routinely speaks with persons

7  located overseas.

8          THE COURT:  He says in PRISM areas.  I don't know

9  how you know where those areas are.

10          MS. TULIS:  Exactly, Your Honor.

11          MR. KLAYMAN:  Your Honor, I have to interrupt you.

12  That is false.

13          THE COURT:  No, no, it is not your turn.  We can't

14  do that.

15          MS. TULIS:  Your Honor, correct.  So he does

16  also -- he states -- he purports, alleges that the regions

17  are surveilled by PRISM.  That is a speculative allegation

18  for the reasons we explained.  But even if that allegation

19  were credited, taken as true, he has not plausibly alleged

20  that his communications have been, are being, or would be

21  acquired incidental to the targeting of non-U.S. persons who

22  would be reasonably believed to be located overseas in such

23  regions.

24          So even if you take as true the latter allegation,

25  it still doesn't take his theory out of the realm of a

1    purely speculative chain of inferences to get to any kind of

2    injury for purposes of Article 3.

3         THE COURT:  I can't remember if this is within

4    your argument or Mueller's.  If he is saying now that it is

5    both in Mueller's individual capacity and his official,

6    where does that leave us?  And it is not a Bivens action.

7         MS. TULIS:  Are we discussing the Fourth Amendment

8    claim, Your Honor?

9         THE COURT:  6(e), Count II.

10        He has told us today that he sued Count II, only

11   Defendant Mueller.  Where does that put us, if we have an

12   individual claim, not under Bivens, and an official one?

13        MS. TULIS:  Your Honor, with respect to an

14   official claim, since that's all I'm here to speak to, Your

15   Honor can speak to the putative claim under Rule 12(b)6 on

16   multiple grounds.  One of them is that it's not plausibly

17   alleged that there was any 6(e) violation.  But in addition,

18   there is no cause of action for which the elements are

19   alleged for the reasons Your Honor already identified.

20        The right of action for a claim with respect to a

21   violation of the criminal rule 6(e) is very limited

22   according to the D.C. Circuit, and it has to be brought in a

23   special proceeding that is effectively ancillary to the

24   grand jury proceedings and, under local rules, that would

25   involve making a decision under seal to the chief judge who

1    supervises the grand jury.

2         So there is no freestanding cause of action in the

3    normal civil procedure sense where you file a complaint, get

4    discovery --

5         THE COURT:  Isn't it true -- I understand all

6    those arguments, but isn't it true that if you are suing

7    Mueller in his official capacity, that means you are suing

8    the government?  There is no Mueller at that point.  It is

9    not a Westfall issue.  You are really the entity being sued

10   at that point.

11        Put aside the individual, the individual you can

12   sue under Bivens for damages.  He is not asking for damages.

13   He said in the complaint he wants a preliminary injunction.

14   We know that under Bivens or under liability for individuals

15   personally, it is only damages and nothing else.  That is

16   clear.

17        I'm trying to understand where we are when he says

18   officially.

19        MS. TULIS:  Yes, Your Honor.  I think one

20   complication here, the only context in which the

21   D.C. circuit has recognized actions with respect to a

22   purported violation of the criminal rule 6(e) is in these

23   proceedings that relate to the grand jury proceedings.

24        So, for instance, the scant case law that exists

25   involved, for instance, I believe previously, for instance,

```
1    an office of independent counsel and allegations with

2    respect to leaks by independent counsel in the office of

3    that counsel.

4              I don't know that the --

5              THE COURT:  They were prosecuted in front of grand

6    jury judge.  I know that.  That is not my question.

7              MS. TULIS:  I understand, Your Honor.

8              THE COURT:  My question is, let's say he alleges a

9    Fourth Amendment violation.

10             MS. TULIS:  Okay.

11             THE COURT:  I'm just taking a hypothetical.  He

12   says, he is not looking for Bivens, not looking for damages,

13   he is looking for some kind of injunction.  So that is the

14   government, and he is suing Mueller under personally and

15   officially.

16             What is the action against the government?  What

17   is your response in that situation?

18             MS. TULIS:  With respect to the Fourth Amendment

19   claim?

20             THE COURT:  Yes.

21             MS. TULIS:  Your Honor, I --

22             THE COURT:  Can you sue the government directly

23   for a constitutional violation based on the act of an

24   official?  That ought to be a simple question.

25             MS. TULIS:  Your Honor, I believe --
```

1              THE COURT:  Do you know the answer?

2              MS. SMITH:  No, Your Honor, you may not sue the

3    United States.

4              THE COURT:  We'll get to it.  Let's hear from your

5    co-counsel.  I think she understands my question.

6              Let's start again.  Your name.

7              MS. SMITH:  My name is Laura Smith.  I'm here from

8    the civil division on behalf of Robert Mueller in his

9    individual capacity.

10             THE COURT:  Okay.  You are from the civil torts or

11   from federal programs or civil?

12             MS. SMITH:  Torts.

13             THE COURT:  All right.  So he is saying in

14   Count II, maybe also in Count I, "I'm suing the government;

15   I'm suing in Count I, Mueller under Bivens, and I'm suing

16   the government," I think.  I don't know.

17             Mr. Klayman, yes or no, are you suing the

18   government in Count I, or just Mueller for damages?

19             MR. KLAYMAN:  Let me just make sure I know which

20   one Count I is, Your Honor.

21             THE COURT:  That's the Fourth Amendment.

22             MR. KLAYMAN:  We're suing both.  In fact, in

23   Judge Leon's case we got an injunction against the

24   government.

25             THE COURT:  Fine.

1          MR. KLAYMAN:  The fact -- when there is a

2     constitutional violation there is no immunity here.  That

3     was not a correct statement.

4          THE COURT:  We haven't heard the statement.  All

5     right.  I just --

6          MR. KLAYMAN:  By the way, let me just point one

7     other thing out with that case.  That was vacated ultimately

8     because it was moot, because we had the U.S. Freedom Act.

9     But the law still stands in terms of this District Court in

10    what Judge Leon ruled.

11         THE COURT:  It doesn't bind me.  I think it is

12    vacated.  So I don't know what purpose one could cite it

13    for.  That's neither here nor there.

14         I'm trying to understand, we have a Count I and

15    Count II.  The U.S. Government, he is suing based on Mueller

16    official acts.  And one is a constitutional tort, the other

17    is a statutory tort.

18         What is the black-letter law?

19         MS. SMITH:  Would you like me to address Count I

20    and then Count II?

21         THE COURT:  Sure.

22         MS. SMITH:  Count I is Mr. Corsi's Fourth

23    Amendment claim.  FDIC versus Meyers said you can't recover

24    from a federal agency for an alleged constitutional

25    violation.  But as we explained in our briefs, you can in

1   some cases seek equitable or injunctive relief from the

2   federal government.

3        THE COURT:  Right.

4        MS. SMITH:  It sounds like Your Honor is already

5   aware that you can not receive equitable relief from a

6   federal employee in his or her individual capacity.

7        THE COURT:  Right.  Can you get damages against

8   the federal government if one of their agents illegally

9   searched someone?

10       MS. SMITH:  The federal government has not waived

11  sovereign immunity on constitutional claims.  So the FTCA is

12  a limited waiver of sovereign immunity that does not cover

13  constitutional torts.

14       THE COURT:  It doesn't cover constitutional torts.

15  If, though, there is a tort or constitutional violation, you

16  do go by way of the APA?

17       MS. SMITH:  I think it would depend on the tort.

18       THE COURT:  They are constitutional claims.  There

19  are ways to bring constitutional claims against the federal

20  government other than the Federal Tort Claims Act.

21       MS. SMITH:  Yes.

22       THE COURT:  That is strictly torts.

23       MS. SMITH:  Yes.

24       THE COURT:  So he can't bring them directly

25  here -- or can he?  That is all I want to know.  Can

1    Mr. Klayman sue the federal government in Count I, under

2    Fourth Amendment, or statutory claim under II directly?  He

3    can for injunctive relief.

4              MS. SMITH:  I'm sorry, I didn't hear you.

5              THE COURT:  Can he for injunctive relief?

6              MS. SMITH:  Correct.  I believe what the United

7    States has argued in its official capacity brief is that he

8    lacks standing to seek this sort of injunctive relief that

9    might otherwise be available.

10             THE COURT:  Yes, they have.  But my question is,

11   could he even get it.  Put aside standing, is he legally

12   entitled to get injunctive relief from the federal

13   government here, based on acts of the special counsel?

14             MS. SMITH:  I doubt it, but I would have to defer

15   to my colleague.

16             MS. TULIS:  Your Honor, I think I understand your

17   question now.  As a general matter, setting aside the

18   specific deficiencies of this complaint --

19             THE COURT:  I'm asking a legal question.

20             MS. TULIS:  As a general matter, there can be

21   suits brought for constitutional violations against the

22   government for injunctive relief only.

23             THE COURT:  All right.  And damages can only be

24   brought against an individual.

25             MS. SMITH:  Correct.

1          THE COURT:  All right.  Maybe it is not your part

2    of the argument, is there any injunctive relief here

3    possible, period, whether you can sue the government for it

4    or not?

5          MS. SMITH:  I share Your Honor's confusion about

6    what exactly Mr. Corsi is seeking here.

7          THE COURT:  He said in the complaint he wants

8    preliminary injunctive relief and permanent.  He's never

9    changed that, so I'm bound by that.

10          MS. SMITH:  I'm not sure exactly what he wants,

11    but he certainly can't get it from Mr. Mueller in his

12    individual capacity.

13          THE COURT:  No.  He wants to make sure nobody

14    leaks anything, I guess.  That would be an injunction

15    against the entire federal government, I guess.  I don't

16    know.  I'm having trouble with it myself.

17          You are here on Mueller's behalf.  So he has a

18    series of cases that he has cited.  Trulock is one, Hartman

19    is another.  He cited Judge Kotelly in L-O-U-M-I-E-T and

20    Haynesworth, I think.

21          How do you distinguish those; is that within your

22    brief?

23          MS. SMITH:  It is, Your Honor.  Loumiet is on

24    appeal right now.  That case came shortly after Abbasi.  It

25    also came before the D.C. Circuits opinion in Liff versus

1    Office of Inspector General.

2            So the idea that that case firmly establishes a

3    right to First Amendment retaliation Bivens claims in this

4    circuit is simply not true.

5            THE COURT:  Which case is it?  You said that there

6    has been a case?

7            MS. SMITH:  Loumiet is on appeal right now.  The

8    D.C. Circuit has issued an opinion in Liff, L-I-F-F, versus

9    Inspector General.

10           THE COURT:  What did that hold?

11           MS. SMITH:  That looked at the constellation of

12   remedies available to somebody who was alleging retaliation

13   and Bivens --

14           THE COURT:  Do you have the cite by chance?

15           MS. SMITH:  I can give it to you, but I don't know

16   it off the top of my head.

17           THE COURT:  We have it.

18           Okay.  So you are saying -- did that case reject

19   some kind of First Amendment retaliation claim?

20           MS. SMITH:  It didn't squarely reject the sort of

21   claim that Mr. Corsi is asserting, which really doesn't have

22   any sort of analogue in the D.C. Circuit, but the type of

23   analysis that Mr. Klayman is urging is inconsistent with

24   that taken by the D.C. Circuit in the Liff lift case.

25           THE COURT:  So you would agree that in Loumiet,

1    the man was –– "prosecuted" is not quite the right word.  He

2    was the subject of an enforcement action, right?

3              MS. SMITH:  That's my understanding.

4              THE COURT:  He cites a Seventh Circuit case called

5    W-H-A-R-R-I-E.  He cites his Fourth Circuit case, Trulock,

6    and he cites Hartman and Haynesworth.

7              What do you say about those cases?

8              MS. SMITH:  First I'll address Fields versus

9    Wharrie, which is the Seventh Circuit case.

10             That case found that absolute immunity did not

11   block 1983, not a Bivens claim to benefit someone wrongfully

12   convicted when a prosecutor he procured false testimony.

13   That case was about the distinction between investigative

14   acts and prosecutorial acts, and how the absolute

15   prosecutorial immunity applies in that context.  It was a

16   1983 case, and Mr. Corsi, unlike the plaintiff in that case,

17   was never prosecuted.

18             THE COURT:  The fact that it's a 1983 versus

19   Bivens doesn't matter much.  It is the same law that

20   applies, whether it is a 1983 or Bivens.  One is local, one

21   is federal.

22             MS. SMITH:  The question of availability of a

23   remedy would be different, but the applicable law tends to

24   be the same.

25             Your Honor also asked about Trulock.

1          THE COURT:   There was a case about a distinction

2     between investigatory and --

3          MS. SMITH:   Investigatory and prosecutorial acts.

4          THE COURT:   They said this was investigatory and

5     that you could be sued for it.

6          MS. SMITH:   Right.   It was a case about a person

7     had been wrongfully convicted based on false testimony --

8          THE COURT:   Given that case and given Hartman, and

9     given Moore versus Valder, how can you argue absolute

10    immunity?

11         I'm perplexed.   Doesn't this fall squarely within

12    Moore versus Valder, the case I know well?   Because this was

13    investigatory, it had to do with preparing or arguing with

14    witnesses about their testimony before the grand jury?

15         MS. SMITH:   It may be that some of what Mr. Corsi

16    is talking about here falls within the investigative bubble.

17    The problem that we have here is that the allegations are so

18    vague and speculative that we're not even really sure what

19    he thinks anyone did to violate his rights, so it makes it

20    very difficult to point to whatever particular action is at

21    issue and decide what particular immunity would apply.

22         THE COURT:   I think we've got it.   I understand it

23    to be that they wanted him to plead along the lines of the

24    papers presented to him, and he resisted because he said it

25    wasn't true that he acted as a go-between, between Stone and

1    WikiLeaks.  That's what I understand the case to be.

2            MS. SMITH:  And that may very well be, but that's

3    not what is in the complaint.

4            THE COURT:  He says it is not true, and the

5    example he gave is that -- having to do with the go-between.

6    That's the only example he has given us today.  I think

7    that's exactly what he says.  And that's the basis of his --

8    certainly abuse of process in his First Amendment.

9            They wanted him to falsely testify under oath that

10   he acted as a liaison between Roger Stone and WikiLeaks,

11   leader Julian Assange, concerning the public release of

12   e-mails obtained from the DNC.  He is arguing that he

13   figured this out as a matter of inference, that's

14   paragraph 21, not that he actually knew anything.

15           And they obviously, based on their proposed

16   information in statement of offense, didn't actually believe

17   all that.  But that's what he says right here.

18           So, put aside the vagueness of it for a minute and

19   tell me how this is covered by absolute immunity.

20           MS. SMITH:  We've asserted absolute immunity only

21   to the extent that Mr. Corsi is challenging, for example,

22   charging decisions and presentations to the grand jury.  The

23   way the complaint was drafted left open that possibility, so

24   we felt it appropriate to cover the waterfront.

25           To the extent that absolute immunity doesn't cover

1    some of what has been so vaguely alleged here, then

2    Mr. Mueller, in his personal capacity, has the defenses of

3    lack of proper service, the fact that it would be

4    inappropriate to apply a Bivens remedy even this novel

5    context, the fact that Mr. Corsi has not alleged any

6    personal involvement on the part of Mr. Mueller, and the

7    fact that there is no allegations of clearly established

8    constitutional right violations.  All of these entitle

9    Mr. Mueller's suit dismissal in his individual capacity.

10            THE COURT:  Let's just finish up.

11            Loumiet, how do you distinguish that, other than

12   you think it is bad law?

13            MS. SMITH:  Well.  Again that was a case where

14   there were actual proceedings brought against the plaintiff.

15            THE COURT:  Hartman?

16            MS. SMITH:  Hartman was a case about whether

17   probable cause -- I assume Your Honor means the Supreme

18   Court Hartman.

19            THE COURT:  Yes.

20            MS. SMITH:  Hartman was the case about whether

21   probable cause has been proven in the context of a

22   prosecution claim.  It did not recognize the First Amendment

23   Bivens claim.  The Supreme Court recognized that in its

24   subsequent decision in Abbasi, Ziglar versus Abbasi.

25            THE COURT:  I thought they recognized it in the

1    other case, what was it, R-I-E-H-L-E, that there was no

2    First Amendment claim recognized.

3              MS. SMITH:  I think the D.C. Circuit has also

4    recognized that.

5              THE COURT:  Okay.  So Hartman, you say,

6    established -- we can debate on whether it recognized such a

7    claim, but you have to have at least a no probable cause

8    allegation.  Some of Haynesworth has survived.

9              MS. SMITH:  Haynesworth was a case about someone

10   who was actually prosecuted, which is distinguishable in the

11   obvious reasons.  But here, the only allegation is a threat

12   of prosecution.

13             Again, these other cases were all pre Ziglar

14   versus Abbasi, which tells us that when we're looking about

15   the propriety of implying the Bivens remedy, it is a novel

16   concept if you are going beyond Bivens, Davis, and Carlson.

17             THE COURT:  And the Seventh Circuit case, Wharrie?

18             MS. SMITH:  I believe that's the Fields case,

19   Fields versus Wharrie?

20             THE COURT:  Yes.

21             MS. SMITH:  And I believe you asked about Trulock

22   as well?

23             THE COURT:  Yes, there were two.

24             MS. SMITH:  Trulock relied on the Conley standard

25   for pleading which was retired -- excuse me -- in Bell

1    Atlantic versus Twombly, the no set of facts language.   So

2    it is no longer a good law in terms of pleading standard.

3                    THE COURT:  Which did?

4                    MS. SMITH:  Trulock versus Freeh, the Fourth

5    Circuit case.  It is also a case that was pre-Iqbal, which

6    made it extremely clear that personal participation is

7    absolutory required for Bivens liability, the Supreme Court

8    case, and it also came before Ziglar versus Abbasi, which

9    concerned the propriety of expanding the Bivens remedy.

10                   THE COURT:  When was Iqbal?

11                   MS. SMITH:  2007, Your Honor.

12                   THE COURT:  Time goes by quickly.

13                   Any further responses to his arguments?

14                   Don't we have a power to impose civil contempt in

15   a case like this, when I don't control the grand jury?

16                   MS. SMITH:  I'm not sure of the answer.  I've

17   tried to find out.

18                   THE COURT:  It is novel, that's for sure.  I know

19   that Judge Norma Holloway Johnson had a trial on one of

20   these during Star's investigation.  There was another case.

21   Marion Barry, I think, which also involved Aubrey Robinson

22   as the head of the grand jury.  But I never heard of some

23   other being involved.

24                   Anything else you want to respond to, Mr. Klayman?

25                   MS. SMITH:  No, Your Honor.  To the extent

```
 1   Mr. Klayman has raised any points relevant to the individual
 2   capacity claims, they've been fully addressed in our briefs.
 3   I won't take up any more of your time than I need to.
 4               THE COURT:  Thank you.
 5               You have five minutes, sir.
 6               MR. KLAYMAN:  Thank you, Your Honor.
 7               I may respond to that presentation.  If Your Honor
 8   has any more questions, happy to answer it.
 9               With regard to what was alleged in terms of the
10   illegal surveillance, we're very, very clear in our
11   complaint that it dealt with obtaining the name of Andrew
12   Stettner, who is the son of Mrs. Corsi, the stepson of
13   Dr. Corsi.  There was no way that they could know that name
14   unless text messages were being intercepted.
15               THE COURT:  Why not?  What is Mrs. Corsi's name?
16               Previously did she go by another name before she
17   became Mrs. Corsi?
18               MR. KLAYMAN:  I never asked her.  That was not her
19   maiden name in any event.  In any event, that's what we
20   allege in the complaint.
21               And then the author, Jim Garrow, who developed
22   assistant DEAF system, did an analysis of Dr. Corsi's cell
23   phone and found that it was being subject to government
24   surveillance.  In that respect it is more --
25               THE COURT:  You used the word "attempted"
```

1    surveillance.  I couldn't tell what you meant, that they

2    concluded that there was an attempt --

3              MR. KLAYMAN:  I misspoke.  That there was

4    surveillance, that they were getting into the cell phones,

5    the government was getting into the cell phones.

6              In that respect, the point I'm making is that our

7    allegations here are more specific than they were with

8    regard to the cases in front of Judge Leon, where he

9    enjoined the intelligence agencies, the NSA.  Because in

10   that case, all we had was an order by the Foreign

11   Intelligence Surveillance Court which allowed to access to

12   Verizon telephone records.  Here we have specific

13   allegations of violations of the Fourth Amendment.

14             THE COURT:  Do you have just -- is this a Fourth

15   Amendment claim, or is it a claim based on FISA?

16             MR. KLAYMAN:  It is a Fourth Amendment claim.

17             FISA, I don't know if you've ever been on the

18   court or not, but that's a Star Chamber proceeding.  There

19   is no private right there to participate.  They've been

20   debating whether to have a public advocate represent private

21   interests, but it never happened.

22             THE COURT:  So is it basically irrelevant whether

23   he is making telephone calls to people in certain foreign

24   territories?

25             MR. KLAYMAN:  It is not irrelevant.  That's

1    another section, that's section 702, which is about ready to

2    be reauthorized.  Every communication overseas --

3              THE COURT:  Is that the Patriot Act, 702?

4              MR. KLAYMAN:  Foreign Surveillance Intelligence

5    Act, section 702.

6              THE COURT:  Are you claiming they violated that.

7              MR. KLAYMAN:  I am claiming that they violated

8    that, and the Patriot Act, which is now the U.S.A. Freedom

9    Act.

10             THE COURT:  You are arguing that they violated

11   702 --

12             MR. KLAYMAN:  Both.

13             THE COURT:  -- the Patriot Act and the Fourth

14   Amendment.

15             MR. KLAYMAN:  Yes, that's when I objected to her

16   saying it was only a question of making overseas calls.  It

17   is not.  Every overseas call is picked up under 702.  It is

18   surveilled.

19             THE COURT:  What you do mean, every overseas call

20   is picked up?

21             MR. KLAYMAN:  Every call that you, Your Honor,

22   would make to wherever your family hails from or wherever is

23   picked up by the National Security Agency, FBI and CIA.

24             THE COURT:  No matter where I call?

25             MR. KLAYMAN:  No matter where you call.

1          THE COURT:  But you're just saying it's stored --

2          MR. KLAYMAN:  So be careful.

3          THE COURT:  -- but not that they listen to it.

4     There was a point in time that they were picking it up as a

5     mega data, right?

6          MR. KLAYMAN:  Yes, but in fact, the Inspector

7     General of the NSA has done a number of studies in which

8     they found that people were, at the NSA, listening to

9     content.  In a period of six months, this was cited in the

10    Leon case, 3,000 overseas messages were listened to by NSA

11    employees.

12         THE COURT:  What period of time was that?

13         MR. KLAYMAN:  This is going back a few years.

14         THE COURT:  When did it end?

15         MR. KLAYMAN:  I don't think it ever ended.

16         THE COURT:  They didn't renew it.

17         MR. KLAYMAN:  Well, this is why our cases

18    triggered the U.S.A. Freedom Act.  Congress then enacted

19    that.  But we now know, for instance, that President Trump,

20    his family, his colleagues, were also surveilled despite the

21    U.S.A. Freedom Act, so the illegal surveillance continued

22    on.  And, of course, Dr. Corsi was implicated with regard to

23    President Trump and Russian collusion and everything else.

24         THE COURT:  Okay.

25         MR. KLAYMAN:  One other thing, and it is a small

1    point, but nit is also a major point in a way, that

2    Dr. Corsi was allowed to amend his testimony in front of the

3    grand jury, in front of Special Counsel Robert Mueller.

4    They permitted him to do that.  And despite the amended

5    testimony, they accused him of lying and threatened him with

6    prosecution.

7            So I wanted to clear that up on the record.  But

8    this was a gradual process.  It was a browbeating for many,

9    many months.  They thought they could squeeze water out of a

10   lemon.  I don't mean to call Dr. Corsi a lemon, but they

11   were trying to squeeze the lemon, and the lemon couldn't --

12   couldn't be squeezed.

13           And they knew -- and this is important, Your

14   Honor, it gets back to the surveillance -- is that the

15   government has access to every communication you make over

16   internet, e-mail, telephone, cell phones.  Of course, we

17   allege the illegal surveillance.  They knew that what he was

18   telling was the truth, but they beat the heck out of him

19   anyway because they needed that testimony to save face

20   because their investigation was going down.

21           And we now know, it is not even dispute, from the

22   standpoint of Special Counsel Mueller, that there was no

23   proveable Russian collusion, regardless of anything else

24   that's being alleged on Capitol Hill.

25           THE COURT:  The only thing they were charging him

1   with were false statements.  I don't need to worry about

2   Russian collusion.  The question is whether there is some

3   probable cause for the basis of the charge of false

4   statements.  Whether it had anything to do with anything

5   more is not before me.  Okay.

6          MR. KLAYMAN:  Thank you for your time.  I commend

7   you on giving us this opportunity.  There are not many

8   judges in this courthouse any more that will hold oral

9   argument on these highly charged issues, and I thank you for

10  that.

11         THE COURT:  You are welcome.  I take it under

12  advisement.  Thank you.

13         (Whereupon at 4:17 p.m., the hearing adjourned.)

14

15                          ooOoo

16

17              CERTIFICATE OF REPORTER

18         I, Lisa Walker Griffith, certify that the foregoing

19  is a correct transcript from the record of proceedings in the

23  _____   10-4-19
    Lisa Walker Griffith, RPR           Date

24

25